## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| the Estate of Byron W. Fouty,<br>by and through its Personal Representative,<br>Gordon K. Dibler, Jr., | : | |
| | : | |
| Maria Duran | : | |
| | : | |
| and | : | |
| | : | |
| Ramon D. Jiménez | : | |
| | : | |
| and | : | |
| | : | |
| Yaderlin Jiménez | : | |
| | : | |
| and | : | |
| | : | |
| Andy D. Jiménez | : | **COMPLAINT** |
| | : | |
| and | : | |
| | : | |
| Bryant Jiménez | : | |
| | : | |
| and | : | |
| | : | |
| AV, by and through his Guardian<br>Ramon D. Jiménez | : | |
| | : | |
| and | : | |
| | : | |
| Irving L. Jiménez | : | |
| | : | |
| and | : | |
| | : | |
| Andy J. Jiménez | : | |
| | : | |
| and | : | |
| | : | |
| the Estate of Alex R. Jiménez,<br>by and through its co-Personal Representatives,<br>Yaderlin Jiménez and Andy D. Jiménez, | : | |
| | : | |
| and | : | |
| | : | |

Gordon K. Dibler, Jr.                                    :
                                                        :
        and                                             :
                                                        :
Sarah Haverlock                                         :
                                                        :
        and                                             :
                                                        :
the Estate of Mickey W. Fouty,                          :
by and through its Personal Representative,             :
Ronald L. Fouty,                                        :
                                                        :
        and                                             :
                                                        :
Hilary North, by and through her                        :
Guardian, Sarah Haverlock                               :
                                                        :
                          Plaintiffs,                   :
                                                        :
v.                                                      :
                                                        :
SYRIAN ARAB REPUBLIC                                    :
Damascus, SYRIA                                         :
                                                        :
and                                                     :
                                                        :
Syrian Military Intelligence                            :
(al-Mukhabarat al-`Askariya)                            :
Syrian Ministry of Defense                              :
Omayad Square                                           :
Damascus, SYRIA                                         :
                                                        :
and                                                     :
                                                        :
President Bashar al-Asad                                :
Office of the President                                 :
Damascus, SYRIA                                         :
                                                        :
                          Defendants                    :
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .........:


**COMPLAINT**

Plaintiffs bring this action pursuant to the provisions of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, *et seq*. (hereinafter "FSIA"). This action arises out of the personal injuries and wrongful deaths of Alex R. Jiménez and Byron W. Fouty in or near Baghdad, Iraq which occurred sometime after May 12, 2007 when they were kidnapped and at a time prior to July 8, 2008 when their remains were discovered. These murders were carried out by a Foreign Terrorist Organization so designated by the U.S. Department of State, operating with material support and resources provided by Defendant the Syrian Arab Republic (hereinafter "Syria"), a State-Sponsor of Terrorism, having been so designated by the U.S. Department of State in 1979 and having remained so designated at all times referenced herein, and by the other Defendants who supported these acts of terrorism against United States citizens. The terrorists committed, and Alex R. Jiménez and Byron W. Fouty were the victims of, acts of "torture" and "extrajudicial killings" as defined in the Torture Victim Protection Act, 28 U.S.C. § 1350 (hereinafter "TVPA"), and "personal injury" and "death" as required by 28 U.S.C. § 1605A, thereby the Plaintiffs, and each of them, as American victims of Syrian terrorism, bring this action and recover damages pursuant to applicable law.

Plaintiffs state in support of their Complaint and allege the following:

## THE PARTIES

### A.     The Plaintiffs

1.     This action is brought by the Plaintiffs, by and through their counsel, each in their individual capacity and, as appropriate, in their capacity as Administrator, Executor or Personal Representative of the estates more particularly described in the caption of this action, for their own benefit, for the benefit of each estate and for the benefit and on

behalf of all those legally entitled to assert a claim under the FSIA, and state common law and statutory law.

### The Jiménez Family

2.      Plaintiff Maria Duran at all times relevant hereto was the biological mother of Alex R. Jiménez. Plaintiff Maria Duran is a citizen of the United States of America who resides in the State of New York. Plaintiff Maria Duran can sue and be sued in this Court.

3.      Plaintiff Ramon D. Jiménez at all times relevant hereto is and was the biological father of Alex R. Jiménez. Plaintiff Ramon D. Jiménez is a citizen of the Dominican Republic who resides in the State of Massachusetts. Plaintiff Ramon D. Jiménez can sue and be sued in this Court.

4.      Plaintiff Yaderlin Jiménez at all times relevant hereto is and was the wife of Alex R. Jiménez, and is now his widow. Plaintiff Yaderlin Jiménez is a citizen of the United States of America who resides in the State of New York. Plaintiff Yaderlin Jiménez can sue and be sued in this Court.

**5.**      Plaintiff Andy D. Jiménez at all times relevant hereto is and was the biological full brother of Alex R. Jiménez. Plaintiff Andy D. Jiménez is a citizen of the United States of America who resides in the State of New Jersey. Plaintiff Andy D. Jiménez can sue and be sued in this Court.

6.      Plaintiff Bryant Jiménez at all times relevant hereto is and was the biological full brother of Alex R. Jiménez. Plaintiff Bryant Jiménez is a citizen of the United States of America who resides in the State of North Carolina. Plaintiff Bryant Jiménez can sue and be sued in this Court.

7.      Plaintiff AV at all times relevant hereto is and was the biological half-blood brother of Alex R. Jiménez. Plaintiff AV is a citizen of the United States of America who resides in the State of New York. Plaintiff AV is a minor and is represented in this action by his Guardian Ramon D. Jiménez, and can sue and be sued in this Court.

8.      Plaintiff Irving L. Jiménez at all times relevant hereto is and was the biological half-blood brother of Alex R. Jiménez. Plaintiff Irving L. Jiménez is a citizen of the United States of America who resides in the State of Florida. Plaintiff Irving L. Jiménez can sue and be sued in this Court.

9.      Plaintiff Andy J. Jiménez at all times relevant hereto is and was the biological half-blood brother of Alex R. Jiménez. Plaintiff Andy J. Jiménez is a citizen of the United States of America who resides in the State of Florida. Plaintiff Andy J. Jiménez can sue and be sued in this Court.

10.     Plaintiff the Estate of Alex R. Jiménez is an estate existing under the law of the State of Massachusetts, represented by its co-Personal Representatives Yaderlin Jiménez and Andy D. Jiménez. Alex R. Jiménez was, at the times of the acts alleged, and at all other times relevant hereto, a citizen of the United States of America. Alex R. Jiménez was, at all times relevant hereto, a victim of "torture" and "extrajudicial killing" as defined in the TVPA, and "personal injury" and "death" as required by 28 U.S.C. § 1605A. Plaintiff the Estate of Alex R. Jiménez can sue and be sued in this Court.

**The Fouty Family**

11.     Plaintiff Gordon K. Dibler, Jr. at all times relevant hereto is and was the stepfather of Byron W. Fouty. Plaintiff Gordon K. Dibler, Jr. is a citizen of the United

States of America who resides in the State of Michigan. Plaintiff Gordon K. Dibler, Jr. can sue and be sued in this Court.

12.     Plaintiff Sarah Haverlock at all times relevant hereto is and was the biological half-blood sister of Byron W. Fouty. Plaintiff Sarah Haverlock is a citizen of the United States of America who resides in the State of North Carolina. Plaintiff Sarah Haverlock can sue and be sued in this Court.

13.     Plaintiff the Estate of Mickey W. Fouty is an estate existing under the law of the State of Michigan, represented by its Personal Representative Ronald L. Fouty. Mickey W. Fouty at all times relevant hereto is and was the biological father of Byron W. Fouty. Plaintiff the Estate of Mickey W. Fouty can sue and be sued in this Court.

14.     Plaintiff the Estate of Byron W. Fouty is an estate existing under the law of the State of Michigan, represented by its Personal Representative Gordon K. Dibler. Byron W. Fouty was, at the times of the acts alleged, and at all other times relevant hereto, a citizen of the United States of America. Byron W. Fouty was, at all times relevant hereto, a victim of "torture" and "extrajudicial killing" as defined in the TVPA, and "personal injury" and "death" as required by 28 U.S.C. § 1605A. Plaintiff the Estate of Byron W. Fouty can sue and be sued in this Court.

15.     Plaintiff Hilary North, *aka* Hilary Meunier, *aka* Hilary Dibler, at all times relevant hereto is and was the biological mother of Byron W. Fouty. Plaintiff Hilary North is a citizen of the United States who resides in the State of Texas. Plaintiff Hilary North can sue and be sued in this Court. Plaintiff Hilary North is represented in this action by her Guardian, her daughter, Sarah Haverlock.

B.  **The Defendants**

16.     Defendant Syria is a foreign state that was designated as a state sponsor of terrorism pursuant to section 60 of the Export Administration Act of 1979, 50 U.S.C. App. § 2405, section 620(A) of the Foreign Assistance Act of 1961, 22 U.S.C. § 2371, and section 40 of the Arms Export Control Act, on December 29, 1979, and has remained so designated, continuously, ever since. Syria has been included on the U.S. State Department's list of state sponsors of terrorism longer than any other state.

17.     The U.S. State Department in its Country Reports on Terrorism 2009 states that in the late 1990s, Abu Mus'ab al-Zarqawi ("al-Zarqawi"), organized a terrorist group called al-Tawhid wal-Jihad ("TWJ") in opposition to the presence of U.S. and Western military forces in the Islamic world and also the West's support for the existence of Israel. In late 2004, al-Zarqawi joined al-Qaeda and pledged allegiance to Usama bin Laden. After this, TWJ became known as al-Qaeda in Iraq ("AQI"). Al-Zarqawi led AQI as its first Emir. In January 2006, AQI created and led the Mujahidin Shura Council ("MSC"), an umbrella organization incorporating the various Sunni terrorist groups in Iraq. Following the death of al-Zarqawi in June 2006, AQI was led by al-Zarqawi's appointed successor, AQI's second Emir, Abu Ayyub al-Masri a.k.a. Abu Hamza al-Muhajir ("al-Masri"). AQI claimed its attacks under the MSC banner until mid-October 2006, when the groups included in MSC rebranded themselves the Islamic State of Iraq ("ISI"). al-Masri served as military commander, War Minister and Prime Minister of ISI from October 2006 until his death in April 2010.

18.     Syria, at all times pertinent to this action, provided material support and resources to al-Zarqawi, to his successor al-Masri, and to the terrorist organization that

al-Zarqawi and later al-Masri built and led, known alternatively as TWJ, AQI, MSC and ISI (this terrorist organization under its successive names is commonly referred to, and is referred to for the purposes of this Complaint, as "AQI").

19.    Al-Zarqawi, al-Masri and AQI carried out a murderous campaign of terrorism in, among other places, Iraq and Jordan, with the sponsorship, material support and resources furnished by Syria. Syria, through its actions, is and has been a state sponsor of al-Zarqawi, al-Masri and AQI, within the meaning of 28 U.S.C. § 1605A by providing them with funding, equipment, arms, direction, logistical support, resources and/or training for their terrorist activities.

20.    Defendant Syrian Military Intelligence is the principal Syrian intelligence service through which Syria sponsored al-Zarqawi, al-Masri and AQI, which caused the terrorist acts described below.

21.    Defendants President Bashar al-Assad performed acts within the scope of his office, which caused the extrajudicial killings and personal injuries resulting from the acts of terrorism described herein. Accordingly, Defendants are jointly and severally liable to Plaintiffs.

22.    Syria as well as the Syrian Military Intelligence, and President Bashar al-Assad, are directly and/or vicariously responsible for the actions of their co-Defendants because they materially supported and sponsored al-Zarqawi, al-Masri and AQI. Accordingly, Defendants are jointly and severally liable to Plaintiffs.

### JURISDICTION AND VENUE

23.    Jurisdiction over the subject matter of this case arises under 28 U.S.C. §§ 1330(a), 1331, 1332(a)(2) and 1605A.

24.    Syria and the Syrian Military Intelligence are subject to suit in the courts of the United States as sponsors of and participants in al-Zarqawi, al-Masri and AQI's state-sponsored terrorism pursuant to the FSIA and related statutes.

25.    Defendants President Bashar al-Assad is subject to suit in the courts of the United States pursuant to the FSIA and related statutes.

26.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(4), which provides, in pertinent part, that a civil action against a foreign state may be brought in the United States District Court for the District of Columbia.

27.    28 U.S.C. § 1605A(c) provides a federal private right of action against a foreign state that is or was a State Sponsor of Terrorism, and also against any official, employee or agent of that foreign State while acting within the scope of his or her office, employment or agency, for wrongful death, personal injury and related torts caused by an act of torture or extrajudicial killing, or the provision of material support and resources for such acts.

28.    28 U.S.C. § 1605A(b) provides that suits under 28 U.S.C. § 1605A(c) must be commenced no later than 10 years after the cause of action arose. Though Alex R. Jiménez and Byron W. Fouty were captured on May 12, 2007, their official status was "missing" and their fate remained unknown and unknowable, even at the very highest level of the United States government, until their remains were found and positively identified using dental and DNA technology 14 months later on July 11, 2008. The detailed results of forensic investigation conducted by the Armed Forces Medical Examiner, confirming death and torture while in captivity, were not released to the families until August 1, 2008.

## THE KIDNAPPING, TORTURE AND EXECUTION
## OF ALEX R. JIMÉNEZ AND BYRON W. FOUTY

29.   Initially, al-Zarqawi and AQI focused their operations on Jordan. With Syrian material support and resources, al-Zarqawi and AQI assassinated U.S. diplomat Laurence Michael Foley in Amman, Jordan in October, 2002. Further, with Syrian material support and resources, al-Zarqawi and AQI perpetrated "Jordan's 9-11," the simultaneous suicide bombing of the Radisson SAS, Grand Hyatt and Days Inn hotels in Amman, Jordan in November, 2005.

30.   On March 20, 2003, a multinational force led by the United States invaded Iraq. The force toppled the regime of Saddam Hussein, and established a long-term presence intended to create the conditions necessary for the creation of a democratic form of government in Iraq. Syria formally opposed the invasion, as well as organized a secret terrorist war against Iraq and those seeking to support its new government. Syria's Foreign Minister stated publicly that it was in Syria's interest to see the American invasion of Iraq fail.

31.   As a result of the invasion, al-Zarqawi and AQI shifted their focus from Jordan to Iraq, and to ejecting the United States from Iraq. Al-Zarqawi concentrated his fighters in an area of Iraq known as the "Sunni Triangle" or "Triangle of Death," and commenced attacks on U.S. armed forces and civilians.

32.   AQI terrorists developed a *modus operandi* that included kidnapping members of the United States armed forces and civilians, holding them in captivity, torturing them, and ultimately executing them. They used the Internet and news media outlets to publish images and videos of their prisoners in order to turn Western, and in

particular, American public opinion against the ongoing American presence in Iraq, and as part of their campaign to eject American forces from Iraq. Syria wanted to destabilize Iraq and prevent the United States from succeeding there. These were and are the shared political goals of AQI and the Syrian regime in Iraq.

33.    On April 9, 2004, with material Syrian support and resources, al-Zarqawi and AQI ambushed a fuel convoy traveling within the Sunni Triangle, and kidnapped U.S. Army Staff Sgt. Matt Maupin. AQI tortured Maupin, and later executed him, while he was in AQI captivity.

34.    On September 16, 2004, with material Syrian support and resources, al-Zarqawi and AQI kidnapped American businessmen Olin E. "Jack" Armstrong and Jack L. Hensley. AQI tortured both men, and later executed them, while they were in AQI captivity.

35.    On June 7, 2006, al-Zarqawi was killed in an air strike carried out by American forces. An MSC website immediately named al-Masri as Zarqawi's successor and the new leader of MSC. On June 15, 2006, the United States military acknowledged that al-Masri had succeeded al-Zarqawi as the new leader of MSC. The U.S. State Department acknowledges this succession in its Country Reports on Terrorism 2007, and notes that al-Masri issued a statement pledging to continue what al-Zarqawi began.

36.    On June 16, 2006, with Syrian material support and resources, al-Masri and AQI terrorists ambushed an observation post, and abducted two soldiers, including U.S. Army Private First-Class Kristian Menchaca, near Youssifiyah, Iraq and within the infamous "Triangle of Death". AQI tortured Menchaca, and later executed him, while he was in AQI captivity.

37.    AQI terrorists published or caused to be published videos which depicted the torture and killings of Kristian Menchaca, Olin E. "Jack" Armstrong, and Jack L. Hensley, among others.

38.    Staff Sgt. Alex R. Jiménez and Specialist Byron W. Fouty were both deployed to Iraq as part of the 4th Battalion, 31st Infantry Regiment, 2nd Brigade Combat Team, 10th Mountain Division.

39.    On May 12, 2007, with Syrian material support and resources, al-Masri and AQI terrorists ambushed another observation post outside Mahmudiyah, Iraq, near the area in which Menchaca had been abducted, tortured and executed by AQI in June 2016. Alex R. Jiménez, Byron W. Fouty and Private First-Class Joseph Anzack were helping to man the observation post, and were captured by AQI terrorists in the ambush.

40.    United States forces backed by Iraqi army personnel commenced a search for the abducted men.

41.    On May 14, 2007, two days after the abduction, ISI posted statements to militant websites claiming responsibility for the abduction, and calling on United States forces to halt their search for Alex R. Jiménez, Byron W. Fouty, and Anzack if they wanted them back alive.

42.    On May 23, 2007, Anzack's body was recovered from the Euphrates River downstream from the site of the ambush.

43.    On June 4, 2007, ISI posted a 10-minute video branded with the logo of the ISI media production house to a militant website, and it was aired by television networks around the world. In an Arabic audio commentary on the video, ISI declared that it had

killed Alex R. Jiménez and Byron W. Fouty because the United States had not heeded its warning to abandon the search effort.

44.   The ISI video included footage of three masked and black clad men standing around a stand displaying a diagram of the area of the abduction, apparently the planning stage of the attack. The ISI video also included nighttime footage of an actual attack. The ISI video then shows images taken from a broadcast by Arabic language television network al-Jazeera of coalition forces searching fields. The ISI video shows images of the personal effects of Alex R. Jiménez and Byron W. Fouty, including their credit cards, a crucifix, $50 bills and Iraqi currency. The ISI video concludes with close-up images of the official Department of Defense military identification cards belonging to Alex R. Jiménez and Byron W. Fouty, bearing their names and photographs.

45.   Above the military identification cards, written in Arabic, appeared the message: "Bush is the reason for the loss of your POWs." ISI stated that Alex R. Jiménez and Byron W. Fouty were dead and buried, and mocked the United States by asserting that their bodies would never be returned or found.

46.   Brigadier General Kevin Bergner, the chief military spokesman in Baghdad, stated, "We are analyzing the video, however it doesn't appear to contain any definitive evidence indicating the status of our missing soldiers." Military commanders suspected that ISI sought to drag out the process of discovery, deny closure to the families of the missing soldiers and the thousands of Iraqi and American troops searching for them. The Alex R. Jiménez and Byron W. Fouty families continued to hope and pray that Alex and Byron were alive.

47.    On June 9, 2007, coalition forces recovered personal effects of Alex R. Jiménez and Byron W. Fouty, including their Department of Defense military identification cards, along with video production equipment and computers, during the raid of a known ISI safe house near Samarra, Iraq, also within the "Sunni Triangle".

48.    In October 2007, coalition forces recovered weapons issued to Alex R. Jiménez and Byron W. Fouty in Fetuah, Iraq.

49.    In November 2007, coalition forces recovered video evidence depicting weapons and equipment taken from Alex R. Jiménez and Byron W. Fouty in Iskandariyah, Iraq, south of Baghdad.

50.    On July 1, 2008, coalition forces captured an AQI terrorist reported to be the leader of multiple AQI cells, south of Baghdad. The captured AQI terrorist stated that he knew where the bodies of Alex R. Jiménez and Byron W. Fouty could be found.

51.    On July 8, 2008, the captured AQI terrorist led coalition forces to a site nearly 20 kilometers south of the May 12, 2007 ambush site, where he said the remains of Alex R. Jiménez and Byron W. Fouty were located. Coalition forces searched the area and identified human remains, handcuffs, and also various equipment and clothing belonging to Alex R. Jiménez and Byron W. Fouty.

52.     On July 9, 2008, an Army Criminal Investigation Division forensics team arrived at the site to survey the area and collect evidence. The human remains and other evidence were transported to Dover Air Force Base, and then to the Armed Forces Medical Examiner for forensic examination.

53.    On July 10, 2008, the Armed Forces Medical Examiner positively identified the human remains recovered the day prior in Iraq, as the remains of Alex R. Jiménez and

Byron W. Fouty. The Jiménez and Fouty families were immediately informed. This was the very first moment that the Jiménez and Fouty families knew that Alex R. Jiménez and Byron W. Fouty were dead and not just missing.

54.    This was also the first moment that the United States government, even at the highest level, knew that Alex R. Jiménez and Byron W. Fouty were dead.  As late as June 6, 2008, President Bush had written to Byron's stepfather Gordon Dibler: "I was honored to welcome you to the Oval Office on Memorial Day. Laura and I continue to pray for Byron's safe return."  On July 17, 2008, President Bush sent his condolences: "I am deeply saddened by the loss of your stepson, Specialist Byron W. Fouty, USA."

55.    The Armed Forces Medical Examiner did not complete its forensic investigation and finalize and release its autopsy reports until August 1, 2008. The reports provide the first evidence that Alex R. Jiménez and Byron W. Fouty were physically tortured and died in captivity. The official Army Report of Casualty issued for each man – Alex's on July 17, 2008 and Byron's on July 16, 2008 - concludes that he died while in captivity. Both Alex R. Jiménez and Byron W. Fouty were awarded the Prisoner of War medal posthumously. Following the 2003 invasion of Iraq, no more than ten American soldiers were abducted and held in captivity by AQI or other militant groups.

56.    The abduction, torture and extra-judicial killings of Alex R. Jiménez and Byron W. Fouty are a continuation of the strategy and pattern set by AQI with its abduction, torture and executions of Maupin, Armstrong, Hensley, and Menchaca, among others. All were intended to demoralize United States troops, and to terrorize the victims' families and all other United States civilians, in an effort to influence public opinion and policy-making and to eject the United States from Iraq.

**DEFENDANTS' SPONSORSHIP AND MATERIAL SUPPORT OF
AL-ZARQAWI, AL-MASRI AND AQI**

57.     Defendants' sponsorship and material support of al-Zarqawi, his successor
al-Masri and AQI must be understood in terms of the totalitarian nature of the Syrian
regime, and in the context of its long history of employing terrorism as a tool for
advancing its domestic and international agendas.

58.     The Syrian Arab Republic is a republic in name only. In reality, it is a
dictatorship and police state that strategically exhibits only the external forms of a
democratic regime. Its constitution vests one party – the Arab Socialist Ba'ath Party –
with leadership functions in the State and society. It also vests broad powers in the person
of the President, making him Secretary General of the Ba'ath Party and leader of the
National Popular Front, a coalition of smaller minority political parties that are
authorized to exist by the regime in order to create the appearance of a multi-party
political system. The President has the power to issue laws, and since 1963 an Emergency
Law has been in force that suspends most constitutional protections for Syrians. The
President controls the legislative process.

59.     In 1966, Syrian Ba'athists conducted a coup d'état. The Ba'athists
eliminated all political parties in opposition. Hafez al-Assad was appointed Minister of
Defense. Hafez al-Assad led another coup in 1970, in which the Ba'ath party was purged
of internal opposition, its leaders were jailed, and Hafez al-Assad installed as President of
the police state.

60.     The al-Assad family has controlled the Syrian regime without interruption
for forty years, since 1971. Hafez al-Assad had a three-decade Presidency, lasting from
1971 to 2000, in which he was confirmed President in unopposed referenda five

16

consecutive times. He was succeeded by his son Bashar al-Assad in 2000. Bashar al-Assad was confirmed as President, leader of the Ba'ath Party and leader of the Army, for a 7-year term, by an unopposed referendum held in 2001 in which he claimed 97.2% of the vote. He was re-appointed in another unopposed referendum in 2007, this time claiming 97.6% of the vote.

61.    Members of President al-Assad's own minority sect, the al-Awali clan, control most key positions in the Syrian military and Syrian intelligence and security services. The Ba'ath Party is heavily influenced by the Syrian military and Syrian intelligence and security services, the former consuming a large share of Syria's economic resources. The President and his senior aides in the Syrian military and Syrian intelligence and security services make most important decisions in Syrian political and economic life, and all critical national security decisions.

62.    There are more than a dozen security services in Syria, some overlapping in their domains, to make sure that the whole of Syrian territory is covered. These security services answer directly to President Bashar al-Assad, his brother General Maher al-Asad, commander of the Syrian Republican Guard, and until 2012 his now-deceased brother-in-law General `Asif Shawkat. General Shawkat was married to Bushra al-Assad, President al-Assad's sister. In 2001, General Shawkat was named Deputy Director of Syrian Military Intelligence, one of the main branches of the Syrian intelligence apparatus. From 2005 to 2009, he assumed control of the entire Military Intelligence apparatus. In July 2009, he was upgraded to the rank of General and named as deputy Chief of Staff. He died in July 2012.

63.     Syria is a dictatorship organized to maintain 100% control of Syria by the Assad family, and the minority sect which the family belongs to. The security services cannot and do not act on the scale required to facilitate, coordinate and support the insurgency, or any other foreign policies that are of a critical nature, in Iraq, al-Zarqawi, al-Masri or AQI without President al-Assad's explicit authorization.

64.     Support for al-Zarqawi, al-Masri, AQI and later ISI from Syrian territory or Syrian government actors could not have been accomplished without the authorization of the Syrian government and Syrian Military Intelligence through President al-Assad and General Shawkat. Syria's own Foreign Minister once publicly admitted, with reference to terrorist attacks carried out by the Abu Nidal Organization with Syrian material support and sponsorship, "Whoever knows my government must realize that such attacks could not be carried out without its awareness."

65.     A U.S. Department of State Bulletin published in 1987 states: "Available evidence indicates that Syria prefers to support groups whose activities are generally in line with Syrian objectives rather than to select targets or control operations itself. Damascus utilizes these groups to attack or intimidate enemies and opponents and to exert its influence in the region. Yet at the same time, it can disavow knowledge of their operations. Such Syrian-supported groups have carried out scores of attacks against Palestinian and other Arab, Turkish, Israeli, and Western targets…"

66.     The Bulletin lists many examples of Syrian material support and sponsorship of terrorism and terrorist organizations. A sampling of these includes:

a.     The suicide truck bombing of U.S. Marine barracks in Beirut, Lebanon, on October 23, 1983, in which 299 American and French servicemen were killed,

an operation attributed by then U.S. Secretary of Defense Caspar Weinberger to "basically Iranians with sponsorship and knowledge and authority of the Syrian government";

b.  The July 1985 assassination of Jordanian diplomat Ziad Sati in Ankara, Turkey. Turkish authorities issued an arrest warrant for the Syrian Embassy Second Secretary, Mohammed Darwichi. The chief defendant in the trial, who was employed as a translator in the Jordanian embassy, carried a Syrian passport. During the trial, he confessed to having worked for Syrian intelligence, stating that his control officer was a Syrian diplomat in Turkey who had given the order to assassinate Sati;

c.  The hijacking of Egypt Air Flight 648 on November 23, 1985;

d.  The simultaneous massacres of air passengers at the TWA and El Al ticket counters at the Fiumicino Airport in Rome, Italy, and the Schwechat Airport in Vienna, Austria, on December 27, 1985;

e.  The March 29, 1986 bombing of the German-Arab Friendship Union in West Berlin, injuring 11 persons, which, according to the sworn statement of one of the convicted terrorists, Amad Hasi, was carried out using a bomb that he picked up at the Syrian Embassy in East Berlin from a Syrian Air Force intelligence officer;

f.  The attempted bombing of El Al Flight 016 on April 17, 1986, which, according to the confession that convicted Jordanian terrorist Nezar al-Hindawi, the brother of Ahmad Hasi, made to British police, was planned with the help of Syrian military intelligence officers (including *inter alia* the

19

Chief of Syrian Air Force Intelligence Brigadier General Muhammad al-Khuli, one of President Hafez al-Asad closest aides), and the Syrian Ambassador in London, who supplied him with a Syrian passport, $12,000, Semtex explosives which he planted in the luggage of his pregnant Irish fiancée and a disguise as a Syrian Arab Airlines crew member;

g.  The attempted bombing of an El Al plane on June 26, 1986, in Madrid, Spain, by a Spanish member of the Syrian sponsored Abu Musa terrorist organization, carrying a Syrian passport; and

h.  Support and sponsorship of the Abu Nidal Organization, the Abu Musa Group, the Popular Front for the Liberation of Palestine, the Japanese Red Army, the Kurdish Labor Party, the Armenian Secret Army for the Liberation of Armenia and the Lebanese Armed Revolutionary Faction.

67.    More recently, Syria has provided material support and sponsorship to Hamas, Hezbollah, Palestinian Islamic Jihad and AQI. United States federal courts have determined that Syria provided material support or resources to AQI in furtherance of the assassination of diplomat Laurence Foley in Amman, Jordan, the simultaneous suicide bombings of three Western hotels in Amman, Jordan, and the abduction, torture and executions of Staff Sgt. Matt Maupin, civilian contractor Jack Armstrong, civilian contractor Jack Hensley and Private First-Class Kristian Menchaca in Iraq.

68.    Al-Zarqawi was arrested and imprisoned in Iran for a few weeks in early 2002. The Iranian authorities released him because he had a valid Syrian passport issued by the Syrian authorities, indicating that he worked for Syria. Syria is Iran's closest ally

and the two countries have been partners in terrorism since the early 1980s. Al-Zarqawi left Iran for Syria, via Iraq.

69.    Al-Zarqawi was physically in Syria from May to September 2002. He used Syria as a base for plotting to assassinate Foley. He arranged for his AQI terrorist conspirators to be trained in Syrian military barracks, and he provided supervision and organized financing for the assassination from Syria. Syria protected and refused to extradite Shaker al-Absi, a key al-Zarqawi associate responsible for financing the assassination, to Jordan.

70.    The U.S. Department of State, in its 2009 Country Reports on Terrorism, states: "Prior to 2005, AQI planned and conducted limited attacks in Jordan, including the assassination of USAID official Laurence Foley in 2002." The report also found Syria continues to embrace terrorism as an instrument of policy. The report further noted Jordanian intelligence officials had intercepted AQI agents who were trying to enter Jordan from Syria to participate in a campaign of terrorism against Jordan.

71.    At all times relevant to this Complaint, Syria materially supported al-Zarqawi, his successor al-Masri and AQI in their campaign to use terrorism to destabilize Iraq and eject American forces from Iraq by *inter alia* (1) facilitating the recruitment and training of Zarqawi's followers and their transportation into Iraq, (2) harboring and providing sanctuary to AQI terrorists and their logistical and supply network, and (3) financing al-Zarqawi, al-Masri and AQI. In the words of the former defense minister of Iraq, Sa`dun al-Dulaimi: "We know the terrorists have no other gateway into Iraq but Syria."

72. At all times relevant to this Complaint, Syria furnished various kinds of material support, within the meaning of 28 U.S.C. § 1605A, including, but not limited to:

a. AQI recruits received weapons in Syria and then they were smuggled into Iraq with the full knowledge of the Syrian security services;

b. Funds raised by AQI in various Arab countries, especially in Jordan (al-Zarqawi's native country) and Saudi Arabia, were funneled through Syria; and

c. AQI recruits were trained in Syrian military barracks and were given logistical support from the Syrian military security apparatus headed by General Shawkat, President Bashar al-Assad's brother-in-law and the second-most-powerful official in Syria.

73. The comfort and safe haven provided by Syria and its security services allowed al-Zarqawi and other AQI fighters to move back and forth between Iraq and Syria at will.

74. When AQI publicly executed Maupin, Armstrong and Hensley, al-Zarqawi was physically present in Iraq, but Syria remained his haven. Al-Zarqawi operated by staying at the edges of the urban centers and close to the desert for escape routes. Therefore, it is likely that from time to time he commanded AQI from within Syrian borders.

75. The United States Department of State in its 2005 Patterns of Global Terrorism concluded Syria was a "facilitation hub for terrorists operating in Iraq . . ."

76. In 2007, Senator Joseph Lieberman publicly charged: "Al-Qaida in Iraq is sustained by a transnational network of facilitators and human smugglers, who replenish its supply of suicide bombers – approximately 60 to 80 Islamist extremists, recruited

every month from across the Middle East, North Africa and Europe, and sent to meet their al-Qaida handlers in Syria, from where they are taken to Iraq to blow themselves up to kill countless others."

77.     The U.S. Department of State, in its 2008 Country Reports on Terrorism, stated: "The United States continued its focused efforts to mitigate the threat posed by foreign fighters in Iraq. State sponsors of terrorism, Iran and Syria, continued to play destabilizing roles in the region." It also noted that "nearly 90% of all foreign fighters entering Iraq are transiting from Syria."

78.     On February 28, 2008, pursuant to Executive Order 13224, which targets terrorists and those providing financial or other material support to terrorism, the U.S. Department of the Treasury designated Badran Turki Hishan Al Mazidih a.k.a. Abu Ghadiyah, and three other men.

79.     The Treasury designation states that al-Zarqawi had appointed Abu Ghadiyah as AQI's Syrian commander for logistics in 2004, and that after al-Zarqawi's death Abu Ghadiyah and his AQI logistics network continued to work under the command of al-Zarqawi's successor al-Masri. The designation states that Abu Ghadiyah, from his base in Syria, ran the AQI facilitation network, controlling the flow of money, weapons, terrorists and other resources through Syria into Iraq. It states that Abu Ghadiyah obtained and provided false passports, weapons, guides, safe houses and allowances to AQI terrorists in Syria preparing to cross the border into Iraq.

80.     On October 28, 2008, after Syria's repeated refusals to capture, hand over or kill Abu Ghadiya and shut down his AQI logistics network in Syria, U.S. special forces attacked Abu Ghadiya's and his AQI logistics network on Syrian territory. The

Assad regime condemned the American attack on AQI terrorists harboring in Syria as "serious aggression."

81. Syria regarded AQI as indispensable for Syrian interests in the region. Syria fully supported AQI in order to inflict heavy causalities on the U.S. forces in Iraq to compel the U.S. to withdraw in a humiliating manner from Iraq. This would make it more difficult than ever for the U.S to intervene to change the regimes in Syria or in Iran, Syria's close ally. By fully supporting the insurgency in Iraq and especially AQI, Syria has gained in prestige and stature in the Arab and Islamic worlds.

82. Syria also supported the insurgency to protect itself against the spread of American democracy and the threat of a possible American invasion from Iraq. Paranoia descended upon Damascus and the Syrian regime after Iraq collapsed like a house of cards in the face of the American invasion. The United States Army was positioned next door with the explicit goal of spreading democracy to a neighborhood of tyrannical regimes, such as the dictatorship that ruled over Syria. Various US policy makers made statements regarding the wisdom of sending the troops into Damascus next. "'There's got to be a change in Syria', [Paul] Wolfowitz said in April, adding that the government was a 'strange regime, one of extreme ruthlessness.' At the same time, another prominent conservative closely associated with Wolfowitz and [Richard] Perle, former CIA director James Woolsey, was widely quoted on television as saying that the 'war on terrorism' should be seen as 'World War IV' that should include as targets 'fascists of Iraq and Syria.'"

83. The provision of material support and resources to AQI to organize attacks on the U.S. military is a foreign policy that could have resulted in the end of the Syrian

government if the U.S. had retaliated. Thus, it is a classic example of a foreign policy that could not have been organized or carried out without explicit knowledge and authorization from President Assad and key officers such as Shawkat.

84.     The provision of material support and resources to AQI, a known terrorist organization, by the government of Syria, acting directly and by and through their individual governmental leaders and representatives as named in the Complaint, and by other representatives of the government, constitute violations of applicable and numerous United States laws, thereby rendering the government of Syria and its security agencies, and their individual governmental representatives named as Defendants herein, jointly and severally liable for their illegal acts and deeds.

### <u>COUNT I – BATTERY</u>
**(Under 28 U.S.C. § 1605A(c) and State Common Law and State Statutory Law)**

85.     Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the foregoing paragraphs as if fully set forth herein.

86.     Preceding July 8, 2008, members of AQI willfully, violently and forcefully committed terrorist acts during the kidnapping, torture and execution of Alex R. Jiménez and Byron W. Fouty respectively, with the express purpose of inflicting severe pain and suffering and death. The willful, wrongful and intentional acts of AQI, which were sponsored by all Defendants, constitute a battery upon the persons of Alex R. Jiménez and Byron W. Fouty, causing injury to them as set forth above.

87.     Defendants President Bashar al-Assad performed acts within the scope of his office which provided material support and resources to AQI and its terrorist activities, including but, not limited to, the kidnapping, torture and executions of Alex R. Jiménez and Byron W. Fouty.

88.     As a direct and proximate result of the willful, wrongful and intentional acts of al-Zarqawi, al-Masri, other AQI terrorists, and AQI, which acts were materially supported and sponsored by Syria, as well as by the Syrian Military Intelligence, and President Bashar al-Assad, Alex R. Jiménez and Byron W. Fouty were injured in that they endured extreme mental anguish, physical injury and pain and suffering, all to their damage.

**WHEREFORE,** Plaintiffs Maria Duran, Ramon D. Jiménez, Yaderlin Jiménez, Andy D. Jiménez, Bryant Jiménez, AV, Irving L. Jiménez, Andy J. Jiménez, the Estate of Alex R. Jiménez, Gordon K. Dibler, Jr., Sarah Haverlock, the Estate of Byron W. Fouty, the Estate of Mickey W. Fouty and Hilary North, demand that judgment be entered, jointly and severally, against the Defendants for the damages they suffered, including, but not limited to, pain, suffering, mental anguish, and pecuniary losses, in the amount of **EIGHTEEN MILLION ($18,000,000.00) DOLLARS** plus pre-judgment and post-judgment interest for each of them, on this Count I**,** and their costs expended.

## COUNT II – ASSAULT
### (Under 28 U.S.C. § 1605A(c) and State Common Law and State Statutory Law)

89.     Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the forgoing paragraphs as if fully set forth herein.

90.     During the murders of Alex R. Jiménez and Byron W. Fouty, the AQI terrorists intentionally and willfully put Alex R. Jiménez and Byron W. Fouty in fear for their lives and apprehension of harm and injury as a direct result of the terrorists' actions in holding them against their will, and the physical and mental abuse they inflicted upon them.

91.     As a direct and proximate result of the willful, wrongful and intentional acts of al-Zarqawi, al-Masri, other AQI terrorists and AQI, which acts were accomplished with material support and resources provided by Syria, as well as the Syrian Military Intelligence, and President Bashar al-Assad, Alex R. Jiménez and Byron W. Fouty were injured in that they endured extreme mental anguish, physical injury and pain and suffering, all to their damage.

**WHEREFORE,** Plaintiffs Maria Duran, Ramon D. Jiménez, Yaderlin Jiménez, Andy D. Jiménez, Bryant Jiménez, AV, Irving L. Jiménez, Andy J. Jiménez, the Estate of Alex R. Jiménez, Gordon K. Dibler, Jr., Sarah Haverlock, the Estate of Byron W. Fouty, the Estate of Mickey W. Fouty and Hilary North, demand that judgment be entered, jointly and severally, against the Defendants for the damages they suffered, including, but not limited to, pain, suffering, mental anguish, and pecuniary losses, in the amount of **EIGHTEEN MILLION ($18,000,000.00) DOLLARS** plus pre-judgment and post-judgment interest for each of them, on this Count II**,** and their costs expended.

### <u>COUNT III - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, INCLUDING SOLATIUM</u>
**(Under 28 U.S.C. § 1605A(c) and State Common Law and State Statutory Law)**
**(As to All Plaintiffs)**

92.     Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all of the forgoing paragraphs as if fully set forth.

93.     The kidnapping, torture and executions of Alex R. Jiménez and Byron W. Fouty, and each and all of the acts set forth above, constitute extreme and outrageous conduct with the intent to inflict emotional distress, including solatium, upon them and

the members of their families. Further these acts were undertaken to cause mental duress and suffering, including solatium, upon the members of their families.

94.    As a direct and proximate result of the willful, wrongful and intentional acts of al-Zarqawi, al-Masri, other AQI terrorists and AQI, which acts were materially supported and sponsored by Syria as well as the Syrian Military Intelligence, and President Bashar al-Assad, Alex R. Jiménez and Byron W. Fouty, and their families, as above set forth, were each caused to suffer permanent and severe emotional distress.

**WHEREFORE,** Plaintiffs Maria Duran, Ramon D. Jiménez, Yaderlin Jiménez, Andy D. Jiménez, Bryant Jiménez, AV, Irving L. Jiménez, Andy J. Jiménez, the Estate of Alex R. Jiménez, Gordon K. Dibler, Jr., Sarah Haverlock, the Estate of Byron W. Fouty, the Estate of Mickey W. Fouty and Hilary North, demand that judgment be entered, jointly and severally, against Defendants for the damages they suffered, including, but not limited to, pain, suffering, mental anguish, and pecuniary losses, in the amount of **EIGHTEEN MILLION ($18,000,000.00) DOLLARS** plus pre-judgment and post-judgment interest for each of them, on this Count III, and their costs expended.

## COUNT IV – ACTION FOR WRONGFUL DEATH
### (Under 28 U.S.C. § 1605A(c) and State Common Law and State Statutory Law)

95.    Plaintiffs the Estate of Alex R. Jiménez and the Estate of Byron W. Fouty repeat, reallege and incorporate by reference those facts and allegations set forth in each of the foregoing paragraphs as if fully set forth herein.

96.    The death of Alex R. Jiménez was caused by a willful and deliberate act of extrajudicial killing as he was murdered by AQI terrorists during their terrorist acts of kidnapping, torture and extrajudicial killing against him, as an American citizen, acting

with the material support and resources of defendants Syria as well as Syrian Military Intelligence, and President Bashar al-Assad.

97.   The death of Byron W. Fouty was caused by a willful and deliberate act of extrajudicial killing as he was murdered by AQI terrorists during their terrorist acts of kidnapping, torture and extrajudicial killing against him, as an American citizen, acting with the material support and resources of defendants Syria as well as Syrian Military Intelligence, and President Bashar al-Assad.

**WHEREFORE,** Plaintiffs the Estate of Alex R. Jiménez and the Estate of Byron W. Fouty, by and through their respective Personal Representatives, and all other Plaintiffs entitled to assert the foregoing wrongful death claim under controlling state law, demand that judgment be entered, jointly and severally, against Defendants for the damages they suffered, including, but not limited to, pecuniary losses, which include, but are not limited to, the loss of future earnings, and funeral and burial expenses, in the amount of **EIGHTEEN MILLION ($18,000,000.00) DOLLARS** plus pre-judgment and post-judgment interest for each of them, on this Count IV, and their costs expended.

## COUNT V – ACTION FOR SURVIVAL DAMAGES
### (Under 28 U.S.C. § 1605A(c) and State Common Law and State Statutory Law)

98.   Plaintiffs the Estate of Alex R. Jiménez and the Estate of Byron W. Fouty repeat, reallege and incorporate by reference those facts and allegations set forth in each of the foregoing paragraphs as if fully set forth herein.

99.   Before his death, Alex R. Jiménez suffered extreme bodily pain and mental anguish and suffering, entitling his Estate to compensatory damages.

100.  Before his death, Byron W. Fouty suffered extreme bodily pain and mental anguish and suffering, entitling his Estate to compensatory damages.

101.  As a direct and proximate result of the willful, wrongful and intentional acts of al-Zarqawi, al-Masri, other AQI terrorists and AQI, carried out with material support and resources provided by Syria as well as Syrian Military Intelligence, and President Bashar al-Assad, Alex R. Jiménez and Byron W. Fouty and their families, as above set forth, were each caused extreme bodily pain and suffering, and mental and emotional pain, anguish and suffering, and pecuniary losses.

**WHEREFORE,** the Estate of Alex R. Jiménez and the Estate of Byron W. Fouty, by and through their respective Personal Representatives, and all other Plaintiffs entitled to assert the foregoing claim for survival damages under controlling state law, demand that judgment be entered, jointly and severally, against Defendants for the damages they suffered, including, but not limited to, pain, suffering, mental anguish, and pecuniary losses, in the amount of **EIGHTEEN MILLION ($18,000,000.00) DOLLARS** plus pre-judgment and post-judgment interest for each of them, on this Count V**,** and their costs expended.

## <u>COUNT VI – ACTION FOR CONSPIRACY</u>
### (Under 28 U.S.C. § 1605A(c) and State Common Law and State Statutory Law)
### (As to All Plaintiffs)

102.  Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in each of the foregoing paragraphs as if fully set forth.

103.  Defendants Syria, as well as Syrian Military Intelligence, and President Bashar al-Assad, did knowingly and willfully conspire with, and conspire to provide material support or resources to, a terrorist organization within the meaning of 28 U.S.C. § 1605A, which terrorist organization willfully and deliberately committed an act of terrorism, which caused the personal injuries and/or deaths of Plaintiffs.

104. For the reasons stated above, and having conspired with, and conspired to provide material support or resources to, the terrorist organization which willfully and deliberately committed an act of terrorism which caused the personal injuries and/or deaths of Plaintiffs, Defendants are jointly and severally liable to Plaintiffs for all damages in this civil action.

**WHEREFORE,** Plaintiffs Maria Duran, Ramon D. Jiménez, Yaderlin Jiménez, Andy D. Jiménez, Bryant Jiménez, AV, Irving L. Jiménez, Andy J. Jiménez, the Estate of Alex R. Jiménez, Gordon K. Dibler, Jr., Sarah Haverlock, the Estate of Byron W. Fouty, the Estate of Mickey W. Fouty and Hilary North, demand that judgment be entered, jointly and severally, against Defendants in the amount of **EIGHTEEN MILLION ($18,000,000.00) DOLLARS** plus pre-judgment and post-judgment interest for each of them, on this Count VI, and their costs expended.

## COUNT VII – ACTION FOR AIDING AND ABETTING
### (Under 28 U.S.C. § 1605A(c) and State Common Law and State Statutory Law)
### (As to All Plaintiffs)

105. Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in each of the foregoing paragraphs as if fully set forth.

106. Defendants Syria as well as the Syrian Military Intelligence, and President Bashar al-Assad did knowingly and willfully provide substantial assistance to and sponsor a terrorist organization within the meaning of 28 U.S.C. § 1605A, which terrorist organization willfully and deliberately committed an act of terrorism, which caused the personal injuries and/or deaths of Plaintiffs.

107. For the reasons stated above, and having aided and abetted a terrorist organization which willfully and deliberately committed an act of terrorism which caused

the personal injuries and/or deaths of Plaintiffs, all Defendants are jointly and severally liable to Plaintiffs for all damages in this civil action.

WHEREFORE, Plaintiffs Maria Duran, Ramon D. Jiménez, Yaderlin Jiménez, Andy D. Jiménez, Bryant Jiménez, AV, Irving L. Jiménez, Andy J. Jiménez, the Estate of Alex R. Jiménez, Gordon K. Dibler, Jr., Sarah Haverlock, the Estate of Byron W. Fouty, the Estate of Mickey W. Fouty and Hilary North, demand that judgment be entered, jointly and severally, against Defendants in the amount of **EIGHTEEN MILLION ($18,000,000.00) DOLLARS** plus pre-judgment and post-judgment interest for each of them, on this Count VII, and their costs expended.

## COUNT VIII - 28 U.S.C. §1605A(c)
### (As to All Plaintiffs)

108.    Plaintiffs repeat, re-allege and incorporate by reference those facts and allegations set forth in all the foregoing paragraphs as if fully set forth herein.

109.    AQI terrorists led by al-Masri, acting with the material support and resources of Defendants, willfully, wrongfully, intentionally, violently and forcefully, abducted, assaulted, tortured and murdered Alex R. Jiménez and Byron W. Fouty, while held captive, with the express purpose of inflicting personal injury, death, severe physical pain and suffering, severe emotional and mental anguish and duress, and pecuniary loss, upon them.

110.    Additionally, the acts of abducting, assaulting, torturing and murdering Alex R. Jiménez and Byron W. Fouty, while held captive, constituted extreme and outrageous conduct with the intent and purpose of inflicting emotional distress, including solatium damages, upon members of their families.

111.    The willful, wrongful and intentional acts of the AQI terrorists were accomplished with the material support and resources, sponsorship, aid, abetting, assistance and encouragement of Syria, Syrian Military Intelligence, and President Bashar al-Assad.

112.    As a direct and proximate result of the willful, wrongful and intentional acts of the AQI terrorists, whose acts were materially supported, sponsored, directed, aided, abetted, assisted and encouraged by Defendants, Alex R. Jiménez and Byron W. Fouty were abducted, tortured and killed, were tortured and killed while held in captivity, and they and their families endured extreme mental and emotional distress and anguish, solatium, physical injury, pain and suffering, death and pecuniary loss, all to their damage.

**WHEREFORE,** Plaintiffs Maria Duran, Ramon D. Jiménez, Yaderlin Jiménez, Andy D. Jiménez, Bryant Jiménez, AV, Irving L. Jiménez, Andy J. Jiménez, the Estate of Alex R. Jiménez, Gordon K. Dibler, Jr., Sarah Haverlock, the Estate of Byron W. Fouty, the Estate of Mickey W. Fouty and Hilary North, and each of them, demand that judgment be entered, jointly and severally, against Defendants for the damages they suffered, including, but not limited to, pain and suffering, wrongful death, mental and emotional distress and anguish, pecuniary losses, in the amount of **ONE HUNDRED MILLION ($100,000,000.00) Dollars** plus pre-judgment interest and post-judgment interest, for each of them, on this Count VIII, and their costs expended; as to each of their, mothers, father, sisters, brothers, daughters, sons, and spouses above named, in the amount of **TWENTY-FIVE MILLION DOLLARS ($25,000,000.00)** plus pre-judgment interest and post-judgment interest, for each and every one of them, on this Count VIII, and their costs expended, including attorneys' fees.

## COUNT IX – PUNITIVE DAMAGES
### (Under 28 USC 1605A(c), P.L. 104-208, 110 Stat. 3009-172)
### (As to All Plaintiffs)

113.  Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in each of the foregoing paragraphs as if fully set forth.

114.  The actions of AQI, as above set forth, were intentional and malicious and in willful, wanton and reckless disregard of the rights and well-being of all Plaintiffs. All of the acts of al-Zarqawi, al-Masri and AQI were facilitated by funding, training, and other material support, aid, assistance, resources and sponsorship provided by Syria, as well as by Syrian Military Intelligence, and President Bashar al-Assad.

115.  The Defendants rendered material support and resources to the AQI terrorists actually carrying out the terrorist acts above described. Under 28 U.S.C. § 1605A(c), the Plaintiffs are entitled to an award of economic damages, solatium, pain and suffering, as prayed for above herein; and are further entitled to an award of punitive damages, designed to punish the Defendants, and each of them, jointly and severally, for their heinous conduct in providing material support and resources to the acts of terrorism that killed Alex R. Jiménez and Byron W. Fouty, and caused irreparable harm, loss, pain, suffering, death, pecuniary loss, mental and emotional anguish to all Plaintiffs, and solatium damages to each of the family members of Alex R. Jiménez and Byron W. Fouty, each of whom is entitled to an award of punitive damages against the Defendants, and an award of punitive damages is hereby requested against the Defendants, jointly and severally, in accordance with the provisions of 28 U.S.C. § 1605A(c) making both a State that has been designated as a "state sponsor of terrorism" under § 6(j) of the Export

Administration Act of 1979, and an official, employee, or agent of such a State, liable for economic damages, solatium, pain and suffering, and punitive damages.

116. As required by 28 U.S.C. § 1605A(c), President Bashar al-Assad acted within the scope of his office, employment or agency when he supplied, facilitated or authorized the provision of material support or resources to al-Zarqawi, al-Masri and AQI and the execution of its terrorist attacks.

**WHEREFORE,** Plaintiffs Maria Duran, Ramon D. Jiménez, Yaderlin Jiménez, Andy D. Jiménez, Bryant Jiménez, AV, Irving L. Jiménez, Andy J. Jiménez, the Estate of Alex R. Jiménez, Gordon K. Dibler, Jr., Sarah Haverlock, the Estate of Byron W. Fouty, the Estate of Mickey W. Fouty and Hilary North, and each of them, demand that judgment be entered, jointly and severally, against Defendants in the amount of **THREE HUNDRED MILLION DOLLARS ($300,000,000.00)** for each act of murder, separately for each Plaintiff, on this Count IX, and their costs expended. The award of punitive damages, as requested, is to punish Defendants for their conduct in supporting terrorism and the murderous terrorist acts described herein, and to send a message to them and to others that the United States of America and its citizens respond to lawless acts of terrorism with the application of orderly justice.

### ADDITIONAL RELIEF REQUESTED

WHEREFORE, Plaintiffs request joint and several judgments against the Defendants as follows:

1. Awarding to Plaintiffs compensatory, economic, pain and suffering and sola-tium damages against Defendants in amounts set forth herein and as shall be determined at trial;

2.   Awarding to Plaintiffs punitive or exemplary damages against Defendants, jointly and severally, according to proof to be presented at trial;

3.   Awarding to Plaintiffs prejudgment interest and post-judgment interest on all damages awards computed and calculated at the maximum rate allowable by law;

4.   Awarding to Plaintiffs an explicit and separately quantified adjustment of all damages awards that are based on amounts set in historical precedent, in order to offset the effects of inflation on the value of those awards;

5.   Awarding to Plaintiffs their costs, disbursements, expert fees and legal fees;

6.   Allowing a *lis pendens* notice of action to issue and be noted and enforced by the Court as against each of the Defendants and their instrumentalities;

7.   Leave to amend this Complaint as the interests of justice may allow; and

8.   Granting any and all such further relief as the Court may deem just and proper.

DATED                                    Respectfully Submitted,

February 20, 2018.

Steven R. Perles (No. 326975)
Edward MacAllister   (No. 494558)
PERLES LAW FIRM, PC
1050 Connecticut Avenue, NW,
Suite 500
Washington, DC 20036
Telephone: 202-955-9055
Telefax: 202-772-3101

F. R. Jenkins
(Pending Admission *Pro Hoc Vice*)
(Maine Bar No. 4667)
MERIDIAN 361 INTERNATIONAL LAW
GROUP, PLLC
97A Exchange Street, Suite 202

Portland, Maine
United States of America
Telephone: 866-338-7087
Facsimile: 202-315-3894