# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

ESTATE OF BYRON W. FOUTY, <u>et al.</u>,     )
                                            )
                    Plaintiffs,             )
                                            )
        v.                                  )       Civil Action No. 18-385 (RBW)
                                            )
SYRIAN ARAB REPUBLIC, <u>et al.</u>,        )
                                            )
                    Defendants.             )
_____)

## <u>MEMORANDUM OPINION</u>

The plaintiffs—the estates and immediate family members of deceased United States

servicemen Byron W. Fouty and Alex R. Jiménez—bring this civil action against the

defendants—the Syrian Arab Republic ("Syria") and the Syrian Military Intelligence[1]—pursuant

to the Foreign Sovereign Immunities Act (the "Act"), 28 U.S.C. §§ 1602–1611, seeking damages

resulting from the alleged kidnapping, torture, and extrajudicial killing of the servicemen by a

foreign terrorist organization with material support from the defendants.  <u>See</u> Complaint

("Compl.") at 3, ¶¶ 1–22, ECF No. 1.  Currently pending before the Court is the plaintiffs'

motion for default judgment as to liability and damages.  <u>See</u> Plaintiffs' Memorandum of Law in

Support of Motion for Default Judgment as to Liability and Damages ("Pls.' Mot." or the

"plaintiffs' motion") at 1, ECF No. 25.  After carefully considering all of the relevant evidence

submitted by the plaintiffs,[2] the Court concludes for the following reasons that it must grant the

---

[1] The plaintiffs also brought this suit against the president of Syria, Bashar al-Assad, <u>see</u> Complaint ("Compl.") at 2, ECF No. 1, but have failed to serve this defendant, <u>see</u> Plaintiffs' Memorandum of Law in Support of Motion for Default Judgment as to Liability and Damages ("Pls.' Mot.") at 1 n.2, ECF No. 25.

[2] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) the Affidavit Requesting Foreign Mailing, ECF No. 9; (2) the Affidavit of Failed Service, ECF No. 13; (3) Additional Exhibits for Motion for Default Judgment ("Pls.' Additional Exs."), ECF No. 26; (4) Additional

(continued . . .)

portion of the plaintiffs' motion requesting default judgment as to liability.  The Court will issue a separate Memorandum Opinion and Order addressing the damages to which the plaintiffs are entitled.[3]

## I.      BACKGROUND

On February 20, 2018, the plaintiffs initiated this action against the defendants, seeking damages for "the personal injuries and wrongful deaths of . .  Jiménez and . . . Fouty in or near Baghdad, Iraq, which occurred sometime after May 12, 2007[,] when they were kidnapped and at a time prior to July 8, 2008[,] when their remains were discovered."  Compl. at 3.  The fourteen plaintiffs include the estates of Fouty and Jiménez, as well as twelve of their immediate family members: (1) the Estate of Mickey W. Fouty[4] (representing Fouty's biological father), (2) Hilliary North (Fouty's biological mother), (3) Gordon K. Dibler, Jr. (Fouty's stepfather), (4) Sarah Haverlock (Fouty's biological half-blood sister), (5) Maria Duran (Jiménez's biological mother), (6) Ramon D. Jiménez (Jiménez's biological father), (7) Yaderlin Jiménez (Jiménez's

---

(. . . continued)
Exhibits for Motion for Default Judgment ("Pls.' 2d Additional Exs."), ECF No. 27; (5) Additional Exhibits for Motion for Default Judgment ("Pls.' 3d Additional Exs."), ECF No. 28; (6) Additional Exhibits for Motion for Default Judgment ("Pls.' 4th Additional Exs."), ECF No. 29; (7) Additional Exhibits for Motion for Default Judgment ("Pls.' 5th Additional Exs."), ECF No. 30; (8) the Plaintiffs' Proposed Findings of Fact and Conclusions of Law ("Pls.' Proposed Facts & Law"), ECF No. 34; (9) the Plaintiffs' Notice of Recent Authority in Support of Plaintiffs' Motion for Default Judgment Against Defendants, ECF No. 35; and (10) the Plaintiffs' Response to the Order of the Court ("Pls.' Resp."), ECF No. 39.

[3] Although the Court previously indicated that it "intend[ed] to issue its Memorandum Opinion and Order resolving the plaintiffs' motion for default judgment as to both liability and damages[,]" Order at 3 (Mar. 29, 2024), ECF No. 40, the Court requires additional time to appropriately address the damages to which each plaintiff is entitled. Thus, a separate Memorandum Opinion and Order regarding the damages portion of the plaintiffs' motion is forthcoming.

[4] Plaintiff Estate of Mickey W. Fouty, was originally represented by its personal representative, Ronald L. Fouty. See Compl. ¶ 13.  However, on June 23, 2023, the plaintiffs filed a motion to substitute Ronald L. Fouty with Muriel Pearson, the newly appointed representative of the estate of Mickey W. Fouty, following the death of Ronald L. Fouty.  See Plaintiffs' Motion for Substitution of Party and Memorandum in Support Thereof ("Pls.' Mot. to Substitute") at 1, ECF No. 36.  On March 29, 2024, the Court granted the plaintiffs' motion and substituted Muriel Pearson for Ronald Fouty as the personal representative of plaintiff Estate of Mickey W. Fouty.  See Order at 3 (Mar. 29, 2024).

widow), (8) Andy Domingo Jiménez (Jiménez's biological full blood brother), (9) Bryant

Jiménez (Jiménez's biological full blood brother), (10) Andy Jiménez Vargas (Jiménez's

biological half-blood brother), (11) Irving Lazaro Jiménez Vargas (Jiménez's biological

half-blood brother), and (12) Alexander Jiménez Vargas (Jiménez's biological half-blood

brother). See id. ¶¶ 2–15; Pls' 2d Additional Exs., Ex. 24 (Fouty Family Structure) at 1, ECF

No. 27-24; id., Ex. 25 (Jiménez Family Structure) at 1, ECF No. 27-25. These plaintiffs allege

that the kidnapping, torture, and murders of Fouty and Jiménez "were carried out by a [f]oreign

[t]errorist [o]rganization . . . operating with material support and resources" from the defendants.

Compl. at 3. More specifically, the plaintiffs allege that these acts were planned and executed by

"the terrorist organization founded by Abu Musab al-Zarqawi, which at the time of these terrorist

attacks was known as the Islamic State of Iraq ('ISI'), acting with the training, funding, material

support, protection, and direction of Syria, as part of a coordinated scheme by Syria to target

[United States] service-members in Iraq." Pls' Mot. at 3.

On January 20, 2019, the plaintiffs served the Complaint on Syria and the Syrian Military

Intelligence, pursuant to the procedures authorized by 28 U.S.C. § 1608(a)(4). See Pls' Resp.,

Exhibit ("Ex.") A (Letter from Jared Hess, Attorney Advisor in the Department of State's Office

of Legal Affairs, to the Clerk of the Court (Mar. 11, 2019) ("State Department Letter")) at 1,

ECF No. 39-1. However, the plaintiffs were "not able to serve the Syrian [p]resident[,] Bashar

al-Assad." Pls' Mot. at 1 n.1. After the defendants who had been served failed to appear or

otherwise respond to the Complaint, the plaintiffs filed a motion for entry of default on April 12,

2019, see Plaintiffs' Motion for Entry of Default and Memorandum in Support Thereof at 1, ECF

No. 21, and the Clerk of the Court entered a default against Syria and the Syrian Military

Intelligence on April 16, 2019, see Default (Apr. 16, 2019) at 1, ECF No. 22. On July 24, 2020,

the plaintiffs then moved for entry of a default judgment against Syria and the Syrian Military

Intelligence, both as to liability and damages.[5]  See Pls.' Mot. at 14.

## II.        STANDARD OF REVIEW

The Federal Rules of Civil Procedure provide for the entry of a default judgment "[w]hen

a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise

defend" against an action.  Fed. R. Civ. P. 55(a); see also Jackson v. Beech, 636 F. 2d 831, 836

(D.C. Cir. 1980) ("The default judgment must normally be viewed as available only when the

adversary process has been halted because of an essentially unresponsive party." (quoting H.F.

Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe, 432 F.2d 689, 691 (D.C. Cir. 1970))).

Rule 55 sets forth a two-step process for a party seeking a default judgment: first, entry of a

default, followed by entry of a default judgment.  Fed. R. Civ. P. 55; see also 10A Charles Alan

Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 2682 (4th ed. 2022) (stating that, "[p]rior to

obtaining a default judgment under either Rule 55(b)(1) or Rule 55(b)(2), there must be an entry

of default as provided by Rule 55(a)").  When a defendant has failed to plead or otherwise

defend against an action, the plaintiff may request that the clerk of the court enter a default

against that defendant.  See Fed. R. Civ. P. 55(a).  Once the clerk enters the default pursuant to

Rule 55(a), Rule 55(b) authorizes either the clerk or the Court to enter a default judgment against

the defendant.  See Fed. R. Civ. P. 55(b).

Under the Act, to prevail on a motion for a default judgment against a foreign sovereign,

the plaintiff must show that the Court has original jurisdiction over the claims and personal

jurisdiction over the defendant, see 28 U.S.C. § 1330(a)–(b), and must "establish[ ] his [or her]

---

[5] Because the plaintiffs were unsuccessful in serving the president of Syria, see Pls.' Mot. at 1 n.2, the plaintiffs only seek a default judgment against Syria and the Syrian Military Intelligence, see id. at 1.  Therefore, hereinafter in this Memorandum Opinion, the Court will use the term "defendants" in referring only to Syria and the Syrian Military Intelligence.

claim or right to relief by evidence satisfactory to the [C]ourt[,]" id. § 1608(e); see also Braun v. Islamic Republic of Iran, 228 F. Supp. 3d 64, 74–75 (D.D.C. 2017) (discussing default judgments under the Act).  Such evidence may be presented using "traditional forms of evidence[, e.g.,] testimony and documentation[,]" Estate of Botvin v. Islamic Republic of Iran, 873 F. Supp. 2d 232, 236 (D.D.C. 2012), and plaintiffs may also submit evidence "in the form of affidavits or declarations[,]" Belkin v. Islamic Republic of Iran, 667 F. Supp. 2d 8, 20 (D.D.C. 2009).  However, "[t]he Court is not required to hold an evidentiary hearing[.]"  Estate of Doe v. Islamic Republic of Iran, 808 F. Supp. 2d 1, 7 (D.D.C. 2011); see also Han Kim v. Democratic People's Republic of Korea, 774 F.3d 1044, 1050–51 (D.C. Cir. 2014) (relying on declarations in reversing and remanding for the district court to enter a default judgment without an evidentiary hearing).  "Upon evaluation, the Court may accept any uncontroverted evidence presented by plaintiffs as true."  Belkin, 667 F. Supp. 2d at 20 (citing Estate of Heiser v. Islamic Republic of Iran, 466 F. Supp. 2d 229, 255 (D.D.C. 2006)).

## III.    FINDINGS OF FACT

In support of their motion for a default judgment, the plaintiffs have submitted evidence including written expert opinions, video and photographic evidence, United States government records, and deposition transcripts.  Having considered the extensive record in this case, the Court has determined that the plaintiffs' briefing is comprehensive and, thus, an evidentiary hearing is unnecessary.  Accordingly, based on the existing record, the Court makes the following findings of fact,[6] which are largely derived from the reports and affidavits of three

---

[6] On March 31, 2021, the Court granted the Plaintiffs' Motion and Memorandum in Support With Points and Authorities for Judicial Notice of Certain Facts and Findings ("Pls.' Mot. for Judicial Notice"), ECF No. 31, to the extent it requested that the Court take judicial notice of the findings in Foley v. Syrian Arab Republic, 249 F. Supp. 3d 186 (D.D.C. 2017); Thuneibat v. Syrian Arab Republic, 167 F. Supp. 3d 22 (D.D.C. 2016); and Gates v. Syrian Arab Republic, 580 F. Supp. 2d 53 (D.D.C. 2008), aff'd, 646 F. Supp. 3d 1 (D.C. Cir. 2011).  See Order at 1 (March 31, 2021), ECF No. 32.  Under Federal Rule of Evidence 201, the Court "may judicially notice a fact that is

(continued . . .)

experts: (1) Dr. Daveed Gartenstein-Ross, Ph.D., the Chief Executive Officer of Valens Global and a Senior Fellow at the Foundation for Defense of Democracies; (2) Charles Lister, a Senior Fellow and the Director of Countering Terrorism and Extremism at the Middle East Institute; and (3) Dr. Craig Mallak, a forensic pathologist.[7]

## A.      Syria's Material Support for the Zarqawi Terrorist Organization

The United States Department of State designated Syria as a State Sponsor of Terrorism on December 29, 1979, see United States Department of State, State Sponsors of Terrorism, https://www.state.gov/state-sponsors-of-terrorism (last visited July 17, 2024), and it continues to

---

(. . . continued)
not subject to a reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned."  Fed. R. Evid. 201(b).  "This ability to take notice of adjudicative facts extends to judicial notice of court records in related proceedings."  Rimkus v. Islamic Republic of Iran, 750 F. Supp. 2d 163, 171 (D.D.C. 2010).  "Because of the multiplicity of F[oreign ]S[overeign ]I[mmunities ]A[ct]-related litigation in this jurisdiction, [c]ourts in this District have thus frequently taken judicial notice of earlier, related proceedings."  Id.  Accordingly, the Court's findings are supported, where appropriate, by the findings made by other members of this Court in Foley, Thuneibat, and Gates.  However, the Court is nonetheless required to "reach [its] own, independent findings of fact in the case[ ] before [it]."  Rimkus, 750 F. Supp. 2d at 172.

[7] Federal Rule of Evidence 702 authorizes consideration of the testimony of "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education[.]"  Fed. R. Evid. 702.  Dr. Gartenstein-Ross and Mr. Lister have both previously been qualified as experts by courts considering motions for default judgment against a foreign sovereign, including by courts in this District.  See, e.g., Estate of Parhamovich v. Syrian Arab Republic, No. 17-cv-61 (KBJ/GMH), 2021 WL 6843587, at *9 n.5 (D.D.C. June 23, 2021) (finding that "Mr. Charles Lister is qualified as an expert on conflict and counter-terrorism issues related to Syria"), adopted in part by Estate of Parhamovich v. Syrian Arab Republic, No. 17-cv-61 (FYP), 2022 WL 18281529, at *2 (D.D.C. Mar. 8, 2022); Sotloff v. Syrian Arab Republic, 525 F. Supp. 3d 121, 133 (D.D.C. 2021) (stating that the Court qualified Dr. Gartenstein-Ross "as an expert on violent non-state actors generally, ISIS's evolution from its predecessor organizations, and ISIS's material supporters"); Foley, 249 F. Supp. 3d at 193 n.4 (stating that "the Court qualified [Dr.] Gartenstein-Ross as an expert in the evolution of the history of terrorist organizations and their claims of responsibility for acts of terrorism").  Likewise, Dr. Mallak has previously been qualified by courts as an expert in forensic pathology.  See Pls.' Mot., Ex. 2 (Affidavit of Craig Thomas Mallak, J.D., M.D. ("Mallak Report")), ECF No. 25-2 (attesting that Dr. Mallak "ha[s] been qualified as an expert in forensic pathology and ha[s] testified as such in over 200 judicial proceedings, in both the United States and abroad, including in this Court, with [his] opinion being admitted as to the cause and manner of death").

Having reviewed the qualifications provided by the plaintiffs in regards to Dr. Gartenstein-Ross, Mr. Lister, and Dr. Mallak, see generally Pls.' 2d Additional Exs., Ex. 4 (Expert Witness Report Fouty v. Syrian Arab Republic ("Gartenstein-Ross Report")) at 1–10, ECF No. 27-4; id., Ex. 5 (David Gartenstein-Ross ("Gartenstein-Ross Curriculum Vitae")), ECF No. 27-5; id., Ex. 2 (Expert Report – May-June 2019 – For the case of "Fouty vs. Syria" ("Lister Report")) at 1, ECF No. 27-2; id., Ex. 3 (Charles R. Lister ("Lister Curriculum Vitae")), ECF No. 27-3; Pls.' Mot., Ex. 2 (Mallak Report) ¶¶ 5–17; id., Ex. 3 (Craig Thomas Mallak ("Mallak Curriculum Vitae")), ECF No. 25-3, the Court is satisfied that all three individuals are qualified to offer the opinions discussed in the Court's Findings of Fact below.

retain that designation, see id.; Pls.' 2d Additional Exs., Ex. 2, (Expert Report – May-June 2019 – For the case of "Fouty vs. Syria" ("Lister Report")) at 10, ECF No. 27-2, ("Syria is [ ] the longest-lasting State Sponsor of Terrorism[.]").  From 2000 to 2008, Syria provided support to a terrorist organization founded and operated by Abu Musab al-Zarqawi (the "Zarqawi Terrorist Organization").  Pls.' 2d Additional Exs., Ex. 4 (Expert Witness Report Fouty v. Syrian Arab Republic ("Gartenstein-Ross Report")) at 1, ECF No. 27-4 ("From 2000[–20]08, the Syrian Arab Republic engaged in significant explicit and tacit support for the Zarqawi [Terrorist O]rganization."); Foley v. Syrian Arab Republic, 249 F. Supp. 3d 186, 192 (D.D.C. 2017) ("The Court finds that Syria provided material support to the Zarqawi Terrorist Organization . . . [from] roughly 2002 through 2006.").

The Zarqawi Terrorist Organization, then known as al-Qaeda in Iraq, see Pls.' 2d Additional Exs., Ex. 4 (Gartenstein-Ross Report) at 10, has been designated by the United States Department of State as a "Foreign Terrorist Organization"[8] since 2004, see United States Department of State, Foreign Terrorist Organizations, https://www.state.gov/foreign-terrorist-organizations (last visited July 17, 2024).  Although the Zarqawi Terrorist Organization has operated under various names "[s]ince its emergence in 1993," Pls.' 2d Additional Exs., Ex. 4 (Gartenstein-Ross Report) at 10, it has effectively remained the same organization throughout its existence, see id., Ex. 4 (Gartenstein-Ross Report) at 1 ("Despite its various name changes . . . , there was continuity within the Zarqawi [Terrorist O]rganization, including in the renamed iterations that emerged after . . . []Zarqawi's death.").  According to Dr. Gartenstein-Ross:

---

[8] "Foreign Terrorist Organizations [ ] are foreign organizations that are designated by the Secretary of State in accordance with section 219 of the Immigration and Nationality Act, as amended."  United States Department of State, Foreign Terrorist Organizations, https://www.state.gov/foreign-terrorist-organizations (last visited July 17, 2024); see also 8 U.S.C. § 1189(a)(1) (stating that "[t]he Secretary is authorized to designate an organization as a foreign terrorist organization in accordance with this subsection if the Secretary finds that (A) the organization is a foreign organization; (B) the organization engages in terrorist activity . . . ; and (C) the terrorist activity or terrorism of the organization threatens the security of United States nationals or the national security of the United States").

> [N]ew names and rebrands were part of a continuous pattern for the Zarqawi
> [Terrorist O]rganization—which alternatively adopted the monikers Bayat
> al-Imam [(1993-1999)], Jund al-Sham [(1999-2004)], [Jamaat al-Tawhid
> wal-Jihad ('JTJ[') (2004)], [al-Qaeda in Iraq ('AQI') (2004-2006)], [Mujahedin
> Shura Council [(']MSC['] (2006)], and [the Islamic State of Iraq (']ISI[']
> (2006-2013)]—and did not change the core of what it was.  There was clear
> continuity of leadership, ideology, and strategy from one name to the next.

Id., Ex. 4 (Gartenstein-Ross Report) at 10–11.

For example, "[i]n October 2004," when the Zarqawi Terrorist Organization was known as Jamaat al-Tawhid wal-Jihad ("JTJ"), "Zarqawi pledged bayat (an oath of allegiance) to [Osama] bin Laden, and the JTJ became al-Qaeda's first official affiliate."  Id., Ex. 4 (Gartenstein-Ross Report) at 14.  "By joining al-Qaeda, Zarqawi gained access to an international fundraising, facilitation[,] and recruitment network, while retaining much of his autonomy."  Id., Ex. 4 (Gartenstein-Ross Report) at 14.  And, despite adopting a new moniker, i.e., al-Qaeda in Iraq ("AQI"), the Zarqawi Terrorist Organization's "leadership structure and membership ranks remained intact" as "[t]hose who had worked with Zarqawi in the early days of JTJ either maintained their positions within the organization or grew in stature[.]"  Id., Ex. 4 (Gartenstein-Ross Report) at 15.

Another example of the Zarqawi Terrorist Organization's rebranding occurred "[o]n January 15, 2006," when "AQI's deputy emir, Abu Maysarah al-Iraqi, announced the establishment of . . . the Mujahedin Shura Council, or MSC[], an umbrella group comprised of six Iraqi Sunni militant factions."  Id., Ex. 4 (Gartenstein-Ross Report) at 15.  Although "the MSC purported to function as a coalition, the group was AQI's brainchild, born out of strategic necessity" at a time when "AQI faced growing criticism from local Iraqi groups for representing a foreign agenda and conducting indiscriminate terrorist attacks against civilians."  Id., Ex. 4 (Gartenstein-Ross Report) at 15.  Amidst this discontent, "AQI envisioned [the] MSC as a way

to rebrand, highlighting its local origins and connections in an effort to regain the support of other Iraqi factions." Id., Ex. 4 (Gartenstein-Ross Report) at 15. Similarly, "[o]n October 15, 2006, the . . . MSC[] announced its establishment of the Islamic State of Iraq (['']ISI['])" as "part of a continued effort to gain greater legitimacy and unify the Iraqi Sunni militant factions not yet encompassed under the MSC umbrella." Id., Ex. 4 (Gartenstein-Ross Report) at 16. As demonstrated by these examples, although the Zarqawi Terrorist Organization's "leadership, decision-making[,] and agenda evolved over time, . . . in no case did the group's change in names represent a fundamental shift away from the previous iteration." Id., Ex. 4 (Gartenstein-Ross Report) at 10.

From 2000 to 2008, Syria provided "considerable support for the Zarqawi [Terrorist O]rganization [that] was intended to undermine coalition efforts in Iraq[,]" and its involvement with the organization "oscillated between tacit approval . . . and blatant support[.]" Id., Ex. 4 (Gartenstein-Ross Report) at 23. The first significant way Syria supported the Zarqawi Terrorist Organization was by providing a "primary transit point for militants heading to Iraq, as well as a permissive operating environment for Zarqawi network operatives stationed there[.]" Id., Ex. 4 (Gartenstein-Ross Report) at 23; see also id., Ex. 2 (Lister Report) at 17 ("By 2007, more than 100 jihadists were entering Iraq every month via Syria."); id., Ex. 2 (Lister Report) at 19–20 ("[A] March 2007 [U.S. Department of Defense] report . . . assert[ed] that . . . Syria remains the primary foreign fighter gateway into Iraq."); id., Ex. 2 (Lister Report) at 20 ("A U.S. diplomatic cable dispatched from the U.S. Embassy in Baghdad in July 2008 . . . declared that the Syria-based 'network continues to operate with the knowledge of the Syrian government and sends virtually all of its foreign terrorists into Iraq across the Syrian border.'"). In September 2007, United States Special Forces uncovered documents during a "counter-terrorism

raid in the northwestern Iraqi town of Sinjar," which "detail[ed] the organization's foreign fighter recruitment network through Syria" and "reveal[ed] the scale of the . . . network[.]" Id., Ex. 2 (Lister Report) at 18. "According to the[se] so-called 'Sinjar Records,' at least 700 foreign jihadist militants crossed into Iraq from just one ISI crossing point with Syria between August 2006 and August 2007. Of that number, 576 declared their nationality on arrival into ISI ranks and only [eight percent] were Syrian." Id., Ex. 2 (Lister Report) at 18. Furthermore, as detailed in "[a] classified U.S. intelligence report cited in 2012 in Foreign Policy Magazine[:]"

> Once in Syria, [jihadists] s[ought] accommodations in hotels typically located near large markets or mosques frequented by foreigners, allowing [them] to blend into the general population. . . . Within a few days, facilitators contact[ed] the recruits and escort[ed] them to safehouses where they await[ed] movement into Iraq. The safehouses often [we]re clustered in neighborhoods in Damascus or Aleppo, but [we]re also in border towns such as Al-Bukamal and Qamishli.

Id., Ex. 2 (Lister Report) at 17 (third alteration in original).

Moreover, "[i]n addition to serving as a hub for foreign fighters traveling to Iraq, Syria also served as a safe haven for key Zarqawi [Terrorist O]rganization operatives[.]" Id., Ex. 4 (Gartenstein-Ross Report) at 27; see also id., Ex. 2 (Lister Report) at 15 (stating that "the jihadist organization itself used Syria as a safe base for senior leadership figures"); Foley, 249 F. Supp. 3d at 204 (finding that during the time period from roughly 2002 through 2006, "Syria provided material support to the Zarqawi Terrorist Organization by, among other things, . . . giving its members safe haven"). For example, "Badran Turki Hishan al-Mazidih ([also known as] Abu Ghadiya) was appointed as [the organization's] chief of logistics[,]" Pls.' 2d Additional Exs., Ex. 2 (Lister Report) at 15, as early as 2004, see id., Ex. 4 (Gartenstein-Ross Report) at 27 (stating that Abu Ghadiya "serv[ed] as the Zarqawi [Terrorist O]rganization's Syrian commander for logistics as early as 2004" and that he had a "distinguished jihadist career until his death in 2008"). In this role, Abu Ghadiya worked in Syria, "alongside his cousin, Ghazy Fezza Hisan

al-Mazidih ([also known as] Abu Faysal)[,] . . . between Damascus, a headquarters in the western mountain town of Zabadani, and in the eastern desert governorate of Deir ez Zour, along the Iraqi border." Id., Ex. 2 (Lister Report) at 15.  Abu Ghadiya, with the assistance of Abu Faysal, "facilitated the movement of AQI operatives into Iraq via the Syrian border." Id., Ex. 4 (Gartenstein-Ross Report) at 28.

Beyond its "demonstrably permissive attitude toward the Zarqawi [Terrorist O]rganization and other insurgents making use of its territory as a transit point and safe haven[,]" Syria also "at times provided far more active support to the insurgency in Iraq[.]" Id., Ex. 4 (Gartenstein-Ross Report) at 29; see also id., Ex. 2 (Lister Report) at 16 ("Syria's role in facilitating the activities of Iraq-based jihadists was not always done covertly.  Occasionally, public figures would make clear their support for the likes of AQI and the ISI.").  For example, as Syrian regime defector Nawaf Fares explained "[i]n an interview . . . immediately following his 2012 defection[:]"

> After the invasion of Iraq in 2003, the regime in Syria began to feel danger, and began planning to disrupt the U.S. forces inside Iraq, so it formed an alliance with al-Qaeda. . . . All Arabs and other foreigners were encouraged to go to Iraq via Syria, and their movements were facilitated by the Syrian government. As a governor at the time, I was given verbal commandments that any civil servant that wanted to go would have his trip facilitated, and that his absence would not be noted.

Id., Ex. 4 (Gartenstein-Ross Report) at 29.  Additionally, "in the months prior to the [U.S.] invasion, . . . [Syria] allowed the establishment of an office across the street from the U.S. Embassy in Damascus where would-be insurgents could sign up and board a bus to travel to Baghdad." Id., Ex. 4 (Gartenstein-Ross Report) at 30 (first alteration in original).  As explained by Former Federal Bureau of Investigation special agent Ali Soufan, an al-Qaeda specialist, Syria "not only allowed" this activity to take place, but "happily assisted Zarqawi and his

peers[,]" and "Syrian officials ferried jihadists from Damascus International Airport to the Iraqi border."  Id., Ex. 2 (Lister Report) at 13.

Syria and the Syrian Military Intelligence also supported the Zarqawi Terrorist Organization by other means, including by providing the terrorist organization's recruits with training and enabling key operatives to facilitate the flow of funds from Syria to Iraq.  See Gates v. Syrian Arab Republic, 580 F. Supp. 2d 53, 59 (D.D.C. 2008) (finding that "Syria supported Zarqawi and his organization by[,]" inter alia, "facilitating the recruitment and training of Zarqawi's followers and their transportation into Iraq" and "financing Zarqawi and his terrorist network in Iraq"), aff'd, 646 F. Supp. 3d 1 (D.C. Cir. 2011).  With respect to training, United States Central Command has revealed that, "[i]n March 2007, [ ] multiple AQI/ISI training camps were in operation on Syrian territory."  Pls.' 2d Additional Exs., Ex. 2 (Lister Report) at 17.  Similarly, "a young Syrian man from Hama[,] who joined . . . [the] network to fight in Iraq, said recruits were provided training by Syrian intelligence officers, some of whom travel[]ed with them all the way to the Iraqi border."  Id., Ex. 2 (Lister Report) at 14.  "According to [ ] regime defector Nawaf Fares, [President] Assad's brother-in-law even ran an al-Qaeda training camp struck by U.S. forces in October 2008."  Id., Ex. 4 (Gartenstein-Ross Report) at 31.

Furthermore, as an example of Syria's tacit approval of financial support to the terrorist network in Iraq, Sulayman Khalid Darwish—a Zarqawi Terrorist Organization leader who was based in Syria, see id., Ex. 4 (Gartenstein-Ross Report) at 27—was able to "sen[d] donations of $10,000[–]$12,000 to Zarqawi in Iraq every [twenty to twenty-five] days . . . through suicide attack volunteers who were entering the country[,]" id., Ex. 4 (Gartenstein-Ross Report) at 28.  Following Darwish's death in 2005, the fundraising continued through Abu Ghadiya and his

"familial network of Zarqawi [Terrorist O]rganization operatives in Syria[,]" who obtained funds "to support anti-U.S. military elements and the travel of AQI foreign fighters" and, "[a]s of the spring of 2007, [ ] facilitated the movement of AQI operatives into Iraq via the Syrian border." Id., Ex. 4 (Gartenstein-Ross Report) at 28.  Additionally, "Fawzi Mutlaq al-Rawi[,] ([also known as] Abu Firas), the leader of the Iraqi branch of Syria's Baath Party," was accused by United States intelligence of "involvement in facilitating the financial flows to AQI from Syria[.]"  Id., Ex. 2 (Lister Report) at 17.  Darwish, Abu Ghadiya, and al-Rawi do not "appear to have been challenged by the Syrian government, and given the scale of their operations, it remains all-but impossible to imagine that the Syrian government was unaware of their activities."  Id., Ex. 2 (Lister Report) at 17.

Moreover, Syria and the Syrian Military Intelligence assisted the Zarqawi Terrorist Organization in obtaining weapons and false identification documents.  See id., Ex. 2 (Lister Report) at 15.  According to United States intelligence, Abu Ghadiya "met regularly with the then[-]chief of Syria's Military Intelligence Directorate" and "obtained false passports for foreign terrorists, provided passports, weapons, guides, safe houses[,] and allowances for foreign terrorists in Syria."  Id., Ex. 2 (Lister Report) at 15 (internal quotation marks omitted).  Similarly, United States intelligence indicates that Darwish's role within the terrorist organization was to "forge documents, raise funds, and recruit jihadists and manage their transit into Iraq."  Id., Ex. 2 (Lister Report) at 17.  Members of the Zarqawi Terrorist Organization "ensured that . . . weapons continued to flow across the [Iraqi] border."  Id., Ex. 4 (Gartenstein-Ross Report) at 29.  And, Syria's support for this effort was well-known to senior leadership in both the United States and Iraqi governments.  See id., Ex. 4 (Gartenstein-Ross Report) at 24–25 ("[I]n a news conference in March 2003, [U.S.] Secretary [of Defense Donald] Rumsfeld stated that '[the United States]

ha[s] information that shipments of military supplies have been crossing the border from Syria into Iraq, including night-vision goggles.'"); id., Ex. 4 (Gartenstein-Ross Report) at 25 ("While testifying before the House International Relations Committee (now known as the House Foreign Affairs Committee) in September 2003, [U.S. Secretary of State for Arms Control and International Security, John] Bolton, declared" that "Syria allowed military equipment to flow into Iraq on the eve of and during the war."); id., Ex. 4 (Gartenstein-Ross Report) at 30 ("[A] senior official in the Obama administration . . . said that 'since 2003, [President] al-Assad allowed the Zarqawi [Terrorist O]rganization and its associations to facilitate weapons, money[,] and fighters to al[-]Qadea's Iraq-based affiliate.'"); id., Ex. 4 (Gartenstein-Ross Report) at 33 ("[I]n December 2009[,] Iraqi minister of defense Abd al-Qadir al-Ubaydi stated that 'most of the weapons seized by his ministry's forces' were arriving from Syria, and the regime was 'financing armed groups in Iraq.'").

Based on this record evidence, the Court finds that Syria and the Syrian Military Intelligence provided material support to the Zarqawi Terrorist Organization's terrorist activity throughout the time period relevant to this case, i.e., roughly from 2000 to 2008.

**B.     The Abduction, Torture, and Murder of Fouty and Jiménez by the Zarqawi Terrorist Organization with Material Support from Syria**

**1.    The Attack**

In late 2006, a sectarian war between Shia and Sunni insurgent groups in Iraq "was exploding across the country" and the Zarqawi Terrorist Organization, then known as the ISI, "sought to lead the charge in both killing as many Shia Iraqis as possible and in undermining and confronting the [United States]-led coalition presence in the country." Id., Ex. 2 (Lister Report) at 22.  As violence was peaking, "the [United States] government sought to counter the ISI's momentum by announcing in January 2007 the initiation of a troop 'surge' of 21,500 soldiers[,]"

id., Ex. 2 (Lister Report) at 22, which was "intended to embolden a fledgling tribal uprising . . . in western Iraq, led by prominent Sunni tribal figures, who were mobilizing their male fighting forces to turn against the ISI jihadists in their midst[,]" id., Ex. 2 (Lister Report) at 22–23.  "The combination of [United States] surge and tribal uprising placed great pressure on the ISI" because the terrorist organization "depended on local Sunni Arabs in western Iraq for the majority of its manpower" and "counted on them to permit their presence within their communities."  Id., Ex. 2 (Lister Report) at 23.  Consequently, "[t]he year 2007 [ ] witnessed some of the highest levels of foreign fighter recruitment of the war—again, with the vast majority entering via Syria."  Id., Ex. 2 (Lister Report) at 23.

On May 12, 2007, a group of "ISI militants conducted an armed assault on a [United States] military observation post in the village of al-Taqa, outside the town of al-Mahmudiya, near Yusufiyah, south of Baghdad[.]"  Id., Ex. 2 (Lister Report) at 23; see also id., Ex. 4 (Gartenstein-Ross Report) at 33 ("At around 4:44 a.m. on May 12, 2007, a group of militants attacked an American military post near Mahmoudiyah, Iraq[.]").  "[T]he tactics and weapons employed indicated that the attackers' primary goal was to capture [United States] soldiers."  Id., Ex. 4 (Gartenstein-Ross Report) at 33.  Indeed, the raid "resulted in the immediate deaths of four [United States] soldiers and an Iraqi interpreter, and the capture of [United States] Army soldiers Alex R. Jimenez, Byron W. Fouty[,] and Joseph Anzack."  Id., Ex. 2 (Lister Report) at 23.  Anzack's "remains were found in the Euphrates River on [ ] May [23,] 2007."  Pls.' Additional Exs., Ex. 3 (AR 15-6 Investigating Officer's Report ("AR 15-6 Report")) at 14, ECF No. 26-3.  Fouty and Jiménez were declared "missing, presumed captured ([']MISCAP['])," and Coalition Forces "established a full-time MISCAP Cell to coordinate, synchronize, and focus the search" for the two missing servicemen.  Id., Ex. 3 (AR 15-6 Report) at 14.

After more than a year of the MISCAP Cell's "diligent[] . . . [efforts] to locate the missing [s]oliders[,]" id., Ex. 3 (AR 15-6 Report) at 14, Coalition Forces captured an al-Qaeda terrorist on July 1, 2008, who "stated [that] he . . . kn[ew] where the . . . remains of [Fouty and Jiménez] were buried[,]" id., Ex. 3 (AR 15-6 Report) at 15.  Although the captured terrorist was "unable to pinpoint the exact location" of the remains, id., Ex. 3 (AR 15-6 Report) at 15, he "supplied the name and address of a local national[,]" id., Ex. 3 (AR 15-6 Report) at 15, who ultimately led the Coalition Forces to the remains on July 8, 2008, see id., Ex. 3 (AR 15-6 Report) at 17.  The remains "were transported . . . to Dover A[ir ]F[orce ]B[ase,]" id., Ex. 3 (AR 15-6 Report) at 15, where, on July 10, 2008, they were "positively identified[,]" id., Ex. 3 (AR 15-6 Report) at 15, by the United States Armed Forces Institute of Pathology as the remains of Fouty and Jiménez using dental and DNA testing, see Pls.' Mot., Ex. 2 (Affidavit of Craig Thomas Mallak, J.D., M.D. ("Mallak Report")) ¶¶ 22, 25, ECF No. 25-2 (stating that Fouty and Jiménez's "remains have been positively identified with absolute certainty, by means of comparing antemortem DNA samples and dental records with the results of postmortem DNA and dental examinations"); see also id., Ex. 3 (Autopsy Examination Report ("Fouty Autopsy Report")) at 3, ECF No. 25-4; id., Ex. 4 (Report of Forensic Osteological Examination ("Fouty Osteological Report")) at 5, ECF No. 25-5; id., Ex. 10 (Autopsy Examination Report ("Jiménez Autopsy Report")) at 3, ECF No. 25-11; id., Ex. 11 (Report of Forensic Osteological Examination ("Jiménez Osteological Report")) at 5, ECF No. 25-12.

Based on the foregoing facts, the Court finds that Fouty and Jiménez were captured on May 12, 2007, during an armed assault conducted by ISI militants on an American military post near Mahmoudiyah, Iraq, and, after a year-long effort to recover the captured soldiers, their remains were discovered and positively identified on July 10, 2008.

### 2. ISI's Claims of Responsibility for the Attack

At the time of the May 12, 2007 attack, the Zarqawi Terrorist Organization was known as the Islamic State of Iraq ("ISI").  See Pls.' 2d Additional Exs., Ex. 2 (Lister Report) at 25 ("At the time of the attack in 2007, the ISI was the latest iteration of a well-established terrorist organization with roots dating back to the activities of its founding leader, . . . []Zarqawi[.]"); id., Ex. 4 (Gartenstein-Ross Report) at 52 (stating that ISI "is the name that the Zarqawi [Terrorist O]rganization employed at the time of the incident").  "In the days immediately after the attack, ISI released multiple statements claiming responsibility[.]"  Id., Ex. 4 (Gartenstein-Ross Report) at 33.  First, on May 13, 2007, ISI posted a statement on the al-Firdaws jihadist forums, see id., Ex. 4 (Gartenstein-Ross Report) at 38, "claiming responsibility for the previous day's attack[] [and] promising that it would later provide a more detailed description of the 'blessed operation[,]'" id., Ex. 4 (Gartenstein-Ross Report) at 33.  The following day, on May 14, 2007, ISI released a second statement, via the World News Network, see id., Ex. 4 (Gartenstein-Ross Report) at 39, that "again highlighted the group's responsibility[] and warned the Americans that they should not try to free the captured soldiers[,]" id., Ex. 4 (Gartenstein-Ross Report) at 33. Additionally, on May 15, 2007, a "London-based Arabic language news agency" reported that a prominent ISI leader had participated in an interview in which he "encouraged the soldiers' captors to maximize the propaganda value of the operation for al-Qaeda[,]" assured the news agency that Fouty and Jiménez were "still alive[,]" and warned the U.S. military against searching for the missing soldiers.  Id., Ex. 4 (Gartenstein-Ross Report) at 34.

Subsequently, on June 4, 2007, "ISI made its final claim of responsibility, when the group published a video announcing the death of its three American captives."  Id., Ex. 4 (Gartenstein-Ross Report) at 41.  The video was "[ten] minutes and [forty-two] seconds in length[,]" id. Ex. 4 (Gartenstein-Ross Report) at 36, and was distributed "through the World

News Network," id. Ex. 4 (Gartenstein-Ross Report) at 44.  It "makes explicit references to the orders of [a]n ISI emir . . . as inspiration for the operation[] and refers back to the two aforementioned ISI statements claiming responsibility for the abduction."  Id., Ex. 4 (Gartenstein-Ross Report) at 44.  The video concludes by displaying the personal effects of Fouty and Jiménez, including "credit cards, machine guns, U.S. dollars, documents, and guns[,]" as well as their official military identification.  Id., Ex. 4 (Gartenstein-Ross Report) at 43. Further corroborating ISI's involvement in the capture and murder of Fouty and Jiménez, on June 10, 2007, "U.S. forces recovered the soldiers' IDs[,]" as well as "computers, video production equipment, rifles[,] and ammunition" "in a raid of a suspected ISI safe house . . . around [ninety] miles north of where Fouty and Jiménez were abducted."  Id., Ex. 4 (Gartenstein-Ross Report) at 36.  Additionally, in late November 2007, "U.S. troops [ ] discovered a notebook entitled 'Operation Capture Soldiers' containing documents about the planning and execution of the kidnappings as well as a list of safe houses and routes used by . . . the chief planner of the incident[.]"  Id., Ex. 4 (Gartenstein-Ross Report) at 37 (internal quotation marks omitted).

Dr. Gartenstein-Ross has analyzed ISI's claims of responsibility and determined that they are authentic for several reasons including: (1) the forums used to distribute the statements and video, see id., Ex. 4 (Gartenstein-Ross Report) at 39 ("The al-Firdaws jihadist forum was a jihadist website that password protected some of its forums[] and regularly published authentic statements issued by Iraqi militant groups."); id. Ex. 4 (Gartenstein-Ross Report) at 44 ("World News Network[] [was] a site known for disseminating official statements and content from jihadist groups[] and [was] specifically endorsed by al-Qaeda's al-Fajr Media Center."); (2) the signatory of the statements and video, see id. Ex. 4 (Gartenstein-Ross Report) at 44 ("The

Islamic State of Iraq's Ministry of Information was the signatory of the statement[s]."); id., Ex. 4 (Gartenstein-Ross Report) at 41 ("The video opens with the . . . name of the Islamic State of Iraq."); (3) the logos featured in the statements and video, see id. at 44 ("The [May 14, 2007] statement featured the ISI logo."); id., Ex. 4 (Gartenstein-Ross Report) at 41 ("The video [wa]s branded with [the] ISI's logo, as well as the logo of ISI propaganda outlet al-Furqan Media Foundation."); and (4) the lack of repudiation of the claims of responsibility after they were published, see id., Ex. 4 (Gartenstein-Ross Report) at 39 ("[N]either [the] ISI nor any militant group repudiated th[e] claim [in the May 13, 2007 statement] as a false attribution."); id., Ex. 4 (Gartenstein-Ross Report) at 43 ("[T]h[e] video reinforces the validity of the previous claims of responsibility put forth in the statements issued on May 13 and 14[, 2007].").

The Court agrees with Dr. Gartenstein-Ross's assessment that the ISI's claims of responsibility are credible and, thus, finds that the Zarqawi Terrorist Organization—then known as the ISI—was responsible for the May 12, 2007 attack.

### 3. The Capture, Torture, and Ultimate Murder of Fouty and Jiménez

Dr. Craig Mallak, a forensic pathologist who served as the Armed Forces Medical Examiner ("AFME") from 2006 to 2012, see Pls.' Mot., Ex. 3 (Craig Thomas Mallak ("Mallak Curriculum Vitae")) at 1, ECF No. 25-3, and was responsible for supervising the autopsies of Fouty and Jiménez, see id., Ex. 2 (Mallak Report) ¶ 18, concludes with "a reasonable degree of medical certainty, that . . . [both soldiers] w[ere:] abducted and held in captivity by ISI terrorists, against [their] will[;] . . . alive and conscious while in ISI captivity[;] . . . tortured while in ISI captivity[;] . . . [and] killed while in ISI captivity, more likely than not by beheading[,]" id., Ex. 2 (Mallak Report) ¶¶ 49–50.  Dr. Gartenstein-Ross and Mr. Lister each provide a similar assessment.  See Pls.' 2d Additional Exs., Ex. 4 (Gartenstein-Ross Report) at 52 (stating that "[t]he evidence overwhelmingly demonstrates that the [ISI] . . . was responsible for killing . . .

Fouty and . . . Jiménez" and that "it is more likely than not that Fouty and Jiménez were tortured during their time in captivity"); id., Ex. 2 (Lister Report) at 25 ("All open-source information suggests . . . Jim[é]nez and . . . Fouty were kidnapped by the ISI, likely tortured, and later executed or died of injuries sustained during the May 11, 2007 attack.").

As Dr. Mallak explains, "[t]here are a number of facts and circumstances that are properly considered in a forensic pathology investigation that compel the conclusion that both [ ] Fouty and [ ] Jiménez were held in captivity alive and conscious, before being tortured and killed." Pls.' Mot., Ex. 2 (Mallak Report) ¶ 28. For instance, both soldiers were young at the time of captivity, see id., Ex. 2 (Mallak Report) ¶ 29 ("[Fouty] was a healthy [nineteen] year[] old male at the time of his captivity."); id., Ex. 2 (Mallak Report) ¶ 30 ("[Jiménez] was also young, approximately [twenty-five] years old, at the time of his captivity."), and "[n]either soldier suffered from any pre-existing medical condition that would have compromised his ability to survive capture and wounding consistent with his training[,]" id., Ex. 2 (Mallak Report) ¶ 29. Also, a portion of a pair of handcuffs was recovered among the skeletal remains of Fouty and Jiménez, see id., Ex. 5 (Fouty Osteological Report) at 4; id., Ex. 12 (Jiménez Osteological Report) at 4, and "[t]he use of handcuffs suggests that the soldiers were conscious, capable of resisting their captors or fleeing, and being held against their will[,]" id., Ex. 2 (Mallak Report) ¶ 34. Furthermore, "[d]esiccated brain material was found in the skulls of both soldiers[,]" id., Ex. 2 (Mallak Report) ¶ 31; see also id., Ex. 5 (Fouty Osteological Report) at 2; id., Ex. 12 (Jiménez Osteological Report) at 2, which Dr. Mallak explains "is a very strong indicator that both survived for at least weeks after the initial ambush of their military unit[,]" id., Ex. 2 (Mallak Report) ¶ 31, since "the brain is the first organ to decompose[,]" id., Ex. 2 (Mallak Report) ¶ 31.

The finding that Fouty and Jiménez were held alive in captivity is further supported by the statements made by the ISI in its June 4, 2007 video that "confirmed that the soldiers were alive in captivity[] before [the] ISI killed them." Id., Ex. 2 (Mallak Report) ¶ 39; see Pls.' 2d Additional Exs., Ex. 4 (Gartenstein-Ross Report) at 42 (quoting the narration over the video footage, in which the ISI stated that "it decided to end the issue and it announced news of their killing so that the bitter result for the enemies of God will be the three soldiers after they were alive and in captivity"). Moreover, the Army Human Resources Command has certified the "Prisoner of War" status and medal award of Fouty and Jiménez, see Pls.' Mot., Ex. 8 (Funeral and Interment Information ("Fouty List of Awards")) at 2, ECF No. 25-9; id., Ex. 15 (Funeral and Interment Information ("Jiménez List of Awards")) at 2, ECF No. 25-16, which is "reserved for soldiers held alive in captivity[,]" id., Ex. 2 (Mallak Report) ¶ 38.

Additionally, both Dr. Gartenstein-Ross and Dr. Mallak conclude that Fouty and Jiménez were tortured prior to being killed by the ISI. See id., Ex. 2 (Mallak Report) ¶ 40 ("I have no doubt whatsoever that [the] ISI physically tortured both [ ] Fouty and [ ] Jiménez before killing them."); Pls.' 2d Additional Exs., Ex. 4 (Gartenstein-Ross Report) at 45 ("[I]t is my expert opinion that . . . Fouty and . . . Jiménez were tortured prior to being killed."). "[T]orture of captives was a well-established modus operandi of [the] ISI[,]" Pls.' 2d Additional Exs., Ex. 4 (Gartenstein-Ross Report) at 46, as demonstrated by "an examination of the cases of other Western hostages held by the Zarqawi [Terrorist O]rganization[,]" id., Ex. 4 (Gartenstein-Ross Report) at 47, the discovery by U.S. forces of "a manual specifically dedicated to providing instruction for torture in an ISI safe house in May 2007[,]" id., Ex. 4 (Gartenstein-Ross Report) at 48, and the "discover[y of] a multitude of facilities utilized by the Zarqawi [Terrorist O]rganization from 2004 to as late as 2009 to torture and brutalize hostages[,]" id., Ex. 4

21

(Gartenstein-Ross Report) at 49.  See also Pls.' Mot., Ex. 2 (Mallak Report) ¶ 40 ("I know from my firsthand experience in the field in Iraq, and as AFME presiding over all autopsies performed on military personnel killed during the Second Gulf War, that this terrorist organization routinely tortured and killed its abductees.").

Neither Fouty nor Jiménez died of injuries sustained prior to their abduction, natural causes, or natural diseases.  See id., Ex. 2 (Mallak Report) ¶¶ 29–30.  Rather, the autopsy examinations identify the cause of death of both soldiers as "homicide[,]" id., Ex. 4 (Fouty Autopsy Report) at 3; id., Ex. 11 (Jiménez Autopsy Report) at 3, which "is the cause of death used by forensic pathologists when all other causes of death, to a reasonable degree of certainty, have been excluded[,]" id., Ex. 2 (Mallak Report) ¶ 36.  As further evidence that the soldiers' homicides "occurred while they were in captivity[,]" id., Ex. 2 (Mallak Report) ¶ 37, the Reports of Casualty for both Fouty and Jiménez state that they were "[d]eceased [w]hile [c]aptured[,]" id., Ex. 6 (Report of Casualty ("Fouty Report of Casualty")) at 3, ECF No. 25-7; id., Ex. 13 (Report of Casualty ("Jiménez Report of Casualty")) at 4, ECF No. 25-14.

Not only were the soldiers tortured and killed while in captivity, but the evidence also "strongly indicates that both [ ] Jiménez and [ ] Fouty were beheaded after being taken hostages." Id., Ex. 2 (Mallak Report) ¶ 32.  Beheadings are a "routine practice" and "key component of the Zarqawi [Terrorist O]rganization's method of spreading terror."  Pls.' 2d Additional Exs., Ex. 4 (Gartenstein-Ross Report) at 49.  "The group became notorious for performing, and often filming, beheadings throughout the 2000s, both prior to and contemporaneous with the 2007 deaths of . . . Jiménez and . . . Fouty." Id., Ex. 4 (Gartenstein-Ross Report) at 49.  The beheadings served strategic purposes for the organization, through which it attempted to "extract concessions from Coalition forces[] or generate the kind of public

pressure that could cause the governments to withdraw from Iraq." Id., Ex. 4 (Gartenstein-Ross Report) at 51.  "Not only did the Zarqawi [Terrorist O]rganization demonstrate that these governments were unable to protect their citizens in Iraq, but these executions had the potential to cause horrified citizens to oppose their governments' involvement in the Iraq conflict."  Id., Ex. 4 (Gartenstein-Ross Report) at 51.

In this case, the heads of Fouty and Jiménez were "found together separate from the other bones[,]" and "[o]nly four cervical vertebrae were recovered of the fourteen from the two [s]oldiers."  Pls.' Mot., Ex. 2 (Mallak Report) ¶ 32.  "The four recovered, cervical vertebrae numbers 1[–]4," were all from Fouty and "showed extensive postmortem animal predation" and "were missing the anterior portion of the bone[,]" indicating "inflicted trauma to the neck of [ ] Fouty."  Id., Ex. 2 (Mallak Report) ¶ 32.  Similarly, "[t]he lack of any recovery of cervical vertebra from [ ] Jiménez indicated that the[ ] [vertebrae] were subject to animal predation and removal from the burial site."  Id., Ex. 2 (Mallak Report) ¶ 32.  According to Dr. Mallak, because "[a]nimal predation occurs first at injured sites of the body, where the skin has been compromised[,]" "[t]he lack of recovery of the bones of the neck strongly indicates that both [ ] Jiménez and [ ] Fouty were beheaded after being taken as hostages."  Id., Ex. 2 (Mallak Report) ¶ 32.  Furthermore, it is likely that the beheadings were performed prior to the soldiers' deaths.  See id., Ex. 2 (Mallak Report) ¶ 32 (stating that, "[t]hroughout the conflict in Iraq, [ ] [Dr. Mallak] investigated many cases of captives that were beheaded" and is not aware of any cases "where beheading was performed after death to mutilate the body").

In conclusion, relying on the expert reports of Dr. Mallak, Dr. Gartenstein-Ross, and Mr. Lister, as well as the documentary evidence supporting their opinions, the Court finds that Fouty and Jiménez were held alive in captivity, tortured, and ultimately murdered by ISI terrorists.

Accordingly, based on the "uncontroverted evidence presented by [the] plaintiffs[,]"

Belkin, 667 F. Supp. 2d at 20, the Court finds that the Zarqawi Terrorist Organization (then

known as the ISI)—materially supported by the defendants—is responsible for the abduction,

torture, and murders of Fouty and Jiménez.

## IV.    CONCLUSIONS OF LAW

The plaintiffs request that the Court "enter [d]efault [j]udgment on [their] behalf . . .

against the . . . [d]efendants[] for the hostage taking, torture, and extrajudicial killings of . . .

Fouty and . . . Jiménez[.]" Pls.' Mot. at 1.  Under the Act, "default judgment may be entered if:

(1) the [C]ourt has subject[-]matter jurisdiction over the [plaintiffs'] claims; (2) personal

jurisdiction is properly exercised over [the d]efendant[s]; and (3) [the p]laintiff[s] ha[ve]

presented satisfactory evidence to establish [their] claim[s] against [the d]efendant[s]." Friends

of Mayanot Inst., Inc. v. Islamic Republic of Iran, 313 F. Supp. 3d 50, 56 (D.D.C. 2018).  The

Court's Conclusions of Law will therefore proceed in several parts.  First, the Court will address

whether it has subject-matter jurisdiction over the plaintiffs' claims.  Next, the Court will address

whether it may validly exercise personal jurisdiction over Syria and the Syrian Military

Intelligence.  Finally, the Court will assess whether the plaintiffs have stated cognizable claims

for relief.

## A.    Subject-Matter Jurisdiction

To determine whether a default judgment may be entered, the Court must first consider

whether it has subject-matter jurisdiction over the plaintiffs' claims.  The Foreign Sovereign

Immunities Act provides the "sole basis for obtaining jurisdiction over a foreign state in [United

States] courts." Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989).

Under the Act, the Court has subject-matter jurisdiction over "(1) nonjury civil actions (2)

24

against a foreign state (3) as to any claim for relief <u>in personam</u>, (4) provided that the foreign

state is not entitled to immunity." <u>Reed v. Islamic Republic of Iran</u>, 845 F. Supp. 2d 204, 210

(D.D.C. 2014) (citing 28 U.S.C. § 1330(a)).  A "foreign state" is defined to include "a political

subdivision of a foreign state or an agency or instrumentality of a foreign state[.]"  28 U.S.C.

§ 1603(a).  In interpreting this statutory definition of a foreign state, "th[e] [District of Columbia]

Circuit employs a core-functions test, under which 'an entity that is an integral part of a foreign

state's political structure is to be treated as the foreign state itself' while an 'entity the structure

and core function of which are commercial is to be treated as an agency or instrumentality of the

state.'" <u>Murphy v. Islamic Republic of Iran</u>, 740 F. Supp. 2d 51, 62–63 (D.D.C. 2010) (internal

quotation marks omitted) (quoting <u>TMR Energy Ltd. v. State Prop. Fund of Ukraine</u>, 411 F.3d

296, 300 (D.C. Cir. 2005)).

 Here, the first three prerequisites for subject-matter jurisdiction—<u>i.e.</u>, that the suit is a

"[(1)] nonjury civil action [(2)] against a foreign state . . . [(3)] as to any claim for relief <u>in</u>

<u>personam</u>[,]" 28 U.S.C. § 1330(a)—are easily satisfied.  First, the plaintiffs have not sought a

jury trial, <u>see generally</u> Compl., nor are they entitled to one in this case, <u>see</u> <u>Croesus EMTR</u>

<u>Master Fund L.P. v. Federative Republic of Brazil</u>, 212 F. Supp. 2d 30, 40 (D.D.C. 2002)

("[C]laims under the [Act] are not eligible for resolution by a jury[.]").  Thus, this "default

judgment proceeding under the [Act] is a nonjury civil action." <u>Reed</u>, 845 F. Supp. 2d at 210.

Second, the plaintiffs have initiated this action against the Syrian Arab Republic, <u>see</u> Compl.

at 1, which is "indisputably a foreign sovereign[,]" <u>Thuneibat v. Syrian Arab Republic</u>, 167 F.

Supp. 3d 22, 33 (D.D.C. 2016), and the Syrian Military Intelligence, <u>see</u> Compl. at 1, which is

also considered a foreign state under § 1603(a) "because its core functions are governmental, not

commercial[,]" <u>Gates</u>, 580 F. Supp. 2d at 64; <u>see</u> <u>Thuneibat</u>, 167 F. Supp. 3d at 33–34

(concluding that "the Syrian Military Intelligence . . . is a 'political subdivision' of Syria, [and] is [ ] considered a foreign sovereign . . . under 28 U.S.C § 1603(a)"); Worley v. Islamic Republic of Iran, 75 F. Supp. 3d 311, 324 (D.D.C. 2014) ("Intelligence gathering and operations are not commercial in nature; they are governmental functions.").  Third, this is an action in personam, rather than in rem, because "the Court is being asked to exercise personal jurisdiction over [the d]efendant[s] as [] legal person[s] and not to exercise such jurisdiction over any property[.]" Alinejad v. Islamic Republic of Iran, No. 19-cv-3599 (GMH), 2023 WL 4684929, at *11 (D.D.C. July 6, 2023); see Compl. ¶ 24.

The fourth prerequisite for subject-matter jurisdiction—i.e., that "the foreign state is not entitled to immunity[,]" 28 U.S.C. § 1330(a)—warrants greater discussion.  Under the Act, "a foreign state is presumptively immune from the jurisdiction of United States courts[.]"  Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993).  However, the Act contains certain exceptions that "strip foreign states of this immunity."  Reed, 845 F. Supp. 2d at 210 (citing 28 U.S.C. §§ 1605– 1607).  Relevant here, the plaintiffs argue that the "[d]efendants' conduct falls within the 'state sponsor of terrorism' exception" to sovereign immunity.  Pls.' Mot. at 6.  The "state sponsor of terrorism" exception establishes that a foreign state is not immune in "any case" in which "money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act[.]"  28 U.S.C. § 1605A(a)(1).

To invoke the state sponsor of terrorism exception, the plaintiffs must satisfy several threshold requirements.  See id. § 1605A(a)(2).  The Court will therefore first examine whether the threshold requirements are met in this case before proceeding to an analysis of whether the plaintiffs' suit falls within the state sponsor of terrorism exception to sovereign immunity.

1.  **Requirements for a Claim to be Considered under § 1605A**

The plaintiffs argue that "each of the [threshold] requirements for subject[-]matter jurisdiction" under the state sponsor of terrorism exception are satisfied in this case, Pls.' Mot. at 7, because (1) "the Syrian Arab Republic was designated as a state sponsor of terrorism at the time of the abduction, torture[,] and extrajudicial killing of Fouty and Jiménez described in the Complaint and remains so [designated] today[,]" id.; (2) "the direct victims[,] Fouty and Jiménez[,] were serving on active duty as members of the U.S. armed forces when they were abducted, tortured[,] and killed in Iraq," id. at 9; and (3) "the requirement . . . to arbitrate the claim prior to the initiation of this lawsuit does not apply where, as here, the immediate acts causing the death of the decedents, their torture and murder, occurred in Iraq and not in Syria[,]" id.

A federal district court "shall hear a claim" under the state sponsor of terrorism exception when the following three requirements are met: (1) the foreign state was designated as a "state sponsor of terrorism at the time [of] the act . . . and . . . remains so designated when the claim is filed[,]" 28 U.S.C. § 1605A(a)(2)(A)(i)(I); (2) "the claimant or the victim was . . . a national of the United States[,] [ ] a member of the armed forces[,] or [ ] otherwise an employee of the Government of the United States" at the time of the act, id. § 1605A(a)(2)(A)(ii); and (3) "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim[,]" id. § 1605A(a)(2)(A)(iii).[9]

---

[9] Cases brought pursuant to the Act's state sponsor of terrorism exception are also subject to a ten-year limitations period.  See 28 U.S.C. § 1605A(b) ("An action may be brought or maintained under this section if the action is commenced . . . not later than . . . [ten] years after the date on which the cause of action arose.").  Here, the plaintiffs argue that "[t]his lawsuit [w]as [t]imely [c]ommenced[,]" Pls.' Mot. at 28, because it was filed "on February 20, 2018, over four months prior to the close of the [ten-year] limitation period[,]" id. at 30, which began to run from "Fouty and Jiménez's official dates of death on July 8, 2008[,]" id.  Ultimately, however, the Court need not address

(continued . . .)

Here, the threshold requirements for the Court to entertain a claim pursuant to the state sponsor of terrorism exception are satisfied.  With respect to the first requirement, as discussed in the Court's Findings of Fact, see supra Section III.A, Syria has been designated as a state sponsor of terrorism since December 29, 1979, and remains so designated today, see United States Department of State, State Sponsors of Terrorism, https://www.state.gov/state-sponsors-of-terrorism (last visited July 17, 2024).  See 28 U.S.C. § 1605A(h)(6) (defining "state sponsor of terrorism" as "a country the government of which the Secretary of State has determined . . . is a government that has repeatedly provided support for acts of international terrorism[.]").  And, "because § 1605A focuses on whether 'the foreign state' was designated—and not whether each named defendant was separately designated—the Court concludes that the designation of [Syria] as a state sponsor of terrorism is sufficient to satisfy the designation requirement as to both defendants."  Fritz v. Islamic Republic of Iran, 320 F. Supp. 3d 48, 77–78 (D.D.C. 2018).

Additionally, as to the second requirement—i.e., that "the claimant or the victim was . . . a national of the United States[,] [ ] a member of the armed forces[,] or [ ] otherwise an employee of the Government of the United States" at the time of the act, 28 U.S.C. § 1605A(a)(2)(A)(ii)—both Fouty and Jiménez were United States citizens, see Pls.' 2d Additional Exs., Ex. 29 (Certificate of Live Birth ("Fouty Birth Certificate")) at 1, ECF No. 27-29; Pls.' 3d Additional Exhibits, Ex. 14 (Certification of Birth ("Jiménez Birth

---

(. . . continued)

the issue of whether this lawsuit was timely commenced because "when a defendant state 'fail[s] to enter an appearance or submit a filing at any stage of [a] case[ ],' it forfeits any potential statute-of-limitations defenses." Roberts v. Islamic Republic of Iran, 581 F. Supp. 3d 152, 172 (D.D.C. 2022) (alterations in original) (quoting Maalouf v. Islamic Republic of Iran, 923 F.3d 1095, 1108 (D.C. Cir. 2019)).  Thus, because the defendants have not appeared in this case, the Court may not sua sponte raise a potential statute of limitations defense on the defendants' behalf.  See Radmanesh v. Islamic Republic of Iran, 6 F.4th 1338, 1341 n.1 (D.C. Cir. 2021) ("[B]ecause the [Act's] [ten]-year statute of limitations is a non-jurisdictional affirmative defense, [the Court] may not raise it on the [defendant's] behalf." (citing Maalouf, 923 F.3d at 1108, 1113)); Roberts, 581 F. Supp. 3d at 172 ("A federal court has no authority to raise this statute of limitations defense 'on behalf of an entirely absent defendant.'" (quoting Maalouf, 923 F.3d at 1122)).

Certificate")) at 1, ECF No. 28-14, and were serving on active duty as members of the United States armed forces, see Pls.' Mot., Ex. 7 (Fouty Report of Casualty) at 3; id., Ex. 14 (Jiménez Report of Casualty) at 4, when they were captured, tortured, and killed.  Although some of the plaintiffs were not United States nationals at the time of the attack, see Pls.' Mot. at 11 ("Three of the immediate family members of [ ] Jiménez were not U.S. citizens at the time of [his] abduction and killing—his father Ramon Jiménez, his widow Yaderlin Jiménez, and[ ]his younger sibling, Alexander Jiménez Vargas."), "this fact is non-consequential" for jurisdictional purposes, Force v. Islamic Republic of Iran, 464 F. Supp. 3d 323, 369 (D.D.C. 2020), because "the waiver of foreign sovereign immunity applies so long as 'the claimant or the victim was, at the time of the' terrorist attack, a U.S. national, member of the armed forces, or government employee[,]" id. (quoting 28 U.S.C. § 1605A(a)(2)(A)(ii)).  In other words, the fact that some of the plaintiffs were not United States citizens at the time of the attack "does not deprive the Court of jurisdiction because the terrorism exception can apply as long as 'the claimant or the victim' was a U.S. national[, member of the armed forces, or government employee] at the time of the attack."  Shatsky v. Syrian Arab Republic, No. 08-cv-496 (RJL), 2024 WL 1091803, at *5 (D.D.C. Mar. 13, 2024) (quoting 28 U.S.C. § 1605A(a)(2)(A)(ii)).  Thus, because Fouty and Jiménez—the direct victims of the terrorist attack—were United States nationals and members of the United States armed forces at the time of the attack, the plaintiffs have satisfied the second requirement for the Court to consider their claims.  See Abedini v. Gov't of Islamic Republic of Iran, 422 F. Supp. 3d 118, 131 (D.D.C. 2019) (concluding that both the direct victim of an attack and his sister met the second requirement for the court to consider their claims under the Act "even though [the victim's sister] [wa]s not" a U.S. national because "the victim, is—and was at the time of his captivity—a  U.S. national").

Finally, the third requirement, <u>i.e.</u>, that "the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim[,]" only applies "in a case in which the act occurred in the foreign state against which the claim has been brought[.]"  28 U.S.C. § 1605A(a)(2)(A)(iii).  Here, because Fouty and Jiménez were killed in Iraq, rather than Syria, <u>see</u> <u>supra</u> Section III.B.1, the plaintiffs had no obligation to afford the defendants a "reasonable opportunity to arbitrate the claim[s,]" 28 U.S.C. § 1605A(a)(2)(A)(iii).  <u>See</u> <u>Thuneibat</u>, 167 F. Supp. 3d at 35 (concluding that "[t]he plaintiffs d[id] not need to satisfy the third element [ ] because the terrorist attacks at issue did not occur 'in the foreign state against which the claim has been brought." (quoting 28 U.S.C. § 1605A(a)(2)(A)(iii))).

Therefore, the threshold requirements are satisfied and the Court "shall hear [the plaintiffs'] claim[s,]" 28 U.S.C. § 1605A(a)(2), under the state sponsor of terrorism exception.

## 2.  Waiver of Sovereign Immunity under § 1605A

Having concluded that the threshold requirements for the Court to consider a claim under the state sponsor of terrorism exception to sovereign immunity are satisfied, the Court now turns to the question of whether the exception applies in this case.  The state sponsor of terrorism exception denies immunity

> in any case . . .  in which [1] money damages are sought [2] against a foreign state [3] for personal injury or death [4] that was caused by [5] an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1).

Here, the first three elements of the exception are established because the plaintiffs seek money damages against Syria and the Syrian Military Intelligence—both of which the Court has determined are foreign states, <u>see</u> <u>supra</u> Section IV.A.1—for the personal injuries and deaths of

Fouty and Jiménez, as well as for the personal injuries sustained by the family members of these servicemen.  See Compl. at 3, ¶¶ 85–116.  Although not direct victims of the terrorist attack, the relatives of Fouty and Jiménez "also satisfy the personal injury requirement of § 1605A(a)(1)" because "the [Act] is understood to encompass claims by family members of those injured or killed for the distress caused by their relative's injuries[.]"  Force, 464 F. Supp. 3d at 359.

With respect to the fourth and fifth elements—i.e., whether the plaintiffs' injuries were "caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act" by Syria and the Syrian Military Intelligence, 28 U.S.C. § 1605A(a)(1)—the plaintiffs assert that the "[d]efendants provided 'material support and resources' to the Zarqawi Terrorist Organization[—i.e.,] the terrorist organization that committed acts of 'hostage taking[,]'[] 'torture[,]' and 'extrajudicial killing' against Fouty and Jiménez . . . from at least 2004[–]2007[,]" Pls.' Mot. at 8.  Moreover, the plaintiffs allege that "there is a direct causal relationship between Syria's intensified provision of material support and resources to the Zarqawi Terrorist Organization in 2007, and the abduction, torture, and execution of Fouty and Jiménez."  Id. at 26.  For the reasons explained below, the Court concludes that (1) the Zarqawi Terrorist Organization committed acts of hostage taking, torture, and extrajudicial killing within the meaning of the Act; (2) the defendants provided material support and resources for the commission of these acts; and (3) the defendants' provision of material support and resources caused the injuries and deaths of Fouty and Jiménez and the resulting injuries to their family members.

### a.  Whether the Zarqawi Terrorist Organization Committed Acts of Hostage Taking, Torture, and Extrajudicial Killing

The fourth element of the state sponsor of terrorism exception to sovereign immunity requires that there be "an act of torture, extrajudicial killing, aircraft sabotage, [or] hostage

taking[.]"  28 U.S.C. § 1605A(a)(1).  The plaintiffs allege that the Zarqawi Terrorist

Organization "committed acts of 'hostage taking', 'torture'[,] and 'extrajudicial killing' against

Fouty and Jiménez," Pls.' Mot. at 8, so the Court will address each alleged act in turn.

### i.   Hostage Taking

The Act's definition of "hostage taking" is borrowed from Article I of the International

Convention Against the Taking of Hostages.  See 28 U.S.C. § 1605A(h).  Under that treaty, the

term "hostage taking" means

> seiz[ing] or detain[ing] and threaten[ing] to kill, to injure or to continue to detain
> another person . . . in order to compel a third party, namely, a State, an
> international governmental organization, a natural or juridical person, or a group
> of persons, to do or abstain from doing any act as an explicit or implicit
> condition for the release of the hostage.

International Convention Against the Taking of Hostages, art. 1, Dec. 17, 1979, 1316

U.N.T.S. 205.  "Hostage taking thus has two elements: the abduction or detention and the

purpose of accomplishing 'the sort of third-party compulsion described in the [C]onvention.'"

Sotloff v. Syrian Arab Republic, 525 F. Supp. 3d 121, 135 (D.D.C. 2021) (quoting Simpson v.

Socialist People's Libyan Arab Jamahiriya, 470 F.3d 356, 359 (D.C. Cir. 2006)).

Here, the plaintiffs have satisfied the first element of hostage taking based on the

evidence submitted with their motion which established that Fouty and Jiménez were abducted

and held captive by the Zarqawi Terrorist Organization.  See supra Section III.B.  Indeed, Dr.

Mallak, Dr. Gartenstein-Ross, and Mr. Lister each concluded that Fouty and Jiménez were

abducted and held in captivity by this terrorist organization.  See Pls.' Mot., Ex. 2 (Mallak

Report) ¶ 18 (concluding with "a reasonable degree of medical certainty, that" both soldiers were

"abducted and held in captivity by ISI terrorists, against [their] will"); Pls.' 2d Additional Exs.,

Ex. 4 (Gartenstein-Ross Report) at 44 (finding credible the May 13, 2007 and May 14, 2007

statements in which the "ISI claimed responsibility for Fouty and Jiménez's abduction"); id.,
Ex. 2 (Lister Report) at 25 (concluding that "[a]ll open-source information suggests . . . Jiménez
and . . . Fouty were kidnapped by the ISI").  Additionally, the second element of hostage taking
is satisfied in this case because the plaintiffs have shown that the Zarqawi Terrorist Organization
"threaten[ed] to kill, [ ] injure[,] or to continue to detain" Fouty and Jiménez "in order to
compel" the United States to refrain from further military action.  International Convention
Against the Taking of Hostages, art. 1, Dec. 17, 1979, 1316 U.N.T.S. 205; see, e.g., Pls.' 2d
Additional Exs., Ex. 4 (Gartenstein-Ross Report) at 40 (quoting the ISI's second claim of
responsibility for the attack, which was posted to the World News Network on May 14, 2007 and
stated: "Your soldiers are in our hands, and if you want the safety of your soldiers, do not look
for them."); id. Ex. 4 (Gartenstein-Ross Report) at 34 (describing a May 15, 2007 "London-
based Arabic language news agency" report that a prominent ISI leader had participated in an
interview following the attack in which "[h]e explained al-Qaeda's desire to produce a video in
which the soldiers 'trample on the U.S. flag, curse [President George W.] Bush and demand him
to pull out troops, and advise other soldiers to escape'"); cf. id., Ex. 4 (Gartenstein-Ross Report)
at 51 (stating that a "strategic purpose" of beheading captive "citizens of countries that
contributed to the Coalition" was to "extract concessions from Coalition forces[] or generate the
kind of public pressure that could cause the governments to withdraw from Iraq").  Therefore,
because both elements are satisfied, the Court concludes that the kidnapping of Fouty and
Jiménez qualifies as hostage taking.

### ii.   Torture

Under the Act, the term "torture" has the meaning given to it in section 3 of the Torture Victim Protection Act of 1991 ("TVPA"), see 28 U.S.C § 1605A(a)(h)(7), which defines the term as

> any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering . . . , whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind[,]

Torture Victim Protection Act of 1991, Pub. L. No. 102-256, § 3(b), 106 Stat. 73, 73 (1992) (codified at 28 U.S.C. § 1350).  "When identifying what conduct constitutes torture, [the District of Columbia] Circuit uses two measures: (1) 'the degree of pain and suffering that the alleged torturer intended to, and actually did, inflict upon the victim'; and (2) the extent to which the 'production of pain and suffering is purposive.'"  Abedini, 422 F. Supp. 3d at 129 (quoting Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 93 (D.C. Cir. 2002)).  Thus, "[t]o establish torture, the plaintiffs must [ ] show that the conduct was sufficiently severe and purposeful."  Sotloff, 525 F. Supp. 3d at 13.

Dr. Mallak, the forensic pathologist responsible for the autopsies of Fouty and Jiménez, concluded that "[he] ha[s] no doubt whatsoever that [the] ISI physically tortured both [ ] Fouty and [ ] Jiménez before killing them."  Pls.' Mot., Ex. 2 (Mallak Report) ¶ 40.  Dr. Mallak's opinion is corroborated by Dr. Gartenstein-Ross.  See Pls.' 2d Additional Exs., Ex. 4 (Gartenstein-Ross Report) at 45 ("[I]t is my expert opinion that . . . Fouty and . . . Jiménez were tortured prior to being killed.").  With respect to the severity of the Zarqawi Terrorist Organization's conduct, not only were Fouty and Jiménez tortured in the form of mental pain and

suffering in light of being held in captivity, see Foley, 249 F. Supp. 3d at 203 (concluding that a hostage subjected to threats of imminent death was tortured in the form of "mental pain and suffering"), but evidence suggests that the soldiers were also brutally physically tortured, see, e.g., Pls.' 2d Additional Exs., Ex. 4 (Gartenstein Ross Report) at 45 (citing a 2009 NBC report which stated that "[t]he one page autopsy report and its four page supplement offer clues that [Fouty] may have been beaten and dismembered before he and . . . Jiménez were killed" including an indication that "Fouty's nose had been broken but had 'well healed prior to death[,]'" a description of "foot bones detached from commingled remains of Fouty and Jiménez[] and finger bones wrapped in a blanket[,]" and mention of "a pair of handcuffs [that] was found"); Pls.' Mot., Ex. 2 (Mallak Report) ¶ 32 (stating that "[t]he lack of recovery of the bones of the neck strongly indicates that both [ ] Jiménez and [ ] Fouty were beheaded after being taken hostages").  Additionally, the pain and suffering inflicted on Fouty and Jiménez satisfies the Act's "purposeful" requirement.  As Dr. Gartenstein-Ross explains in his report, "torture of captives was a well-established modus operandi of [the] ISI."  Pls.' 2d Additional Exs., Ex. 4 (Gartenstein-Ross Report) at 46.  Furthermore, the Zarqawi Terrorist Organization used beheadings to "serve[] several strategic purposes[,]" including attempting "to extract concessions from Coalition forces[] or generate the kind of public pressure that could cause the governments to withdraw from Iraq."  Id., Ex. 4 (Gartenstein-Ross Report) at 51.  Therefore, the Court concludes without any doubt that the plaintiffs have presented satisfactory evidence that Fouty and Jiménez were tortured by the Zarqawi Terrorist Organization.

### iii.    Extrajudicial Killing

The Act also borrows the definition of "extrajudicial killing" from the TVPA, see 28 U.S.C. § 1605A(h)(7), which defines the term to mean:

> [A] deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

Torture Victim Protection Act of 1991, Pub. L. No. 102-256, § 3(a), 106 Stat. 73, 73 (1992). As the District of Columbia Circuit has explained, this definition "contains three elements: (1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court." Owens v. Republic of Sudan, 864 F.3d 751, 770 (D.C. Cir. 2017). "A 'deliberated' killing is simply one undertaken with careful consideration, not on a sudden impulse." Owens v. Republic of Sudan, 174 F. Supp. 3d 242, 263 (D.D.C. 2016).

The Court is satisfied—based on the evidence provided by the plaintiffs and outlined in detail in the Court's Findings of Fact—that the attack on May 12, 2007, ultimately resulted in the murders of Fouty and Jiménez by the acts of members of the Zarqawi Terrorist Organization. See supra Sections III.B.1, B.2. And, the killings were obviously the product of deliberation, as demonstrated by a notebook discovered by United States troops "in late November 2007" that was "entitled 'Operation Capture Soldiers' [and] contain[ed] documents about the planning and execution of the kidnappings as well as a list of safe houses and routes used by . . . the chief planner of the incident[.]" Pls.' 2d Additional Exs., Ex. 4 (Gartenstein-Ross Report) at 37 (internal quotation marks omitted); see also id., Ex. 4 (Gartenstein-Ross Report) at 38 (quoting the May 13, 2007 statement of responsibility in which the ISI described the attack as a "blessed operation"); id., Ex. 4 (Gartenstein-Ross Report) at 43 (describing the June 4, 2007 video in which the ISI "claim[ed] responsibility for the soldiers' deaths[] by depicting the planning stage of the attack and outlining how the U.S. did not heed [the] ISI's warning"). Moreover, the murders of Fouty and Jiménez "[c]learly" were not authorized "by a prior judgment affording

guarantees or due process." <u>Foley</u>, 249 F. Supp. 3d at 202.  Nor were they "lawfully carried out under the authority of a foreign nation."  Torture Victim Protection Act of 1991, Pub. L. No. 102-256, § 3(a), 106 Stat. 73, 73 (1992).  Therefore, the Court concludes that Fouty and Jiménez were the victims of extrajudicial killings.

> **b.      Whether the Material Support and Resources Provided to the Zarqawi Terrorist Organization by the Defendants Proximately Caused Fouty and Jiménez's Injuries and Deaths and the Resulting Injuries to their Family Members**

The final element necessary for the state sponsor of terrorism exception to sovereign immunity to apply is a showing that the hostage taking, torture, and extrajudicial killings of Fouty and Jiménez were "caused by the provision of material support or resources" to the Zarqawi Terrorist Organization by "an official, employee, or agent" of Syria and the Syrian Military Intelligence.  28 U.S.C. § 1605A(a)(1).  The Court will first address whether the defendants' officials, employees, or agents provided material support and resources to the Zarqawi Terrorist Organization.  The Court will then analyze whether the hostage taking, torture, and extrajudicial killings were proximately caused by the provision of such material support and resources.

> **i.      Material Support**

The Act defines "material support or resources" as having "the meaning given that term in section 2339A of title 18[,]" 28 U.S.C. § 1605A(h)(3), which in turn defines "material support or resources" as

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel ([one] or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1).  As explained at length in the Court's Findings of Fact, the support

provided by the defendants to the Zarqawi Terrorist Organization in the years leading up to and

surrounding the attack at issue included financing, lodging, training, safehouses, false

identification, weapons, and transportation.  See supra Section III.A.  And, as Dr. Gartenstein-

Ross explains, "[g]iven the fact that the [ ] government is a dictatorship that rules Syria as a

police state, with total control over all aspects of life, it remains impossible that the scale of ISI

activities inside Syria[—]from recruitment, logistics, planning, financing, and training[—]could

have occurred without the knowledge and involvement of elements of the Syrian government

and its security apparatus."  Pls.' 2d Additional Exs., Ex. 4 (Gartenstein-Ross Report) at 26; see

also Sotloff, 525 F. Supp. 3d at 128 (stating that "the Zarqawi [Terrorist O]rganization could not

have operated in Syria without the knowledge and permission of the Syrian regime" (internal

quotation marks omitted); Foley, 249 F. Supp. 3d at 194 (finding that during the time period

from roughly 2002 to 2006, "the Syrian government had firm control throughout its country and

was a world-class police state, in which nothing of political significance occurred without the

knowledge and authorization of the state").  Indeed, "any such knowledge and/or involvement

would not have been possible without the knowledge and permission of individuals at the highest

levels, including and particularly the President himself."  Pls.' 2d Additional Exs., Ex. 4

(Gartenstein-Ross Report) at 26; see also Foley, 249 F. Supp. 3d at 194 (finding that "the support

and safe haven given to the Zarqawi Terrorist Organization, which was a matter of sensitive

foreign policy for Syria, could not have been accidental" but "was instead a matter of Syrian

policy, directed by [President] Assad and [intelligence director Asif] Shawkat"); Gates, 580 F.

Supp. 2d at 69 (finding that "[n]othing that happens within Syria of any political significance

occurs without the knowledge and authority [of] President Assad and General Shawkat").

Therefore, the Court concludes that the plaintiffs have demonstrated that the defendants' officials, employees, or agents provided "material support [and] resources" to the Zarqawi Terrorist Organization within the meaning of the Act.  28 U.S.C. § 1605A(h)(3).

### ii.  Causation

A plaintiff bringing suit under the Act "need not show that the defendant state 'specifically knew of or intended its support to cause' a particular terrorist act," Fritz, 320 F. Supp. 3d at 85 (quoting Owens, 864 F.3d at 798), or that "the defendant's material support was a 'but for' cause of the victim's injury or death[,]" id. (quoting Kilburn v. Socialist People's Libyan Arab Jamahiriya, 376 F.3d 1123, 1128 (D.C. Cir. 2004)).  Rather, "[t]he [Act's] causation requirement is satisfied by a showing of proximate cause."  Ben-Rafael v. Islamic Republic of Iran, 540 F. Supp. 2d 39, 54 (D.D.C. 2008) (citing Kilburn, 376 F.3d at 1128–29). "Proximate causation may be established by a showing of a 'reasonable connection' between the material support provided and the ultimate act of terrorism."  Owens v. Republic of Sudan, 826 F. Supp. 2d 128, 151 (D.D.C. 2011) (quoting Valore v. Islamic Republic of Iran, 700 F. Supp. 2d 52, 66 (D.D.C. 2010)).  More specifically, the plaintiffs must establish (1) that Syria's provision of material support was a "substantial factor in the sequence of events[,]" Owens, 864 F.3d at 794 (internal quotation marks omitted), leading to the plaintiffs' injuries and deaths, and (2) that what happened to them was "reasonably foreseeable or anticipated as a natural consequence of [Syria's] conduct[,]" id.

Courts in this District have previously held that Syria's provision of material support and resources to the Zarqawi Terrorist Organization satisfied the Act's proximate causation requirement.  See Foley, 249 F. Supp. 3d at 204 (concluding causation was satisfied where the plaintiffs presented evidence that "Syria's support for the Zarqawi Terrorist Organization was

given for the purpose of allowing this group to commit precisely the types of terrorist attacks at issue" and that "without this support, the terrorist acts at issue . . . would likely not have been possible"); Thuneibat, 167 F. Supp. 3d at 36–37 (concluding that "the plaintiffs [ ] satisfactorily established that [Syria's] material support to Zarqawi and AQI proximately caused the [v]ictims' untimely deaths" where Syria, among other things, provided a "transit pipeline" for foreign fighters and allowed Zarqawi supporters to operate in Syria); Gates, 580 F. Supp. 2d at 68 (concluding that the "[p]laintiffs proved, by evidence satisfactory to the Court, that Syria provided substantial assistance to Zarqawi and al-Qaeda in Iraq and that this led to the deaths by beheading of Jack Armstrong and Jack Hensley").

Here, too, the Court is satisfied that the plaintiffs have demonstrated the level of causation required under the Act.  With respect to the first showing necessary to establish proximate cause, the plaintiffs have demonstrated that the material support provided to the Zarqawi Terrorist Organization by the defendants was a "substantial factor in the sequence of events[,]" Owens, 864 F.3d at 794, leading to the injuries and deaths of Fouty and Jiménez, as well as the resulting injuries experienced by the family members of both servicemen.  As described in the Court's Findings of Fact, see supra Section III.A, the defendants provided a "primary transit point for militants heading to Iraq, as well as a permissive operating environment for Zarqawi network operatives stationed there[.]"  Pls.' 2d Additional Exs., Ex. 4 (Gartenstein-Ross Report) at 23.  The defendants also provided "training [to recruits] by Syrian intelligence officers," id., Ex. 2 (Lister Report) at 14, as well as other resources such as "weapons . . . and allowances for foreign terrorists [to be] in Syria[,]" id., Ex. 2 (Lister Report) at 15.  All of this material support assisted the Zarqawi Terrorist Organization in capturing, torturing, and killing United States servicemen, including Fouty and Jiménez.  See id., Ex. 2

(Lister Report) at 23 ("[I]t is highly likely that such support, facilitation[,] and safe haven . . .
was invaluable to the ISI in the immediate lead-up to the May 11/12, 2007 attack on the U.S.
military observation post[.]").  Moreover, "[w]ithout the extensive support provided by and
space opened up to AQI and the ISI by the Syrian government throughout the period of time in
question, the terrorist organization would not have had the capacity and means to have sustained
the scale of insurgency that it did against the fledgling Iraqi state, Iraq's Shia community and the
U.S.-led military coalition." Id., Ex. 2 (Lister Report) at 26.  Thus, in Mr. Lister's opinion,
"[w]ithout the dynamic of Syrian government support at such a critical time in which the ISI was
facing unprecedented pressure, the kind of high-profile attacks like that conducted in . . .
May 2007 would not have occurred." Id., Ex. 2 (Lister Report) at 26.  Dr. Gartenstein-Ross
concurs, concluding that "[i]t is more likely than not that, absent the support of the Syrian Arab
Republic, Fouty and Jiménez could not have been kidnapped, held, tortured, and killed in the
manner that they were." Id., Ex. 4 (Gartenstein-Ross Report) at 52–53.

Regarding the second showing necessary to establish proximate cause, the plaintiffs have
demonstrated that Fouty and Jiménez's injuries and death were "reasonably foreseeable or
anticipated as a natural consequence[,]" Owens, 864 F.3d at 794, of Syria's material support
because the support was given for the purpose of allowing the Zarqawi Terrorist Organization to
commit precisely the types of terrorist attacks at issue. See, e.g., Pls.' 2d Additional Exs., Ex. 4
(Gartenstein-Ross Report) at 29 (describing how regime defector Nawaf Fares explained that
"[a]fter the invasion of Iraq in 2003, the regime in Syria began to feel danger, and began
planning to disrupt the U.S. forces inside Iraq, so it formed an alliance with al-Qaeda" and
encouraged "[a]ll Arabs and other foreigners . . . to go to Iraq via Syria"); id., Ex. 2 (Lister
Report) at 16 (stating that "Syria's role in facilitating the activities of Iraq-based jihadists was

not always done covertly" and that one of Syria's public figures "gave a public address in September 2004 during heavy conflict in the Iraqi city of Fallujah, in which he lauded the efforts of 'our brothers' in AQI and called on them to 'kill Americans'"); id., Ex. 2 (Lister Report) at 26 (stating that "the support provided by the Syrian government to AQI and [the] ISI was strategic in nature" and that "[t]he escalation in ISI terrorists crossing from Syria into Iraq in the period immediately preceding the attack . . . was not a coincidence, given the context in which it took place[,]" which included a "U.S. military 'surge'").  Moreover, "it was also entirely foreseeable (and, indeed, intended) that the[] families [of the United States servicemen] would suffer grave emotional and psychological trauma as a result of the injuries suffered by their loved ones[,]" Salzman v. Islamic Republic of Iran, No. 17-cv-2475 (RDM), 2019 WL 4673761, at *14 (D.D.C. Sept. 25, 2019).  See Pls.' 2d Additional Exs., Ex. 4 (Gartenstein-Ross Report) at 51 (indicating that the Zarqawi Terrorist Organization strategically used brutal tactics such as beheadings to "generate the kind of public pressure that could cause [ ] governments to withdraw from Iraq").

Based on this evidence, the Court concludes that the hostage taking, torture, and extrajudicial killings of Fouty and Jiménez, and the resulting injuries to their family members, were "caused by . . . the provision of material support or resources[,]" 28 U.S.C. § 1605A(a)(1), to the Zarqawi Terrorist Organization by the defendants.  And, accordingly, because all five elements of the state sponsor of terrorism exception have been satisfied, see id. ("A foreign state shall not be immune from the jurisdiction of courts of the United States . . . in any case . . .  in which [1] money damages are sought [2] against a foreign state [3] for personal injury or death [4] that was caused by [5] an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign

state while acting within the scope of his or her office, employment, or agency."), the Court concludes that the defendants are not entitled to sovereign immunity in this case.

In sum, having determined that all four prerequisites for subject-matter jurisdiction have been established, the Court concludes that it has subject-matter jurisdiction over the plaintiffs' claims in this case.  See Reed, 845 F. Supp. 2d at 210 (stating that the Act "grants United States district courts subject-matter jurisdiction over (1) nonjury civil actions (2) against a foreign state (3) as to any claim for relief in personam, (4) provided that the foreign state is not entitled to immunity." (citing 28 U.S.C. § 1330(a)).

**B.      Personal Jurisdiction**

The Court next considers whether it may properly exercise personal jurisdiction over the defendants in this case.  "Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction . . . where service has been made under [28 U.S.C. §] 1608[.]"  28 U.S.C. § 1330(b); see also Estate of Heiser, 466 F. Supp. 2d at 255 ("Personal jurisdiction exists over a non-immune sovereign so long as service of process has been made under [§] 1608 of the [Act].").  Accordingly, the Court must now determine whether the plaintiffs have effected proper service of process pursuant to 28 U.S.C. § 1608.

As a preliminary matter, as discussed above, see supra Section IV.A.1, Syria is clearly a foreign state and the Syrian Military Intelligence is also considered a foreign state "because its core functions are governmental, not commercial[,]" Gates, 580 F. Supp. 2d at 64.  See Roth v. Islamic Republic of Iran, 78 F. Supp. 3d 379, 393 (D.D.C. 2015) ("The [District of Columbia] Circuit has adopted a 'categorical approach' to determining the legal status of foreign government-related entities for purposes of the [Act's] jurisdiction and service of process provisions: 'if the core functions of the entity are governmental, it is considered

the foreign state itself; if commercial, the entity is an agency or instrumentality of

the foreign state.'" (quoting <u>Roeder v. Islamic Republic of Iran</u>, 333 F.3d 228, 234 (D.C. Cir.

2003)).

 Section 1608 provides four methods for serving "a foreign state or political subdivision

of a foreign state[,]" 28 U.S.C. § 1608(a), "in descending order of preference[,]" <u>Barot v.</u>

<u>Embassy of the Republic of Zambia</u>, 785 F.3d 26, 27 (D.C. Cir. 2015).  "A party cannot progress

from one method to another until it has either attempted the preceding method or determined that

it is plainly inapplicable."  <u>Trapote v. Bolivarian Republic of Venezuela</u>, No. 23-cv-2118 (LLA),

2024 WL 1549146, at *1 (D.D.C. Apr. 10, 2024).  First, a foreign state may be served via

"special arrangement for service between the plaintiff and the foreign state[.]"  28 U.S.C.

§ 1608(a)(1).  "[I]f no special arrangement exists," service may be effected "in accordance with

an applicable international convention on service of judicial documents[.]"  <u>Id.</u> § 1608(a)(2).  If

the first two methods are inapplicable, service may be completed through "the head of the

ministry of foreign affairs of the foreign state concerned" "by sending a copy of the summons

and complaint and a notice of suit, together with a translation of each into the official language

of the foreign state, by any form of mail requiring a signed receipt[.]"  <u>Id.</u> § 1608(a)(3).  Finally,

"if service cannot be made within [thirty] days under [§ 1608(a)](3)," a plaintiff may serve a

foreign state "through diplomatic channels[,]" which requires the plaintiff to send "two copies of

the summons and complaint and a notice of suit, together with a translation of each into the

official language of the foreign state[.]"  <u>Id.</u> § 1608(a)(4).  The copies may be sent "by any form

of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the

Secretary of State in Washington, District of Columbia, to the attention of the Director of Special

Consular Services[.]"  <u>Id.</u>  Once the Secretary has "transmit[ted] one copy of the papers through

diplomatic channels to the foreign state[,]" the clerk of the court shall receive "a certified copy of the diplomatic note indicating when the papers were transmitted." Id.

Here, "[t]he defendants have neither a special arrangement for service with the plaintiffs[,] nor entered into any international convention governing service." Thuneibat, 167 F. Supp. 3d at 37.  Because the first two methods for service on a foreign state were not available, the plaintiffs were authorized to proceed to the third method of service and therefore attempted to serve the defendants pursuant to § 1608(a)(3).  See Affidavit Requesting Foreign Mailing at 1, ECF No. 9.  That entailed on March 26, 2018, the Clerk of the Court mailing a copy of the summons, Complaint, and notice of suit, together with a translation of each into the official language of the foreign state, via DHL, to the head of the ministry of foreign affairs.  See Certificate of Mailing at 1, ECF No. 12.  Thereafter, on May 2, 2018, the plaintiffs advised the Court of their failure to achieve service through this method.  See Affidavit of Failed Service at 1, ECF No. 13; see also id. ¶ 3 ("According to DHL, delivery was attempted on April 5, 2018 . . . and April 26, 2018[,] . . . but the recipient refused delivery."); id., Ex. 2 (Track DHL Express Shipments) at 1, 2, 4, ECF No. 13-2 (showing attempted delivery for Waybills 8367663721 and 8367650152 on April 5, 2018, and Waybill 8367653652 on April 26, 2018).

When service through the third method proved unsuccessful, the plaintiffs appropriately turned to the fourth method and advised the Court of their intent to "attempt to serve [the d]efendants pursuant to . . . § 1608(a)(4)." Id. ¶ 4.  That entailed, at the plaintiffs' request, the Clerk of this Court mailing "two copies of the summons, [C]omplaint, and notice of suit, together with a translation of each into the official language of the foreign state, by Priority Mail, to the U[nited ]S[tates] Department of State . . .  pursuant to . . . [§] 1608(a)(4)." Request (May 24, 2018), ECF No. 16.  In turn, "[b]ecause the United States does not have an Embassy in

the Syrian Arab Republic, the Department of State [wa]s assisted by the Foreign Interests

Section of the Embassy of the Czech Republic in Damascus[,]" which delivered these documents

"to the Ministry of Foreign Affairs of the Syrian Arab Republic under cover of diplomatic

notes . . . on January 20, 2019."  Pls.' Resp., Ex. A (State Department Letter) at 1.  On March 11,

2019, the Secretary of State then "sen[t] to the clerk of the court a certified copy of the

diplomatic note[s] indicating when the papers were transmitted."  28 U.S.C. § 1608(a)(4).  See

Pls.' Resp., Ex. A (State Department Letter) at 1 (stating that "[c]ertified copies of these

diplomatic notes are enclosed"); id., Ex. A (State Department Letter) at 3–13 (including certified

copies of the diplomatic notes as enclosures with the letter).  Therefore, the plaintiffs properly

effected service of process on the defendants through diplomatic channels pursuant to

§ 1608(a)(4).  See 28 U.S.C. § 1608(a)(4).

Accordingly, because the Court has valid subject-matter jurisdiction over the action, see

supra Section IV.A, and the plaintiffs properly served the defendants pursuant to § 1608(a)(4),

the Court concludes that it has personal jurisdiction over the defendants.  See Shatsky, 2024

WL 1091803, at *5 ("Personal jurisdiction over a foreign state exists when a court has

subject[-]matter jurisdiction and service has been made in compliance with 28 U.S.C. § 1608.").

## C.    The Defendants' Liability for the Plaintiffs' Personal Injuries

Having concluded that the Court has subject-matter jurisdiction over the plaintiffs' claims

and personal jurisdiction over the defendants, the Court will now proceed to an analysis of

whether the plaintiffs have "establishe[d] [their] claim[s] or right to relief by evidence

satisfactory to the [C]ourt."  28 U.S.C. § 1608(e).

The estates and immediate family members of Fouty and Jiménez assert six claims[10] against the defendants under 28 U.S.C. § 1605A(c), state common law, and state statutory law for battery, assault, intentional infliction of emotional distress, wrongful death, conspiracy to provide material support or resources to a terrorist organization, and aiding and abetting a terrorist organization.  See Compl. ¶¶ 85–112.  As reparations for these claims, the plaintiffs seek economic damages for loss of life, see id. ¶ 97, damages for physical and emotional pain and suffering endured prior to death, see id. ¶¶ 99–100, solatium damages, see id. ¶¶ 93–94, and punitive damages, see id. ¶¶ 115–16.

Section 1605A(c) provides a federal private right of action against designated state sponsors of terrorism for certain enumerated categories of persons, including, inter alia, "national[s] of the United States," "member[s] of the armed forces," and "the legal representative[s]" of either of these persons.  28 U.S.C. § 1605A(c)(1), (2), (4).  However, "foreign national family members of an American victim, who do not have a cause of action under § 1605A(c), may . . . pursue claims under applicable . . . [state or] foreign law."  Fraenkel v. Islamic Republic of Iran, 892 F.3d 348, 353 (D.C. Cir. 2018) (second omission in original) (internal quotation marks omitted); see also id. ("Although § 1605A created a new cause of action, it did not displace a [foreign national] claimant's ability to pursue claims under applicable state or foreign law upon the waiver of sovereign immunity." (quoting Leibovitch v. Islamic Republic of Iran, 697 F.3d 561, 572 (7th Cir. 2012))).  Because the federal private right of action

---

[10] The Complaint also includes purported claims for survival and punitive damages, but the essence of these purported claims amount only to requests for relief rather than independent causes of action.  See Compl. ¶¶ 98–101 (Count V—Action for Survival Damages); id. ¶¶ 113–16 (Count IX—Punitive Damages).  Accordingly, the Court considers these claims to be requests for survival damages and punitive damages as remedies for their other claims against the defendants.  See Thuneibat, 167 F. Supp. 3d at 38 n.2 (noting that "[t]he complaint denominate[d] nine separate counts," but that the counts pertaining to survival damages and punitive damages "amount[ed] only to requests for relief"); Worley, 75 F. Supp. 3d at 337 (treating the plaintiffs' punitive damages counts as, in effect, a request for punitive damages as a remedy for their other claims against defendants" because "[p]unitive damages is not an independent cause of action").

under § 1605A(c) is only available to certain categories of persons, the Court will first determine which of the plaintiffs may rely on § 1605A(c), before proceeding to an analysis of the claims asserted by any plaintiffs who must pursue their claims under applicable state or foreign law.

### 1.   The Plaintiffs with a Federal Cause of Action Under § 1605A(c)

Section 1605A(c) provides a federal private cause of action against foreign state sponsors of terrorism liable for "personal injury or death." 28 U.S.C. § 1605A(c). "Although the federal cause of action was added to the [Act] in 2008, '§ 1605A(c) operates retroactively' and 'plainly applies . . . to the pre-enactment conduct of a foreign sovereign.'" Force, 464 F. Supp. 3d at 369 (quoting Owens, 864 F.3d at 815). Pursuant to § 1605A(c), a foreign state is only liable to "(1) a national of the United States,[11] (2) a member of the armed forces, (3) an employee [or contractor] of the [United States] Government . . . acting within the scope of the employee's employment, or (4) the legal representative of" any such person. 28 U.S.C. § 1605A(c)(1)–(4). Successful plaintiffs may recover damages that "include economic damages, solatium, pain and suffering, and punitive damages." Id. § 1605A(c).

Although § 1605A(c) provides a private right of action, "it does not provide guidance on the substantive bases for liability to determine [the p]laintiffs' entitlement to damages." Estate of Hirshfeld v. Islamic Republic of Iran, 330 F. Supp. 3d 107, 137 (D.D.C. 2018). Plaintiffs are required "to prove a theory of liability under which defendants cause the requisite injury or death." Valore, 700 F. Supp. 2d at 73; see also Rimkus v. Islamic Republic of Iran, 750 F. Supp. 2d 163, 175–76 (D.D.C. 2010) ("[P]laintiffs in § 1605A actions . . . must articulate the justification for such recovery, generally through the lens of civil tort liability."). "Based on the

---

[11] The Act incorporates the definition of "national of the United States" from 8 U.S.C. § 1101(a)(22), which defines the term to mean a "citizen of the United States" or a person owing "permanent allegiance to the United States." 28 U.S.C. § 1605A(h)(5).

[District of Columbia] Circuit's guidance, district courts in this jurisdiction 'rely on well-established principles of law, such as those found in the Restatement (Second) of Torts . . .' to define the elements and scope of these theories of recovery." Worley, 75 F. Supp. 3d at 335 (quoting Oveissi v. Islamic Republic of Iran, 879 F. Supp. 2d 44, 54 (D.D.C. 2012)); see also Fraenkel, 892 F.3d at 353 (D.C. Cir. 2018) ("The courts are not authorized to craft a body of federal common law in deciding [Foreign Sovereign Immunities Act] terrorism exception claims. However, a district court may rely on well-established statements of common law." (citing Bettis v. Islamic Republic of Iran, 315 F.3d 325, 333 (D.C. Cir. 2003))).[12]

As detailed below, the estates of Fouty and Jiménez, as well as eleven of the family member plaintiffs, have a private right of action under § 1605A(c). Although these thirteen plaintiffs also allege liability under both state common and state statutory law, these "[p]laintiffs can only have one recovery for their injuries, regardless of the number of theories upon which they base their complaint." Estate of Hirshfeld, 330 F. Supp. 3d at 138 (citing Kassman v. Am. Univ., 546 F.2d 1029, 1034 (D.C. Cir. 1976) ("Where there has been only one injury, the law

_____

[12] As another member of this Court recently recognized, "some courts in this District have begun to take a swifter course" in light of "the similarity between two of the terrorism exception's provisions: § 1605A(a)(1), its immunity-stripping provision, and § 1605A(c), its liability provision." Estate of Farhat v. Islamic Republic of Iran, No. 19-cv-3631 (RCL), 2024 WL 706971, at *17 (D.D.C. Feb. 21, 2024). Under this newer approach, "once the court has determined subject matter jurisdiction, liability under the [Act's] terrorism exception is conclusively established for eligible plaintiffs[,]" id. at *18. See Salzman, 2019 WL 4673761, at *15 ("There is almost total 'overlap between the elements of [a § 1605A(c)] cause of action and the terrorism exception to foreign sovereign immunity,' and a plaintiff that offers proof sufficient to establish a waiver of sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of law." (internal citation omitted) (quoting Foley, 249 F. Supp. 3d at 205)); Allan v. Islamic Republic of Iran, No. 17-cv-338 (RJL), 2019 WL 2185037, at *6 (D.D.C. May 21, 2019) ("While the [Act] technically requires plaintiffs to prove a theory of liability separate and apart from establishing the elements of subject matter jurisdiction, most courts conduct the analysis together, since evidence sufficient to establish jurisdictional causation will almost always establish a theory of 'personal injury' necessary to prevail under § 1605A(c)." (internal citation and internal quotation marks omitted)). Here, the Court need not decide whether this newer approach is proper for the plaintiffs with a federal cause of action under § 1605A(c), as "[t]hese plaintiffs' claims would survive either view." Estate of Farhat, 2024 WL 706971, at *18. Under the newer approach, the Court has already concluded that the plaintiffs submitted satisfactory evidence demonstrating the defendants' liability to the plaintiffs in its conclusions on subject-matter jurisdiction. See supra Section IV.A.2. And, under the older traditional approach, the plaintiffs with a private right of action pursuant to § 1605A(c) have articulated valid common law theories for liability. See infra Sections IV.C.1a., 1.b.

confers only one recovery, irrespective of the multiplicity of parties whom or theories which the plaintiff pursues.")).  Accordingly, because § 1605A(c) "explicitly provides for the types of damages that [these p]laintiffs seek in relation to [their] claims—economic damages, pain and suffering, solatium, and punitive damages[,]" Estate of Hirshfeld, 330 F. Supp. 3d at 138, "the Court will proceed only based on the [§] 1605A(c) claims[,]" id., as to these thirteen plaintiffs and need not consider their state common and statutory law claims.  See Warmbier v. Democratic People's Republic of Korea, 356 F. Supp. 3d 30, 54 n.5 (D.D.C. 2018) (noting that "discussion of the plaintiffs' tort-based claims for relief is unnecessary since those claims would give rise to no more damages than those available under the [Act's] private right of action, and are therefore 'subsumed in the [ ] claims [provided by the Act]'" (internal citation omitted) (quoting Kaplan v. Cent. Bank of the Islamic Republic of Iran, 896 F.3d 501, 508 (D.C. Cir. 2018))); Fritz, 320 F. Supp. 3d at 89 (stating that the plaintiffs' state law claims "are redundant of their federal law claims and do not provide any additional right to recover").

### a.  The Estates of Fouty and Jiménez

The victims of the May 12, 2007 attack—Fouty and Jiménez—are represented in this action by their respective estates.  See Compl. ¶ 10 ("[T]he estate of Alex R. Jiménez is an estate existing under the law of the State of Massachusetts, represented by its co-Personal Representatives Yaderlin Jiménez and Andy D. Jiménez."); id. ¶14 ("[T]he Estate of Byron W. Fouty is an estate existing under the law of the State of Michigan, represented by its Personal Representative Gordon K. Dibler."); Pls.' 2d Additional Exs., Ex. 6 (Letters of Authority for Personal Representative for the Estate of Byron Wayne Fouty) at 1, ECF No. 27-6; id., Ex. 7 (Letters of Authority for Personal Representative for the Estate of Alex Ramon Jiménez) at 1, ECF No. 27-7.  Both estate plaintiffs have a federal cause of action under § 1605A(c) because

the decedents would have had a federal cause of action in their own right as United States

nationals and members of the United States armed forces.  See 28 U.S.C. § 1605A(c)(4); Doe v.

Democratic People's Republic of Korea Ministry of Foreign Affs. Jungsong-Dong, 414 F. Supp.

3d 109, 125 (D.D.C. 2019) ("An estate of a plaintiff who would have had standing to sue is

'expressly covered by, and entitled to bring claims under, [§] 1605A(c).'" (quoting Braun, 228 F.

Supp. 3d at 78–79)).  Having concluded that the estates of Fouty and Jiménez each have a federal

cause of action under § 1605A(c), the Court will now evaluate the "theor[ies] of liability" under

which these estate plaintiffs allege that "[the] defendants cause[d] the requisite injur[ies] [and]

death[,]" Valore, 700 F. Supp. 2d at 73, i.e., wrongful death and battery.

### i.    Wrongful Death

The estates of Fouty and Jiménez "may recover for [Fouty and Jiménez's] wrongful

deaths if they can establish the defendants caused their deaths."  Thuneibat, 167 F. Supp. 3d

at 39 (citing Restatement (Second) of Torts § 925 (1965)); see also Barry v. Islamic Republic of

Iran, 437 F. Supp. 3d 15, 46 (D.D.C. 2020) ("A number of courts in this district have distilled the

generally applicable principles of a wrongful death tort in the context of [Foreign Sovereign

Immunities Act] suits.  These courts have determined that a plaintiff may recover for wrongful

death upon a showing that the defendant caused the plaintiff's death.").  As discussed previously,

see supra Section IV.A.2.a.iii, the plaintiffs have submitted ample evidence which establishes

that Fouty and Jiménez's deaths were the result of extrajudicial killings perpetrated by the

Zarqawi Terrorist Organization with material support provided by the defendants.

Consequentially, the defendants are liable to the estates of Fouty and Jiménez under § 1605A(c)

for "economic losses which result from [the] decedent[s'] premature death[s]."  Valore, 700 F.

Supp. 2d at 78 (internal quotation marks omitted).

### ii.   Battery

The estates of Fouty and Jiménez also seek to recover pain and suffering damages based on the tort of battery.[13]  See Compl. ¶¶ 85–88, 108.  A defendant is liable for battery when the defendant "[(1)] acted 'intending to cause a harmful or offensive contact with . . . , or an imminent apprehension of such a contact' by, those attacked and (2) 'a harmful contact with' those attacked 'directly or indirectly result[ed].'"  Valore, 700 F. Supp. 2d at 77 (omission in original) (quoting Restatement (Second) of Torts § 13).  Here, the first element of battery is satisfied as "acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm."  Id. at 76.  Additionally, the second element of battery is satisfied because the plaintiffs' uncontroverted affidavits establish that Fouty and Jiménez were killed by the Zarqawi Terrorist Organization, see supra Section III.B, and thus they were subjected to "harmful contact[,]" Valore, 700 F. Supp. 2d at 77.  Therefore, the estates of Fouty and Jiménez have established a valid theory of recovery for pain and suffering damages.

### b.  The United States National Family Member Plaintiffs

Eleven of the family member plaintiffs are "national[s] of the United States[,]" 28 U.S.C. § 1605A(c)(1), and thus also have a private right of action pursuant to § 1605A(c).  These plaintiffs are: (1) the Estate of Mickey Fouty (service member Fouty's biological father), (2) Hilliary North (service member Fouty's biological mother), (3) Gordon Dibler (service member

---

[13] The estates of Fouty and Jiménez have also asserted assault and intentional infliction of emotional distress as additional theories of liability for their injuries.  See Compl. ¶¶ 89–94.  However, as noted earlier, "[w]here there has been only one injury, the law confers only one recovery, irrespective of the multiplicity of . . . theories which the plaintiff pursues."  Kassman, 546 F.2d at 1034.  Thus, the estates of Fouty and Jiménez may recover under only one of the three asserted theories of liability—i.e., battery, assault, or intentional infliction of emotional distress.  See Valore, 700 F. Supp. 2d at 77 (noting that "plaintiffs who have claimed assault, battery, and IIED may recover under only one of any such theories, as multiple recovery is prohibited").  Because the Court ultimately concludes that the estates of Fouty and Jiménez may recover for their injuries based on the tort of battery, see infra Section IV. C.1.a.2, the Court need not assess whether these plaintiffs could also recover based on the torts of assault or intentional infliction of emotional distress.

Fouty's stepfather and guardian), (4) Sarah Haverlock (service member Fouty's biological half-blood sister), (5) Maria Duran (service member Jiménez's biological mother), (6) Yaderlin Jiménez (service member Jiménez's widow); (7) Andy Domingo Jiménez (service member Jiménez's biological full blood brother), (8) Bryant Jiménez (service member Jiménez's biological full blood brother), (9) Andy Jiménez Vargas (service member Jiménez's biological half-blood brother), (10) Irving Lazaro Jiménez Vargas (service member Jiménez's biological half-blood brother), and (11) Alexander Jiménez Vargas (service member Jiménez's biological half-blood brother) (collectively, the "United States national family member plaintiffs").  See Compl. ¶¶ 2, 4–9, 11–13, 15.

More specifically, Mickey Fouty, Hilliary North, Gordon Dibler, Sarah Haverlock, Andy Domingo Jiménez, and Bryant de Jesus Jiménez were born in the United States and thus were nationals at birth.  See Pls.' 2d Additional Exs., Ex. 29 (Fouty Birth Certificate) at 1 (indicating that Mickey Fouty's place of birth was Michigan); id., Ex. 42 (State of California Certificate of Live Birth ("Hilary North Birth Certificate")) at 1, ECF No. 27-42; id., Ex. 12 (Michigan Department of Health Certificate of Live Birth ("Gordon Dibler Birth Certificate")) at 4, ECF No. 27-12; id., Ex. 27 (State of Michigan Certificate of Live Birth ("Sarah Haverlock Birth Certificate")) at 1, ECF No. 27-27; Pls.' 4th Additional Exs., Ex. 7 (City of New York Certificate of Birth ("Andy D. Jiménez Birth Certificate")) at 1, ECF No. 29-7; id., Ex. 8 (Commonwealth of Massachusetts Record of Birth ("Bryant de Jesus Jiménez Birth Certificate")) at 1, ECF No. 29-8.  Additionally, although Andy Jiménez Vargas and Irving Lazaro Jiménez Vargas were both born in Puerto Rico, see Pls.' 3d Additional Exs., Ex. 31 (Puerto Rico Certificate of Birth ("Andy Jiménez Vargas Birth Certificate")) at 1, ECF No. 28-31; id., Ex. 32 (Puerto Rico Certificate of Birth ("Irving Lazaro Jiménez Vargas Birth Certificate")) at 1, ECF No. 28-32,

they too were citizens at birth because the Immigration and Nationality Act conferred United States citizenship on "[a]ll persons born in Puerto Rico on or after January 13, 1941," effective at birth, 8 U.S.C. § 1402.  Furthermore, although not born in the United States or conferred citizenship at birth, Maria Duran became a naturalized citizen on January 21, 2000, more than seven years before the May 12, 2007 terrorist attack on her son.  See Pls.' 3d Additional Exs., Ex. 15 (Certificate of Naturalization ("Maria Duran Certificate of Naturalization")) at 1, ECF No. 28-15.

       Finally, although Jiménez's widow, Yaderlin Jiménez, and his younger sibling, Alexander Jiménez Vargas, "were not [United States] citizens at the time of [his] abduction and killing[,]" Pls.' Mot. at 11, both of these plaintiffs were United States citizens when the Complaint was filed, see Compl. ¶¶ 4, 7; see also Pls.' 2d Additional Exs., Ex. 23 (Transcript of Alexander Jiménez ("Alexander Jiménez Vargas Tr.")) at 9:11–14, ECF No. 27-23 (indicating that Alexander Jiménez became a United States citizen in 2015).  Thus, because Yaderlin Jiménez and Alexander Jiménez Vargas later gained United States citizenship, they may also rely on § 1605A(c)'s private right of action.  Compare 28 U.S.C. § 1605A(a)(2)(A)(ii) (granting jurisdiction over the claims based on the status of "the claimant or the victim . . . at the time the act [of terrorism] . . . occurred"), with 28 U.S.C. § 1605A(c) (granting private right of action to "a national of the United States" or "a member of the armed forces" without temporal limits); see also Cabrera v. Islamic Republic of Iran, Nos. 19-cv-3835 (JDB), 18-cv-2065 (JDB), 2023 WL 3496303, at *6 (D.D.C. May 16, 2023) (explaining how "the private right of action is less restrictive[ than the Act's jurisdictional inquiry] because it does not contain the same express temporal requirement that the claimant must fall into one of those categories when the terrorist attack occurred").  Therefore, because all eleven of the aforementioned family member plaintiffs

were United States citizens when the Complaint was filed on February 20, 2018, they each have standing to pursue a federal cause of action under § 1605A(c).  See Doe, 414 F. Supp. 3d at 125 & n.9 (concluding that "[a]ll family member plaintiffs are currently [United States] nationals and thus [ ] have standing" under § 1605A(c) even though two plaintiffs became naturalized citizens after the terrorism incident).

The eleven United States national family member plaintiffs seek to recover solatium damages for the defendants' intentional infliction of emotional distress by their provision of material support to the terrorists who killed Fouty and Jiménez.  See Compl. ¶¶ 93–94; Pls.' Mot. at 11.  "The defendants are liable for intentional infliction of emotional distress [('IIED')] under § 1605A(c) if the plaintiffs produce sufficient evidence demonstrating that the defendants 'by extreme and outrageous conduct intentionally or recklessly cause[d] severe emotional distress to' the plaintiffs."  Thuneibat, 167 F. Supp. 3d at 39 (alteration in original) (quoting Restatement (Second) of Torts § 46(1)).  "Where the claimants were not the direct recipient of the 'extreme and outrageous conduct,' the Restatement permits recovery if (1) they are members of a victim's immediate family and (2) they are present at the time, or 'the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person [who] is not present.'"  Braun, 228 F. Supp. 3d at 81 (alteration in original) (quoting Estate of Heiser v. Islamic Republic of Iran, 659 F. Supp. 2d 20, 26–27 (D.D.C. 2009)).

The immediate family member requirement "is strictly construed" and "generally, only spouses, parents, siblings, and children are entitled to recover."  Roth, 78 F. Supp. 3d at 400.  However, "[i]mmediate family members do include those of the half blood," Murphy, 740 F. Supp. 2d at 75, and, thus, "[s]iblings of half-blood . . . are presumed to recover as a full-blood sibling would[,]" Peterson v. Islamic Republic of Iran, 515 F. Supp. 2d 25, 52 (D.D.C. 2007); see

also Fritz v. Islamic Republic of Iran, No. 15-cv-456 (RDM), 2018 WL 5046229, at *20 (D.D.C.

Aug. 13, 2018) (stating that the strict meaning of immediate family "include[s] . . . immediate

family members of half blood"), adopted as modified by Fritz v. Islamic Republic of Iran, 324 F.

Supp. 3d 54 (D.D.C. 2018); Spencer v. Islamic Republic of Iran, 71 F. Supp. 3d 23, 27 (D.D.C.

2014) ("Half-blood siblings are presumed to recover at the same level as full-blood siblings

would, unless the evidence indicates that such individuals did not have a close relationship with

the victim[.]" (internal citation omitted)).  Additionally, non-adoptive stepparents may be

considered immediate family members if they are "members of the victim's household . . . [who]

[a]re viewed as the functional equivalents of immediate family members[,]" Bettis, 315 F.3d

at 337; see also Estate of Heiser, 659 F. Supp. 2d at 29 (stating that "the Court of Appeals [in

Bettis] subtly acknowledge[d] that, in those rare cases in which the parties at issue had lived in

the victim's immediate household and had been in other important respects like a spouse, parent,

sibling, or child to the victim, circumstances may require a slight stretching of the immediate-

family requirement").  Regarding the element of presence when the act occurred, one "need not

be present at the time of a terrorist attack upon a third person to recover for severe emotional

injuries suffered as a result."  Valore, 700 F. Supp. 2d at 80; see also Restatement (Second) of

Torts § 46, cmt. 1 (leaving "open the possibility of situations in which presence at the time may

not be required").  "This is because terrorism is sufficiently extreme and outrageous to

demonstrate that it is intended to inflict severe emotional harm on even those not present at the

site of the act."  Roth, 78 F. Supp. 3d at 400.

      Here, the United States national family member plaintiffs have satisfied the elements of

an intentional infliction of emotional distress claim.  The evidence demonstrates that the

defendants engaged in conduct that was extreme and outrageous by providing material support to

the Zarqawi Terrorist Organization with the intent that such terrorist organization would carry

out attacks that would cause severe emotional distress.  See Belkin, 667 F. Supp. 2d at 22 ("Acts

of terrorism are by their very definition extreme and outrageous and intended to cause the

highest degree of emotional distress." ).  And, the United States family member plaintiffs have

submitted uncontroverted evidence, including deposition testimony, which details their

relationships to Fouty and Jiménez and the severe mental anguish and emotional trauma they

suffered as a result of the terrorist attack.  For example, the abduction, torture, and murders of

Fouty and Jiménez caused their family members to have difficulty sleeping, eating, working, and

coping with their loss.  See, e.g., Pls.' 2d Additional Exs., Ex. 11 (Transcript of Gordon Kenneth

Dibler, Jr. ("Gordon Dibler Tr.")) at 67:12–69:9, 80:11–81:8, ECF No. 27-11; id., Ex. 16

(Transcript of Maria Duran ("Maria Duran Tr.")) at 34:9–17, ECF No. 27-16; id., Ex. 17

(Transcript of Yade[r]lin Jiménez ("Yaderlin Jiménez Tr.")) at 22:17–22, ECF No. 27-17; id.,

Ex. 18 (Transcript of Andy Jiménez ("Andy Domingo Jiménez Tr.") at 26:10–13, 30:2–7, ECF

No. 27-18; id., Ex. 21 (Transcript of Irving Lazaro Jiménez Vargas ("Irving Jiménez Vargas

Tr.")) at 24:2–12, ECF No. 27-21; id., Ex. 23 (Alexander Jiménez Vargas Tr.) at 9–16.  Some

family members responded by working excessively, see id., Ex. 18 (Andy Domingo Jiménez Tr.)

at 29:9–16; id., Ex. 20 (Transcript of Andy Javier Jiménez Vargas ("Andy Javier Jiménez Vargas

Tr.")) at 23:17–21, ECF No. 27-20, and/or by abusing alcohol or drugs, see, e.g., id., Ex. 18

(Andy Domingo Jiménez Tr.) at 29:16–18; id., Ex. 21 (Irving Jiménez Vargas Tr.) at 24:12–13;

id., Ex. 22 (Transcript of Br[yant] [d]e[ ]Jesus Jiménez ("Bryant de Jesus Jiménez Tr."))

at 14:20–15:13, ECF No. 27-22.  Additionally, plaintiff Sarah Haverlock was diagnosed with

"post-dramatic stress disorder and adjustment disorder with mixed anxiety and depression mood,

caused by her brother's murder."  Pls.' Mot. at 59; see also Pls.' 5th Additional Exs., Ex. 7

(Declaration of Lisa Page) ¶ 4, ECF No. 30-7.  Furthermore, "[s]ome of the family members ultimately succumbed to their profound grief."  Pls.' Mot. at 86.  For example, Ronald Fouty, the original personal representative of the Estate of Mickey Fouty, testifies that Fouty's abduction, torture, and murder caused his father to lose the will to live and that he "committed suicide slowly[,]" Pls.' 2d Additional Exs., Ex. 13 (Transcript of Ronald Lane Fouty ("Ronald Fouty Tr.")) at 12:18, ECF No. 27-13, by self-destructively "doing drugs that were extremely powerful[,]" id., Ex. 13 (Ronald Fouty Tr.) at 12:16–17.  Additionally, Fouty's murder "shattered [his mother,] Hilary [North,] emotionally and psychologically," Pls.' Mot. at 52, and she "has been evaluated extensively by a court-appointed physician and found to be totally incapacitated[,]" id. at 55; see Pls.' 3d Additional Exs., Ex. 1 (Physician's Certificate for H.N.) at 5, ECF No. 28-1.

The United States family member plaintiffs have also satisfied the immediate family requirement for IIED claims by claimants who were not the direct recipients of the extreme and outrageous conduct.  Plaintiffs Mickey Fouty (represented by his estate) and Hilliary North are the biological parents of Fouty, see Compl. ¶¶ 13, 15, and plaintiff Maria Duran is the biological mother of Jiménez, see id. ¶ 2.  Plaintiff Yaderlin Jiménez was the wife, and is now the widow, of Jiménez, see id. ¶ 4, and plaintiffs Andy Domingo Jiménez and Bryant Jiménez are his full biological brothers, see id. ¶¶ 5, 6.  Thus, these six plaintiffs meet the strict definition of immediate family members.  See Estate of Heiser, 659 F. Supp. 2d at 28 (observing that the "strict meaning of immediate family[]'" is "one's spouse, parents, siblings, and children").  Moreover, plaintiffs Andy Javier Jiménez Vargas, Irving Lazaro Jiménez Vargas, and Alexander Jiménez Vargas are Jiménez's half-blood brothers, see Compl. ¶¶ 7–9, and plaintiff Sarah Haverlock is Fouty's half-blood sister, see id. ¶ 12.  These four plaintiffs each attest to their close

relationship with their half-siblings.  See Pls.' 2d Additional Exs., Ex. 20 (Andy Javier Jiménez

Vargas Tr.) at 14:2–3, 17:1–2 (testimony of Andy Javier Jiménez Vargas that he and Jiménez

"were just so close that [they] knew everything about each other" and that they "never really

thought of [each other as] half-brother or anything like that"); id., Ex. 21 (Irving Jiménez Vargas

Tr.) at 19:7–10, 15:14–15 (testimony of Irving Lazaro Jiménez Vargas describing the closeness

of his relationship with Jiménez on a scale of 1 to 10 as a "10" and stating that their father

"always kept [him, Andy Javier, and Jiménez] together as a really tight knit bond"); id., Ex. 23

(Alexander Jiménez Vargas Tr.) at 11:22, 11:14–16 (testimony of Alexander Jiménez Vargas

that he and Jiménez "loved each other a lot" and that Jiménez was not "any less of a brother to

[him]" even though they have different mothers); id., Ex. 10 (Transcript of Sarah Haverlock

("Sarah Haverlock Tr.")) at 21:11–14, ECF No. 27-10 (testimony of Sarah Haverlock that

"[Fouty is] [her] brother and [her] best friend[,]" they "were very close and [ ] talked about just

about everything[,]" and "[she] trusted him more than [she] trusted anybody and had more fun

with him than [she] had with anybody").  Thus, plaintiffs Andy Javier Jiménez Vargas, Irving

Lazaro Jiménez Vargas, Alexander Jiménez Vargas, and Sarah Haverlock also satisfy the

definition of immediate family members.  See Mustard v. Islamic Republic of Iran,

No. 21-cv-163 (BAH), 2023 WL 1778193, at *11 (D.D.C. Feb. 6, 2023) (concluding that the

biological half-sister of a victim of a terrorist bombing was "indeed a member of [the victim's]

immediate family" because "half-siblings are presumed to recover as full siblings would" and

"the evidence [ ] support[ed] application of that presumption" because the half-sister "attest[ed]

to her close relationship with her brother" (internal quotation marks omitted)).

     With respect to plaintiff Gordon Dibler, Fouty's stepfather, see Compl. ¶ 11, the evidence

before the Court shows that Dibler was a "member[] of [Fouty's] household," Bettis, 315 F.3d

at 337, for a significant period of time and that he was "the functional equivalent[] of [an] immediate family member[,]" id.  Dibler "lived with [Fouty] under the same roof, in the house that [Dibler] owned and provided to [Fouty], from January 1991 to September 1997, and again from April 2006 to August 2006."  Pls.' Mot. at 59 (citing, inter alia, Pls.' 2d Additional Exs., Ex. 11 (Gordon Dibler Tr.) at 7:1–9:5; 28:8–30:7).  And, "[a]t all other times, [Dibler] and [Fouty] maintained their relationship through regular contact, usually weekly."  Id. (citing Pls.' 2d Additional Exs., Ex. 11 (Gordon Dibler Tr.) at 37:19–42:11).  Moreover, from "October 19, 1994[,] . . . . [through] September 17, 1997, [Dibler] held limited letters of guardianship pursuant to which he exercised parental rights with respect to [Fouty]."  Id. at 59–60 (citing Pls.' 2d Additional Exs., Ex. 11 (Gordon Dibler Tr.) at 27:16–29:3, 29:14–30:7).  Additionally, Dibler acted as a father to Fouty by ensuring that he was properly enrolled in school and transporting him to and from school, see Pls.' 2d Additional Exs., Ex. 11 (Gordon Dibler Tr.) at 25:19–26:14; attending his school performances and assisting him with school projects, see id., Ex. 11 (Gordon Dibler Tr.) at 13:10–12; teaching him life skills, such as potty training, see id., Ex. 11 (Gordon Dibler Tr.) at 14:11–19, and riding a bicycle, see id., Ex. 11 (Gordon Dibler Tr.) at 20:6–9; and ensuring that he received the medical care that he needed, see id., Ex. 11 (Gordon Dibler Tr. at 15:7–20, 27:16–28:2).

Dibler also testified that he "thought of [Fouty] as [his] son" rather than as a stepson.  Id., Ex. 11 (Gordon Dibler Tr.) at 12:7; see also id., Ex. 11 (Gordon Dibler Tr.) at 22:4–5 (stating that he "loved . . . all [his] children equally").  Likewise, Fouty always called Dibler "dad" and never by his first name.  See id., Ex. 11 (Gordon Dibler Tr.) at 21:20–22:1.  Additionally, Dibler supported Fouty financially.  See, e.g., id., Ex. 11 (Gordon Dibler Tr.) at 20:10–18 (indicating that Dibler "provided [Fouty] with a house to live in[,]" that he was the "only income" for the

family at that time, and that he "provided the money" to buy food to feed the family).  Finally,

Dibler "showed affection to [Fouty], and met [Fouty's] emotional needs."  Pls.' Mot. at 60.  For

example, Dibler "unselfishly supported [Fouty's] relationships with [his biological parents,]

Hilary and Mickey[.]"  Id. (citing Pls.' 2d Additional Exs., Ex. 11 (Gordon Dibler Tr.) at 36:15–

37:2, 39:19–40:7, 55:18–21).  Dibler also "intervened when [Fouty] needed direction, such as

when [he] had stopped attending high school and [Dibler] ensured that he obtained his GED

degree."  Id.  (citing Pls.' 2d Additional Exs., Ex. 11 (Gordon Dibler Tr.) at 42:18–43:4, 44:1-6,

47:1-11).  And Dibler "ensured that he was present to support [Fouty] at important moments,

such as [his] graduation from Army boot camp[.]"  Id. (citing Pls.' 2d Additional Exs., Ex. 11

(Gordon Dibler Tr. at 47:19–51:18)).

Based on this evidence, the Court concludes that Dibler was the functional equivalent of

a father for Fouty and, thus, satisfies the immediate family member test.  See Estate of Heiser,

659 F. Supp. 2d at 29 (awarding damages to the non-adoptive stepfather of a victim when he

"lived in the same household" while the victim was a minor and the stepfather treated the victim

as his own son "in every sense (e.g., financially, emotionally, socially)"); Valore, 700 F. Supp.

2d at 79–80 (concluding that a victim's stepfather "was the functional equivalent of a father"

where he "considered [the victim] to be his son and vice versa[,]" he "would hunt and fish with

[the victim]," and the victim "grew up with [the stepfather], as though they constituted a natural

family"); Fritz, 324 F. Supp. 3d at 63 (awarding solatium damages to the stepmother of a victim

where the evidence demonstrated that she "treated [the victim] as, and considered [the victim] to

be, one of her sons" and as to the stepmother of a second victim who "functioned as [that

victim's] mother—fulfilling all aspects of such a relationship—from the time [the victim] was

approximately four years old until his death").

Finally, while Fouty and Jiménez's immediate family members were not personally present when the events that are the subject of this case occurred, the defendants' conduct was sufficiently extreme and outrageous, which negates the need for the family members to have been present to recover for their emotional distress.  See Ben-Yishai v. Syrian Arab Republic, 642 F. Supp. 3d 110, 129 (D.D.C. 2022) (stating that the presence requirement "is not imposed when the extreme and outrageous conduct is a terrorist attack"); Cohen v. Islamic Republic of Iran, 238 F. Supp. 3d 71, 85 (D.D.C. 2017) ("[B]ecause of the appalling and extreme nature of terrorist attacks, courts in this [D]istrict have generally held that a defendant is liable to the victim's family even if they were not physically present during the attack as long as there is some evidence [ ] that they suffered mental anguish and trauma as a result of it.").

Therefore, the Court concludes that the eleven United States national family member plaintiffs may recover damages pursuant to § 1605A(c) based on the tort of intentional infliction of emotional distress.

## 2. The Plaintiff Without a Federal Cause of Action Under § 1605A(c)

The remaining plaintiff, Ramon D. Jiménez, is "the biological father" of Jiménez and "a citizen of the Dominican Republic who resides in the State of Massachusetts."  Compl. ¶ 3.

As noted above, a foreign state is only liable under § 1605A(c) to "(1) a national of the United States, (2) a member of the armed forces, (3) an employee [or contractor] of the [United States] Government . . . acting within the scope of the employee's employment, or (4) the legal representative of" any such person.  28 U.S.C. § 1605A(c)(1)–(4).  However, "foreign national family members of an American victim, who do not have a cause of action under § 1605A(c), may . . . pursue claims under applicable . . . [state or] foreign law."  Fraenkel, 892 F.3d at 353 (second omission in original) (internal quotation marks omitted).

Recognizing that he does not have a federal cause of action, plaintiff Ramon D. Jiménez seeks to pursue a "state common law claim[] for intentional infliction of emotional distress." Pls.' Mot. at 9.  To evaluate whether he can pursue this claim, the Court must first determine which jurisdiction's substantive law to apply, see Oveissi v. Islamic Republic of Iran, 573 F.3d 835, 841 (D.C. Cir. 2009), before evaluating whether he has satisfactorily established liability.

### a.  Choice of Law

In the absence of a federal cause of action, "the Court must apply the choice of law rules of the forum state." Fritz, 320 F. Supp. 3d at 89.  The Court must therefore consider the choice of law rules of the District of Columbia.  The District of Columbia choice of law rules combine a "governmental interests analysis" with a "most significant relationship" test.  Oveissi, 573 F.3d at 842.  Pursuant to the governmental interests analysis, the Court "must evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review." Id. (quoting Hercules & Co., Ltd. v. Shama Rest. Corp., 566 A.2d 31, 41 (D.C. 1989)).  And, under the most significant relationship test, the Court must consider the factors enumerated in the Restatement (Second) of Conflict of Laws, including: "(1) 'the place where the injury occurred'; (2) 'the place where the conduct causing the injury occurred'; (3) 'the domicil[e], residence, nationality, place of incorporation and place of business of the parties'; and (4) 'the place where the relationship, if any, between the parties is centered.'"  Id. (alteration in original) (quoting Restatement (Second) of Conflict of Laws § 145(2) (1971)).  "The Restatement also references the 'needs of the interstate and the international systems, the relevant policies of the forum, the relevant policies of other interested states, certainty, predictability and uniformity of result, and ease in the determination and application of the law to be applied.'"  Estate of Doe, 808 F. Supp.

2d at 21 (quoting <u>Dammarell v. Islamic Republic of Iran</u>, No. 01-cv-2224 (JDB), 2005 WL

756090, at *18 (D.D.C. Mar. 29, 2005)).  "As a general rule, the law of the forum governs,

'unless the foreign state has a greater interest in the controversy.'"  <u>Owens</u>, 826 F. Supp. 2d

at 154 (quoting <u>Kaiser-Georgetown Cmty. Health Plan v. Stutsman</u>, 491 A.2d 502, 209

(D.C. 1985)).

Here, there are three potential jurisdictions whose law the Court could apply: the law of

the forum state (the District of Columbia), the law of the place of Fouty and Jiménez's

abduction, torture, and murder (Iraq), and the law of the domicile state of the plaintiff

(Massachusetts).[14]  Applying the "governmental interests" analysis in this case, the policy

considerations strongly favor applying domestic law over foreign law because, "[i]n terrorism

cases, '[t]he United States has a unique interest in having its domestic law—rather than the law

of a foreign nation—used in the determination of damages in a suit involving such an attack.'"

<u>Estate of Doe</u>, 808 F. Supp. 2d at 22 (second alteration in original) (quoting <u>Holland v. Islamic</u>

<u>Republic of Iran</u>, 496 F. Supp. 2d 1, 22 (D.D.C. 2005)).  This is especially true where the acts of

terrorism "are committed to weaken United States' interests and policies abroad."  <u>W.A. v.</u>

<u>Islamic Republic of Iran</u>, 427 F. Supp. 3d 117, 139 (D.D.C. 2019); <u>see also</u> <u>Fritz</u>, 320 F. Supp.

3d 48, 90 (D.D.C. 2018) ("In dicta bearing directly on the [choice of law] question . . . , the

[District of Columbia] Circuit observed as follows in <u>Oveissi v. Islamic Republic of Iran</u>: 'We

have no doubt that the United States has a strong interest in applying its domestic law

to terrorist attacks on its nationals, especially when . . . the attacks are by reason of their

---

[14] Although the law of the foreign state where the material support for the Zarqawi Terrorist Organization was originated—<u>i.e.</u>, Syria—"is also a conceivable source of law in this case, the [C]ourt rejects this choice" because "[i]t is implausible to conclude that Congress would have passed § 1605[A(a)(1)] to grant jurisdiction to federal courts over foreign states that the United States Department of State has determined to be state sponsors of terrorism, only to require application of the law of such states (to the extent such states can be said to have law)." <u>Reed v. Islamic Republic of Iran</u>, 439 F. Supp. 2d 53, 65 n.5 (D.D.C. 2006).

nationality.'" (quoting <u>Oveissi</u>, 573 F.3d at 843)).  Because the injuries in this case are the result

of a state-sponsored terrorist attack on members of the United States armed forces and American

military operations in Iraq, <u>see</u> <u>supra</u> Section III, the governmental interest portion of the District

of Columbia choice of law analysis favors applying domestic law rather than the law of Iraq.

<u>See</u> <u>Owens</u>, 826 F. Supp. 2d at 155 (noting that "United States domestic law remains more

appropriate in state-sponsored terrorism cases than foreign law").

 The "most significant relationship" portion of the choice of law analysis provides little

guidance in this case, as the factors enumerated in the Restatement (Second) of Conflict of Laws

point in different directions.  Ramon D. Jiménez lived in Massachusetts when his son was

kidnapped, tortured, and murdered, <u>see</u> Pls.' 2d Additional Exs., Ex. 15 (Transcript of Ramon

Domingo Jiménez Peralta ("Ramon D. Jiménez Tr.")) at 7:20–21, 12:9–11, 45:6–8, ECF

No. 27-15, and therefore the first factor—<u>i.e.</u>, "the place where the injury occurred[,]"

Restatement (Second) of Conflict of Laws § 145(2)—favors Massachusetts.  Additionally, the

second factor, "the place where the conduct causing the injury occurred[,]" <u>id.</u>, favors Iraq.  The

third factor, which considers the parties' "domicil[e], residence, [or] nationality," <u>id.</u>, favors

Massachusetts, <u>i.e.</u>, the plaintiff's domicile and residence, and the Dominican Republic, <u>i.e.</u>, the

plaintiff's nationality.  <u>See</u> Compl. ¶ 3.  The fourth factor—"the place where the relationship, if

any, between the parties is centered[,]" Restatement (Second) of Conflict of Laws § 145(2)—

does not clearly favor any particular jurisdiction.

 "However, these factors are not hard and fast rules."  <u>Barry</u>, 437 F. Supp. 3d at 50.

"[W]here . . . an injury is 'caused by distant conduct[,] . . . the Court turns to certainty,

predictability[,] and uniformity of result.'"  <u>Id.</u> (second alteration in original) (first omission in

original) (quoting <u>Abedini</u>, 422 F. Supp. 3d at 135).  "Although courts in this Circuit often

applied the law of individual plaintiffs' domiciles before Congress's 2008 amendments to the [Act], these amendments 'were directed, in part, to correct the problem of disparity among the various state laws regarding the recovery of emotional distress by immediate family members.'" Id. at 49 (internal citation omitted) (quoting Estate of Doe, 808 F. Supp. 2d at 23; see also Abedini, 422 F. Supp. 3d at 134 ("Congress intended to make [ ] damages [under the Act] more consistent[] and applying D.C. law to the[ non-United States national plaintiffs] furthers this goal.").  "Given the similarity between D.C. law and that of the Restatement," the Court concludes that "applying D.C. law to [Ramon D. Jiménez's] claim[] would promote consistency in the treatment of h[is] claim and those of the [United States national family member plaintiffs]."  Hammons v. Islamic Republic of Iran, Nos. 19-cv-2518 (ACR/RMM), 20-cv-1058 (ACR/RMM), 2023 WL 5933340, at *25 (D.D.C. July 24, 2023), adopted by Hammons v. Islamic Republic of Iran, Nos. 19-cv-2518 (ACR), 20-cv-1058 (ACR), 2023 WL 6211248 (D.D.C. Sept. 25, 2023); see also Owens, 826 F. Supp. 2d at 155 ("[I]n light of the 2008 amendments to [the Act] that seek to promote uniformity and extend access to U.S. federal courts to foreign national immediate family members of victims of terrorism, the law of the forum state, the District of Columbia, should provide the rule of decision.").  Although uniformity concerns "cannot prevail when another location has 'a significantly greater interest than does the District' in the cause of action," Estate of Doe, 808 F. Supp. 2d at 23 (quoting Dammarell, 2005 WL 756090, at *20), this is not such a case because the most significant relationship analysis does not overwhelmingly point to one particular jurisdiction.[15]  Therefore,

---

[15] The Court notes that even if it were to conclude that Massachusetts has a significantly greater interest than the District of Columbia because it is the place where the plaintiff's injury occurred and the plaintiff's domicile and residence, the conclusion reached below with respect to Ramon D. Jiménez's state law claim, see infra Section IV.C.2.b, would be the same because "Massachusetts [also] follow[s] the Restatement (Second) of Torts" for intentional infliction of emotional distress claims.  Torosian v. Garabedian, 206 F. Supp. 3d 679, 683 (D. Mass. 2016).  While the Massachusetts formulation requires that an IIED claimant satisfy an additional element, the tests

(continued . . .)

the Court will proceed by applying the law of the District of Columbia.  See Fritz, 320 F. Supp.

3d at 89–91 (applying District of Columbia law to a claim under the Act brought by a

non-United States national family member of a United States solider abducted and executed

while serving in Iraq).

### b.  Ramon D. Jiménez's IIED Claim under District of Columbia Law

"The District of Columbia has adopted the Restatement (Second) of Torts' standard for

the intentional infliction of emotional distress."  W.A., 427 F. Supp. 3d at 140; see also Republic

of Sudan v. Owens, 194 A.3d 38, 41 (D.C. 2018) (noting that the District of Columbia Court of

Appeals "has embraced the Restatement Second's Approach to IIED liability").  As noted above

with respect to the United States national family member plaintiffs, see supra Section IV.C.1.b,

under this standard, a plaintiff must allege "(1) extreme and outrageous conduct on the part of

the defendant which (2) intentionally or recklessly (3) causes the plaintiff [to suffer] severe

emotional distress."  Ortberg v. Goldman Sachs Grp., 64 A.3d 158, 163 (D.C. 2013) (internal

quotation marks omitted).  Furthermore, although the Restatement Second contains a presence

requirement for immediate family members, see Restatement (Second) of Torts § 46 ("Where

such conduct is directed at a third person, the actor is subject to liability if he intentionally or

---

(. . . continued)
are effectively identical.  Compare Ortberg v. Goldman Sachs Grp., 64 A.3d 158, 163 (D.C. 2013) ("In order to prove the tort of intentional infliction of emotional distress, a plaintiff must show (1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff [to suffer] severe emotional distress." (alteration in original) (internal quotation marks omitted)), with Roman v. Trustees of Tufts College, 461 Mass. 707, 717–18 (Mass. 2012) ("To sustain a claim of intentional infliction of emotional distress, a plaintiff must show (1) that the defendant intended to cause, or should have known that his conduct would cause, emotional distress; (2) that the defendant's conduct was extreme and outrageous; (3) that the defendant's conduct caused the plaintiff's distress; and (4) that the plaintiff suffered severe distress." (quoting Sena v. Commonwealth, 417 Mass. 250, 263–64 (Mass. 1994))).  Additionally, similar to the District of Columbia Court of Appeals, which has concluded that "presence at the scene is not required[,]" Republic of Sudan v. Owens, 194 A.3d 38, 42 (D.C. 2018), in the context of an IIED case where the "claimant alleg[es] emotional distress arising from a terrorist attack that killed or injured a family member[,]" id. at 39, "the Supreme Judicial Court [of Massachusetts] has expanded the tort of intentional infliction of emotional distress beyond the immediate victim to include recovery for family members" and has suggested that "where the wrongful conduct was intentional or reckless, the presence requirement might be reconsidered[,]" id. (citing Nancy P. v. D'Amato, 401 Mass. 516, 522 (Mass. 1988)).

recklessly causes severe emotional distress [ ] to a member of such person's immediate family member who is present at the time, whether or not such distress results in bodily harm[.]"), "presence at the scene is not required[,]" Owens, 194 A.3d at 42, in the context of an IIED case where the "claimant alleg[es] emotional distress arising from a terrorist attack that killed or injured a family member[,]" id. at 39.  See Maxwell v. Islamic Republic of Iran, No. 22-cv-173 (RC), 2024 WL 1342775, at *17 (D.D.C. Mar. 29, 2024) (stating that the District of Columbia Court of Appeals' decision in Owens "clarif[ied] that a claimant who alleges emotional distress arising from a terrorist attack that injured or killed a family member need not have been present at the scene of the attack to state a cognizable IIED claim for relief").

Because "the same general principles of tort law that govern the claims brought by . . . [p]laintiffs within one of [§] 1605A's enumerated categories also govern claims brought by . . . [p]laintiffs who pursue their claims via District of Columbia law[,]" Maxwell, 2024 WL 1342775, at *17, the Court concludes that Ramon D. Jiménez, the biological father of Jiménez, see Compl. ¶ 3, has satisfied the elements of an IIED claim for the same reasons previously identified by the Court with respect to the eleven United States national family member plaintiffs, see supra Section IV.C.1.b.  Like the United States national family member plaintiffs, Ramon D. Jiménez has also submitted deposition testimony detailing the severe mental anguish and emotional trauma he suffered as a result of the abduction, torture, and murder of his son, which resulted in deep suffering that prevented him from sleeping, see Pls.' 2d Additional Exs., Ex. 15 (Ramon D. Jiménez Tr.) at 42:20–21, prevented him from eating, see id., Ex. 15 (Ramon D. Jiménez Tr.) at 44:20–45:5, and prevented him from working, see id., Ex. 15 (Ramon D. Jiménez Tr.) at 43:19–2.  Therefore, the Court concludes that Ramon D. Jiménez can recover for IIED under District of Columbia law.

## V.      CONCLUSION

For the foregoing reasons, the Court concludes that it must grant the plaintiffs' motion for default judgment as to liability and enter default judgment against the Syrian Arab Republic and the Syrian Military Intelligence.

**SO ORDERED** this 17th day of July, 2024.[16]

REGGIE B. WALTON
United States District Judge

---

[16] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.