# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

———————————————————————
)
ESTATE OF BYRON W. FOUTY, et al.,           )
)
Plaintiffs,            )
)
v.                         )        Civil Action No. 18-385 (RBW)
)
SYRIAN ARAB REPUBLIC, et al.,                 )
)
Defendants.           )
———————————————————————

## MEMORANDUM OPINION

The plaintiffs—the estates and immediate family members of deceased United States servicemen Byron W. Fouty and Alex R. Jiménez—bring this civil action against the defendants—the Syrian Arab Republic ("Syria") and the Syrian Military Intelligence[1]—pursuant to the Foreign Sovereign Immunities Act (the "Act"), 28 U.S.C. §§ 1602–1611, seeking damages resulting from the kidnapping, torture, and extrajudicial killing of the servicemen by a foreign terrorist organization with material support from the defendants.  See Complaint ("Compl.") at 3, ¶¶ 1–22, ECF No. 1.  On July 17, 2024, the Court issued a Memorandum Opinion and Order granting the plaintiffs' motion for a default judgment as to liability.  See Estate of Fouty v. Syrian Arab Republic ("Fouty I"), No. 18-cv-385 (RBW), 2024 WL 3443591, at *30 (D.D.C. July 17, 2024); Order at 1 (July 17, 2024), ECF No. 42.  Currently pending before the Court is

---

[1] The Complaint asserts claims against Syria, the Syrian Military Intelligence, and the Syrian president, Bashar al-Assad.  See Complaint ("Compl.") ¶¶ 86–116, ECF No. 1.  As the Court noted in its prior liability default judgment opinion, under the Foreign Sovereign Immunities Act, Syria "is clearly a foreign state" and the Syrian Military Intelligence "is also considered a foreign state 'because its core functions are governmental, not commercial.'"  Estate of Fouty v. Syrian Arab Republic ("Fouty I"), No. 18-cv-385 (RBW), 2024 WL 3443591, at *20 (D.D.C. July 17, 2024) (citing Gates v. Syrian Arab Republic, 580 F. Supp. 2d 53, 64 (D.D.C. 2008)).  Further, because the plaintiffs never perfected service on President al-Assad, see Plaintiffs' Memorandum of Law in Support of Motion for Default Judgment as to Liability and Damages at 1 n.1, ECF No. 25, "Syria is the only [d]efendant in this case against whom damages can be sought[,]"  Gates, 580 F. Supp. 2d at 64.

the component of the plaintiffs' motion for the award of damages based on their liability default

judgment.  See Plaintiffs' Memorandum of Law in Support of Motion for Default Judgment as to

Liability and Damages ("Pls.' Mot." or the "plaintiffs' motion") at 1, ECF No. 25.  After

carefully considering all of the relevant evidence submitted by the plaintiffs,[2] the Court

concludes for the following reasons that it must grant the damages component of the plaintiffs'

motion for a default judgment and enter a default judgment damages award against the defendant

Syria in the amount of $364,049,255.

## I.       BACKGROUND

On February 20, 2018, the plaintiffs initiated this action against the defendants, seeking

damages for the personal injuries and wrongful deaths of Byron Fouty and Alex Jiménez, two

United States servicemen who were "abducted by Syrian-supported terrorists in the same

terrorist attack on a military observation post . . . south of Baghdad, Iraq, on May 12, 2007[,] . . .

held against their will, tortured, and finally murdered by these terrorists[]" sometime between the

date of the attack and July 8, 2008, "when their remains were discovered."  Compl. at 2–3.  The

following fourteen plaintiffs include the estates of Byron Fouty and Alex Jiménez, as well as

twelve of their immediate family members: (1) the Estate of Mickey W. Fouty (representing

Byron Fouty's biological father); (2) Hilary North (Byron Fouty's biological mother); (3)

Gordon K. Dibler, Jr. (Byron Fouty's stepfather); (4) Sarah Haverlock (Byron Fouty's biological

half-blood sister); (5) Maria Duran (Alex Jiménez's biological mother); (6) Ramon D. Jiménez

---

[2] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) Additional Exhibits for Motion for Default Judgment ("Pls.' Additional Exs."), ECF No. 26; (2) Additional Exhibits for Motion for Default Judgment ("Pls.' 2d Additional Exs."), ECF No. 27; (3) Additional Exhibits for Motion for Default Judgment ("Pls.' 3d Additional Exs."), ECF No. 28; (4) Additional Exhibits for Motion for Default Judgment ("Pls.' 4th Additional Exs."), ECF No. 29; (5) Additional Exhibits for Motion for Default Judgment ("Pls.' 5th Additional Exs."), ECF No. 30; (6) the Plaintiffs' Proposed Findings of Fact and Conclusions of Law ("Pls.' Facts & Law"), ECF No. 34; and (7) the Plaintiffs' Notice of Recent Authority in Support of Plaintiffs' Motion for Default Judgment Against Defendants, ECF No. 35.

(Alex Jiménez's biological father); (7) Yaderlin Jiménez (Alex Jiménez's widow); (8) Andy

Domingo Jiménez (Alex Jiménez's biological full blood brother); (9) Bryant Jiménez (Alex

Jiménez's biological full blood brother); (10) Andy Jiménez Vargas (Alex Jiménez's biological

half-blood brother); (11) Irving Lazaro Jiménez Vargas (Alex Jiménez's biological half-blood

brother); and (12) Alexander Jiménez Vargas (Alex Jiménez's biological half-blood brother).

See id. ¶¶ 2–15; Plaintiffs' 2d Additional Exhibits ("Pls.' 2d Additional Exs."), Ex. 41 (Fouty

Family Structure) at 1, ECF No. 27-24; id., Ex. 42 (Jiménez Family Structure) at 1, ECF

No. 27-25.[3]  These plaintiffs allege that the kidnapping, torture, and murders of Byron Fouty and

Alex Jiménez "were carried out by a [f]oreign [t]errorist [o]rganization . . . operating with

material support and resources" provided by the defendants.  Compl. at 3.  More specifically, the

plaintiffs allege that these acts were planned and executed by "the terrorist organization founded

by Abu Musab al-Zarqawi (the 'Zarqawi Terrorist Organization', which at the time of these

terrorist attacks was known as the Islamic State of Iraq ('ISI'), acting with the training, funding,

material support, protection, and direction of Syria, as part of a coordinated scheme by Syria to

target [United States] service-members in Iraq."  Pls.' Mot. at 3.

On January 20, 2019, the plaintiffs served the Complaint on Syria and the Syrian Military

Intelligence, pursuant to the procedures authorized by 28 U.S.C. § 1608(a)(4).  See Plaintiffs'

Response, Exhibit ("Ex.") A (Letter from Jared Hess, Attorney Adviser in the United States

Department of State's Office of Legal Affairs, to the Clerk of the Court (Mar. 11, 2019) ("State

Department Letter")) at 1, ECF No. 39-1; see also Fouty I, 2024 WL 3443591, at *20–21

(finding that the plaintiffs had properly served Syria and the Syrian Military Intelligence).

---

[3] Several of Alex Jiménez's family members are referred to in the plaintiffs' filings both by their full names and by slightly abbreviated names.  For the sake of clarity, the Court will refer to these individuals throughout by their full names.

However, the plaintiffs were "not able to serve the Syrian [p]resident[,] Bashar al-Assad [with a summons and a copy of their Complaint]." Pls.' Mot. at 1 n.1. After the defendants who had been served failed to appear or otherwise respond to the Complaint, the plaintiffs filed a motion for entry of default on April 12, 2019, see Plaintiffs' Motion for Entry of Default and Memorandum in Support Thereof at 1, ECF No. 21, and the Clerk of the Court entered a default against Syria and the Syrian Military Intelligence on April 16, 2019, see Default (Apr. 16, 2019) at 1, ECF No. 22. On July 24, 2020, the plaintiffs then moved for entry of a default judgment against Syria and the Syrian Military Intelligence, both as to liability and damages.[4] See Pls.' Mot. at 1–2.

On July 17, 2024, the Court issued a Memorandum Opinion and Order granting the plaintiffs' request for a default judgment against the defendants as to liability under 28 U.S.C. § 1605A(c), state common law, and state statutory law for battery, assault, intentional infliction of emotional distress, wrongful death, conspiracy to provide material support or resources to a terrorist organization, and aiding and abetting a terrorist organization. See Fouty I, 2024 WL 3443591, at *30; Order at 1 (July 17, 2024). The Court indicated in its liability opinion that it would "issue a separate Memorandum Opinion and Order addressing the damages to which the plaintiffs are entitled." Fouty I, 2024 WL 3443591, at *1. In this Memorandum Opinion, the Court now addresses the component of the plaintiffs' motion for a default judgment as to damages.

---

[4] Because the plaintiffs were unsuccessful in serving the president of Syria, see Pls.' Mot. at 1 n. 2, the plaintiffs only seek a default judgment against Syria and the Syrian Military Intelligence, see id. at 1. Therefore, hereinafter in this Memorandum Opinion, the Court will use the term "defendants" in referring only to Syria and the Syrian Military Intelligence.

## II.      STANDARD OF REVIEW

The Federal Rules of Civil Procedure provide for the entry of a default judgment "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend" against an action. Fed. R. Civ. P. 55(a); see also Jackson v. Beech, 636 F.2d 831, 836 (D.C. Cir. 1980) ("[T]he default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party." (alteration in original) (quoting H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe, 432 F.2d 689, 691 (D.C. Cir. 1970))). Rule 55 sets forth a two-step process for a party seeking a default judgment: first, entry of a default, followed by entry of a default judgment. Fed. R. Civ. P. 55; see also 10A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 2682 (4th ed. 2022) (stating that "[p]rior to obtaining a default judgment under either Rule 55(b)(1) or Rule 55(b)(2), there must be an entry of default as provided by Rule 55(a)"). When a defendant has failed to plead or otherwise defend against an action, the plaintiff may request that the clerk of the court enter a default against that defendant. See Fed. R. Civ. P. 55(a). Once the clerk enters the default pursuant to Rule 55(a), Rule 55(b) authorizes either the clerk or the Court to enter a default judgment against the defendant. See Fed. R. Civ. P. 55(b).

Under the Act, to prevail on a motion for a default judgment against a foreign sovereign, the plaintiffs must show that the Court has original jurisdiction over the claims and personal jurisdiction over the defendant, see 28 U.S.C. § 1330(a)–(b), and must "establish[] [their] claim or right to relief by evidence satisfactory to the [C]ourt[,]" id. § 1608(e); see also Braun v. Islamic Republic of Iran, 228 F. Supp. 3d 64, 74–75 (D.D.C. 2017) (discussing default judgments under the Act). Such evidence may be presented using "traditional forms of evidence[, e.g.,] testimony and documentation[,]" Estate of Botvin v. Islamic Republic of Iran,

873 F. Supp. 2d 232, 236 (D.D.C. 2012), and the plaintiffs may also submit evidence "in the form of affidavits or declarations[,]" Belkin v. Islamic Republic of Iran, 667 F. Supp. 2d 8, 20 (D.D.C. 2009).  However, "[t]he Court is not required to hold an evidentiary hearing[.]" Estate of Doe v. Islamic Republic of Iran, 808 F. Supp. 2d 1, 7 (D.D.C. 2011); see also Kim v. Democratic People's Republic of Korea, 774 F.3d 1044, 1050–51 (D.C. Cir. 2014) (relying on declarations in reversing and remanding for the district court to enter a default judgment without an evidentiary hearing).  "Upon evaluation, the Court may accept any uncontroverted evidence presented by [the] plaintiffs as true."  Belkin, 667 F. Supp. 2d at 20 (citing Estate of Heiser v. Islamic Republic of Iran, 466 F. Supp. 2d 229, 255 (D.D.C. 2006)).

"After establishing liability, the [C]ourt must make an independent evaluation of the damages to be awarded and has 'considerable latitude in determining the amount of damages.'" Ventura v. L.A. Howard Constr. Co., 134 F. Supp. 3d 99, 103 (D.D.C. 2015) (quoting Boland v. Elite Terrazzo Flooring, Inc., 763 F. Supp. 2d 64, 67 (D.D.C. 2011)).  However, the Court "must ensure[] that there [i]s a basis for the damages specified in the default judgment."  Id. (quoting Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 111 (2d Cir. 1997)) (second alteration in original).  Accordingly, "'the plaintiff[s] must prove [ ] entitlement to the amount of monetary damages requested' using 'detailed affidavits or documentary evidence' on which the [C]ourt may rely."  Boland v. Providence Constr. Corp., 304 F.R.D. 31, 36 (D.D.C. 2014) (quoting Fanning v. Permanent Sol. Indus., 257 F.R.D. 4, 7 (D.D.C. 2009)).

## III.     FINDINGS OF FACT

In Fouty I, the Court made extensive findings of fact, which supported its conclusion that "the Zarqawi Terrorist Organization (then known as the ISI)—materially supported by the defendants—is responsible for the abduction, torture, and murders of [Byron] Fouty and [Alex]

Jiménez."  See Fouty I, 2024 WL 3443591, at *11.  The Court incorporates those Findings of

Fact by reference as though stated in full herein.  See id. at *3–11.  The Court will now

supplement those findings with additional findings of fact that are relevant to its damages

assessment.  Because the plaintiffs have submitted extensive evidence "in the form of affidavits

or declarations[,]" Belkin, 667 F. Supp. 2d at 20, all of which has gone unrebutted by the

defendants, the Court concludes that it need not hold an evidentiary hearing.  See Estate of Doe,

808 F. Supp. 2d at 7 (declining to hold an evidentiary hearing); Kim v. Democratic People's

Republic of Korea, 87 F. Supp. 3d 286, 289 n.1 (D.D.C. 2015) (declining to hold a damages

hearing).  Accordingly, based on the undisputed evidence submitted by the plaintiffs, the Court

makes the following findings of fact as to the family member plaintiffs.

## A.      The Fouty Family

Byron Fouty is survived by his biological mother, Hilary North, his stepfather, Gordon K.

Dibler, Jr., (hereinafter "Gordon Dibler"), and his biological half-blood sister, Sarah Haverlock,

see Compl. ¶¶ 11–12, 15.  At the time of his death, Byron Fouty was also survived by his

biological father, Mickey W. Fouty, who later died on January 31, 2011.  See Pls.' 2d Additional

Exs., Ex. 30 (Transcript of Ronald Lane Fouty ("Ronald Fouty Tr.")) at 6:8–9, ECF No. 27-13.

Thus, Byron Fouty's father Mickey Fouty is represented in this lawsuit by his estate.[5]  See

Compl. ¶ 13.  The Court makes the following findings of fact regarding the four Fouty family

member plaintiffs.

---

[5] The estate of Mickey W. Fouty was originally represented by its personal representative, Ronald L. Fouty.  See
Compl. ¶ 13.  However, on June 23, 2023, the estate filed a motion to substitute Ronald L. Fouty with Muriel
Pearson, the newly appointed representative of the estate of Mickey W. Fouty, following the death of Ronald L.
Fouty.  See Plaintiffs' Motion for Substitution of Party and Memorandum in Support Thereof ("Pls.' Mot. to
Substitute") at 1, ECF No. 36.  On March 29, 2024, the Court granted the motion and substituted Muriel Pearson for
Ronald Fouty as the personal representative of the estate of Mickey W. Fouty.  See Order at 3 (Mar. 29, 2024), ECF
No. 40.

### 1.   **Hilary North**

Hilary North is Byron Fouty's biological mother.  See Pls.' Mot. at 50.  Sarah Haverlock testified that Ms. North and Byron Fouty were "very close[,]" Pls.' 2d Additional Exs., Ex. 27 (Transcript of Sarah Haverlock ("Sarah Haverlock Tr.")) at 42:21, ECF No. 27-10, and that Byron Fouty "was the most important person in her whole world[,]" id., Ex. 27 (Sarah Haverlock Tr.) at 43:8–9.  Ms. Haverlock further testified that Ms. North "was a great mom . . . [who] always worked hard and made sure that [her children] had what [they] needed."  Id., Ex. 27 (Sarah Haverlock Tr.) at 43:15–16.  According to Ms. Haverlock, Ms. North "guided [Byron Fouty,] [ ] disciplined him[,] and forgave him[,] and she mothered with love."  Id., Ex. 27 (Sarah Haverlock Tr.) at 43:17–18.  Gordon Dibler agrees that Ms. North and Byron Fouty had a close, loving relationship.  See id., Ex. 28 (Transcript of Gordon Kenneth Dibler, Jr. ("Gordon Dibler Tr.")) at 17:1–2, ECF No. 27-11 ("[Byron Fouty] cuddled a lot with his mother, obviously.  He loved her dearly.").

"[Ms. North] had a full, successful life prior to Byron [Fouty]'s abduction."  Pls.' Mot. at 52.  She was employed and worked multiple jobs.  Id.; see also Pls.' 2d Additional Exs., Ex. 27 (Sarah Haverlock Tr.) at 46:1–9.  Prior to Byron Fouty's deployment to Iraq, Ms. North had remarried and moved from Michigan to Texas with her new husband, Charles Meunier.  See id., Ex. 27 (Sarah Haverlock Tr.) at 46:12–17, 48:14–15.  Ms. Haverlock and Mr. Dibler both acknowledged that Ms. North had experienced some mental health challenges prior to Byron Fouty's abduction, but indicated that she managed those challenges with medication.  See id., Ex. 27 (Sarah Haverlock Tr.) at 45:10–13; id., Ex. 28 (Gordon Dibler Tr.) at 88:6–11.  Mr. Dibler also attested to the fact that Ms. North "did suffer from alcoholism" prior to her son's abduction, but that she "was not an active alcoholic" and "managed her alcoholism by abstaining

from drinking alcohol." Pls.' 5th Additional Exs., Ex. 114 (Declaration of Gordon Dibler) ¶ 3, ECF No. 30-1.

Byron Fouty's murder "shattered [Ms. North] emotionally and psychologically, and she has never recovered." Pls.' Mot. at 52. As to the impact of her brother's death on their mother, Ms. Haverlock testified:

> It was completely devastating. Her mental state completely deteriorated after my brother's death and as a result of him being in captivity. Again, she worked and she functioned and she parented. And after that, she just did[ not], and it has progressively gotten worse and worse to the point where she has no normal life anymore.

Pls.' 2d Additional Exs., Ex. 27 (Sarah Haverlock Tr.) at 46:21–47:5. For example, Ms. Haverlock testified that in 2010, two years after Byron Fouty's funerals, Ms. North began "abusing prescription drugs, and [ ] had also started drinking." Pls.' 4th Additional Exs., Ex. 113 (Declaration of Sarah Haverlock ("Sarah Haverlock Decl.")) ¶ 6, ECF No. 29-11. Then, in 2012, Ms. North's marriage to Charles Meunier ended as she could "no longer [ ] be in a normal loving relationship with anybody." Pls.' 2d Additional Exs., Ex. 27 (Sarah Haverlock Tr.) at 48:14–20. After Ms. North's divorce from Mr. Meunier, Ms. Haverlock traveled to Texas in 2018 to assist her mother and learned that she "was living on the streets and in and out of shelters and occasionally into very low income group homes[.]" Id., Ex. 27 (Sarah Haverlock Tr.) at 49:10– 12. Ms. North "had abandoned her mobile home because she was convinced that terrorists were monitoring her, eavesdropping on her, and trying to kill her." Pls.' 4th Additional Exs., Ex. 113 (Sarah Haverlock Decl.) ¶ 13. Additionally, "[Ms. North] had also been violent with her neighbors, had tried to kill herself, had been hospitalized, and was in and out of jails for committing minor offenses." Pls.' Mot. at 54 (citing Pls.' 4th Additional Exs., Ex. 113 (Sarah

Haverlock Decl.) ¶ 13; Pls.' 5th Additional Exs., Ex. 115 (Physician Discharge Order Note (May 7, 2018) ("Discharge Order Note")) at 1, ECF No. 30-2).

Ms. North has been diagnosed with "schizoaffective disorder, bipolar type[.]" Pls.' 4th Additional Exs., Ex. 113 (Sarah Haverlock Decl.) ¶ 15; see Pls.' 5th Additional Exs., Ex. 115 (Discharge Order Note) at 1. She has also "been evaluated extensively by a court-appointed physician and found to be totally incapacitated." Pls.' Mot. at 55; see Pls.' 3d Additional Exs., Ex. 70 (Physician's Certificate for H.N.) at 5, ECF No. 28-1. She now "lives full time in a long-term group home for individuals with intellectual and psychiatric disabilities[.]" Pls.' 4th Additional Exs., Ex. 113 (Sarah Haverlock Decl.) ¶ 20. The home provides Ms. North with on-site staff and support services, including "assistance with medication" and "full support with daily activities such as laundry[ and] basic hygiene." Id., Ex. 113 (Sarah Haverlock Decl.) ¶ 20. However, Ms. Haverlock represents that "[her] mother's prognosis has not improved" and that she "continues to deteriorate." Id., Ex. 113 (Sarah Haverlock Decl.) ¶ 22. "[Ms. Haverlock] holds valid Letters of Guardianship, issued by a Texas probate court, pursuant to which she has been appointed Permanent Guardian of the estate and person of [Ms.] North." Pls.' Mot. at 50; see Pls.' 3d Additional Exs., Ex. 71 (Letters of Guardianship), ECF No. 28-2.

The plaintiffs' expert forensic psychiatrist, Dr. Lama Bazzi, MD,[6] has reviewed the relevant medical records and depositions in this case and has concluded "with reasonable

---

[6] Federal Rule of Evidence 702 authorizes consideration of the testimony of "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education[.]" Fed. R. Evid. 702. Dr. Bazzi is a licensed and board-certified psychiatrist, see Pls.' 5th Additional Exs., Ex. 117 (Expert Witness Report ("Bazzi Report") at 11, ECF No. 30-4, with over a decade of experience in both public and private capacities, see id., Ex. 117 (Bazzi Report) at 12–13. In addition to her private practice, Dr. Bazzi is currently an emergency room psychiatrist at the Manhattan VA Hospital, a consultant to the Department of Social Services and Suffolk County, New York Court System as a forensic psychiatric expert, and an independent forensic psychiatric expert for insurance reviews. See id., Ex. 117 (Bazzi Report) at 13. Dr. Bazzi is also a lecturer in forensic psychiatry at Maimonides Medical Center in Brooklyn, New York. See id., Ex. 117 (Bazzi Report) at 13. Having reviewed Dr. Bazzi's qualifications, the

(continued . . .)

medical certainty that [Ms. North] did not suffer from . . . Schizoaffective Disorder[] before the untimely death by beheading of her son[] . . . at the hands of terrorists who abducted and tortured him while serving in the U[nited ]S[tates] Miliatry[.]"  Pls.' 5th Additional Exs., Ex. 117 (Expert Witness Report ("Bazzi Report")) at 5, ECF No. 30-4.  Dr. Bazzi further concludes:

> with reasonable medical certainty that but for the kidnapping, torture, and beheading of her son, . . . [Ms. North] would not have relapsed into alcohol and drug use" nor would she have "developed Schizoaffective Disorder with specific delusions related to [a]l-Qaeda targeting her and coming after her . . . [or] abandoned her safe living arrangements and become entangled in legal troubles as a result.

Id., Ex. 117 (Bazzi Report) at 8–9.  Finally, Dr. Bazzi opines with a reasonable degree of medical certainty that, "[b]ut for the psychosocial consequences of her Schizoaffective Disorder, [Ms. North] would not have required [the] guardianship and she would have been able to live independently without the guardianship of her daughter and the restrictions that entails."  Id., Ex. 117 (Bazzi Report) at 9.

### 2. Gordon Dibler

Gordon Dibler is Byron Fouty's stepfather.  See Pls.' 2d Additional Exs., Ex. 28 (Gordon Dibler Tr.) at 6:8–10.  As described in detail in Fouty I, although not his biological father, Mr. Dibler was the "functional equivalent of a father for [Byron] Fouty and, thus, [qualifies as an] immediate family member[.]"  Fouty I, 2024 WL 3443591, at *27 (listing cases awarding damages to stepparents under similar circumstances).  Mr. Dibler testified that when Byron Fouty was young, the two "were very close . . . [and] loved each other dearly."  Pls.' 2d Additional Exs., Ex. 28 (Gordon Dibler Tr.) at 21:9–10.  As Byron Fouty aged, they remained "very close[,]" id., Ex.. 28 (Gordon Dibler Tr.) at 21:16, and their relationship "developed into a

---

(. . . continued)
Court is satisfied that she is qualified to offer an expert opinion regarding the effect the kidnapping, torture, and beheading of Byron Fouty had on Hilary North in regards to her psychiatric and psychological condition.

great adult relationship[,]" id., Ex. 28 (Gordon Dibler Tr.) at 21:18.  "[Mr. Dibler] testified that his love for Byron [Fouty] was no different from his love for his biological children."  Pls.' Mot. at 61; see Pls.' 2d Additional Exs., Ex. 28 (Gordon Dibler Tr.) at 22:4–5 (stating that he "loved . . . all [his] children equally").

When Mr. Dibler learned that Byron Fouty had been abducted, he "was really scared[.]" Pls.' 2d Additional Exs., Ex. 28 (Gordon Dibler Tr.) at 59:15.  Mr. Dibler "testified that he saw the video released by the Zarqawi Terrorist Organization, and recalls [that] men wearing black hoods paid tribute to the ISI leader al-Baghdadi, declared that they had abducted Byron [Fouty] and Alex [Jiménez] for the Islamic State, showed their ID cards, and threatened to kill them both unless the U[nited ]S[tates] armed forces stopped searching for them."  Pls.' Mot. at 62 (citing Pls.' 2d Additional Exs., Ex. 28 (Gordon Dibler Tr.) at 61:13–63:12).  Mr. Dibler had seen the media coverage of the abduction and torture of other United States servicemen, including Matt Maupin and Kristian Menchaca, see Pls.' 2d Additional Exs., Ex. 28 (Gordon Dibler Tr.) at 64:17–65:5, and he "pray[ed] that [Byron Fouty's fate] would be different[,]" id., Ex. 28 (Gordon Dibler Tr.) at 76:4.  Living with prolonged uncertainty and fear for his stepson's safety and well-being "was profoundly harmful to [Mr. Dibler's] health."  Pls.' Mot. at 62.  After Byron Fouty's abduction, he "could only sleep, . . . [forty] minutes to an hour and a half, and [he] would wake up suddenly without being able to breathe."  Pls.' 2d Additional Exs., Ex. 28 (Gordon Dibler Tr.) at 65:18–21.  Additionally, Mr. Dibler had to take sick leave from work for four and a half months.  See id., Ex. 28 (Gordon Dibler Tr.) at 68:5–69:3.  "In an effort to address his emotional pain, [he] attended a men's group[]" and sought grief counseling through Survivor Outreach Services.  Pls.' Mot. at 62; see Pls.' 2d Additional Exs., Ex. 28 (Gordon Dibler Tr.) at 66:10–20.

However, when Mr. Dibler received the news of Byron Fouty's death, it was like a "dike broke, and . . . just [ ] washed [over him]."  Pls.' 2d Additional Exs., Ex. 28 (Gordon Dibler Tr.) at 75:18–20.  Mr. Dibler subsequently suffered a heart attack in 2015, see id., Ex. 28 (Gordon Dibler Tr.) at 80:3–4, and underwent "quadruple bypass" surgery, id., Ex. 28 (Gordon Dibler Tr.) at 82:9.  He testified that while his "lifestyle may have been part of" what led to the heart attack, id., Ex. 28 (Gordon Dibler Tr.) at 82:5, it also "really felt almost like an exclamation point on what happened" to his stepson, id., Ex. 28 (Gordon Dibler Tr.) at 82:12–13.  "[Mr. Dibler] still suffers from insomnia because of thoughts of Byron[ Fouty]'s murder."  Pls.' Mot. at 63; see Pls.' 2d Additional Exs, Ex. 28 (Gordon Dibler Tr.) at 83:8–14.  "Byron[ Fouty]'s death also caused a painful injury to [Mr. Dibler's] relationship with his daughter Sarah[ Haverlock], who 'shut herself down emotionally[.]'"  Pls.' Mot. at 63 (quoting Pls.' 2d Additional Exs., Ex. 28 (Gordon Dibler Tr.) at 82:20–21).  Mr. Dibler testified that "there[ is] no recovery[,]" Pls.' 2d Additional Exs., Ex. 28 (Gordon Dibler Tr.) at 83:11, and that he is "always going to miss [Byron Fouty,]" id., Ex. 28 (Gordon Dibler Tr.) at 94:1–2.  His daughter Sarah Haverlock corroborates the pain her father has experienced since his stepson's abduction and death.  See id., Ex. 27 (Sarah Haverlock Tr.) at 56:5 (stating that Byron Fouty's abduction and killing "broke [her] father's heart").

### 3.  Sarah Haverlock

Ms. Haverlock is "the biological half-blood sister of Byron[ Fouty,]" Compl. ¶ 12, and they have the same biological mother, Hilary North, Pls.' 2d Additional Exs., Ex. 27 (Sarah Haverlock Tr.) at 10:16–20.  Byron Fouty was Ms. Haverlock's older brother and there was a three-year age difference between them.  See id., Ex 27 (Sarah Haverlock Tr.) at 11:1–4. Between the time she was born and until Byron Fouty joined the Army, the two lived together under the same roof either full-time or part-time.  See Pls.' Mot. at 45–46 (summarizing Byron

Fouty's living arrangements with his family members).  Ms. Haverlock and Byron Fouty had a

very close relationship.  See Pls.' 2d Additional Exs., Ex. 27 (Sarah Haverlock Tr.) at 21:11–14

("[Byron Fouty is] my brother and my best friend.  We were very close and we talked about just

about everything.  I trusted him more than I trusted anybody and had more fun with him than I

had with anybody."); id., Ex. 28 (Gordon Dibler Tr.) at 55:8–13 ("They were very close.  That

was her big brother, her protector I guess you could say. . . . They loved each other very much.").

Ms. Haverlock testified that she and her brother "spent so much time together[,]" id., Ex. 27

(Sarah Haverlock Tr.) at 18:10, and that "he taught her a lot[,] . . . . [including] how to ride a bike

. . . . [and] how to drive[.]"  Id., Ex. 27 (Sarah Haverlock Tr.) at 18:11–12.  She also recalled

when "[she] was a young mother to be[,]" id., Ex. 27 (Sarah Haverlock Tr.) at 23:14, Byron

Fouty drove from his duty station in Fort Drum, New York, to Michigan "in the middle of

January . . . through [ ] snowstorms . . . so that hopefully he could meet [her] son" on the

weekend of her due date, id., Ex. 27 (Sarah Haverlock Tr.) at 23:9–11.

       "While Byron [Fouty] was missing, [Ms. Haverlock] was fully conscious that he had

been captured by terrorists known to torture their hostages."  Pls.' Mot. at 48.  She described

suffering through the fourteen months of uncertainty over her brother's fate as

"devastating . . . [and] like waking up in a nightmare every day."  Pls.' 2d Additional Exs., Ex.

27 (Sarah Haverlock Tr.) at 28:1–2.  She testified that her grief manifested itself in different

ways.  See id., Ex. 27 (Sarah Haverlock Tr.) at 32:19–33:2.  For example, her "sleeping was [ ]

either [very] excessive or nonexistent[,]" id., Ex. 27 (Sarah Haverlock Tr.) at 32:19–20, and she

oscillated between loss of appetite and overeating, see id., Ex. 27 (Sarah Haverlock Tr.) at

32:20–22.  She also isolated herself, "spending a lot of time alone just in pain and feeling like

[she] would never get through things."  Id., Ex. 27 (Sarah Haverlock Tr.) at 32:22–33:2; see also

Pls.' 5th Additional Exs., Ex. 120 (Declaration of Lisa Page ("Page Decl.")) ¶ 4, ECF No. 30-7
(noting that Ms. Haverlock "quickly showed signs of depression[]" upon seeing a therapist,
including "having angry outbursts and isolated behaviors[]" and "abusing alcohol to escape,
ha[ving] reduced appetite, experience[ing] memory loss, and at times [ ] just want[ing] to give
up").

      The news that Byron Fouty's remains had been recovered made Ms. Haverlock feel
"devastated . . . [and] [j]ust deeply, deeply, depressed and sad." Id., Ex. 27 (Sarah Haverlock
Tr.) at 36:3–5.  She testified that she "was in therapy for years after [her brother's] death." Id.,
Ex. 27 (Sarah Haverlock Tr.) at 31:8–9.  "[Ms. Haverlock's therapist,] Lisa Lewis Page[,] has
provided a declaration confirming [Ms. Haverlock's] ongoing diagnosis of post-traumatic stress
disorder and adjustment disorder with mixed anxiety and depression mood, caused by her
brother's murder."  Pls.' Mot. at 49; see Pls.' 5th Additional Exs., Ex. 120 (Page Decl.) ¶ 4.
Despite attending therapy for eight years, Ms. Haverlock reports that the loss of Byron Fouty is
"still very painful . . . [and] [she] would definitely not say that [she is] by any means over
it."  Pls.' 2d Additional Exs., Ex. 27 (Sarah Haverlock Tr.) at 31:13–15.  She "fears irrationally
for her family's safety" and "has an abiding fear of abandonment."  Pls.' Mot. at 49; see also
Pls.' 2d Additional Exs., Ex. 27 (Sarah Haverlock Tr.) at 33:8–20.  Mr. Dibler's testimony
confirms that there is "no question about it" that Ms. Haverlock still experiences the loss of her
brother today.  Pls.' 2d Additional Exs., Ex. 28 (Gordon Dibler Tr.) at 84:11–13.

### 4.  The Estate of Mickey W. Fouty

      Mickey W. Fouty was Byron Fouty's biological father.  See Pls.' Mot. at 57.  Mickey
Fouty's brother, Ronald Fouty, see Pls.' 2d Additional Exs., Ex. 31 (Declaration of Ronald Fouty
("Ronald Fouty Decl.")) ¶ 3, ECF No. 27-14, recalled that "Mickey[ Fouty], . . . [Ms. North,] and
Byron [Fouty] all lived together as one family under the same roof for about two years before

Mickey [Fouty] and [Ms. North] separated, and [Ms. North] married Gordon Dibler[,]" id.,

Ex. 31 (Ronald Fouty Decl.) ¶ 6.  Ronald Fouty also confirmed that "[f]ollowing [Ms. North's]

divorce from [Mr. Dibler], Mickey [Fouty] and Byron [Fouty] saw each other regularly, with

Byron [Fouty] regularly staying overnight in Mickey[ Fouty]'s house, up until the time that [he]

deployed to Iraq." Id., Ex. 31 (Ronald Fouty Decl.) ¶ 7.  According to Ronald Fouty, Mickey

Fouty and Byron Fouty did "[e]verything from snowboarding to tobogganing, hunting,

fishing, . . . rid[ing] bikes, . . . [and] go[ing] out to dinner" together.  Id., Ex. 30 (Ronald Fouty

Tr.) at 10:3–6.  Ronald Fouty described Mickey Fouty's love for Byron Fouty as a "ten" on a

scale of one to ten, see id., Ex. 30 (Ronald Fouty Tr.) at 11:1–4, and testified that Mickey Fouty

"did everything he could do for [Byron Fouty,] . . . [and that] [h]e was always there for him[,]"

id., Ex. 30 (Ronald Fouty Tr.) at 11:14–15.  Although, as Mr. Dibler testified, Mickey Fouty "at

times struggled with some mental health issues and traveled for his work, . . . he was not a bad

father."  Pls.' Mot. at 58 (citing Pls.' 2d Additional Exs., Ex. 28 (Gordon Dibler Tr.) at 23:20–

24:11, 55:14–21).  Mr. Dibler confirms that Mickey Fouty and Byron Fouty loved each other.

See Pls.' 2d Additional Exs., Ex. 28 (Gordon Dibler Tr.) at 55:22–56:3.

Ronald Fouty testified that before Byron Fouty was captured, Mickey Fouty "was

fantastic, [and] he was making stained glass windows [for people] . . . all over the country[.]"

Id., Ex. 30 (Ronald Fouty Tr.) at 14:21–22.  When Mickey Fouty learned about his son's capture

by the terrorists, "[h]e stopped making windows. . . . [and] his condition deteriorated very

rapidly."  Id., Ex. 30 (Ronald Fouty Tr.) at 14:9–12.  According to Mr. Dibler, who "spent time

with Mickey [Fouty] during the [fourteen] months that Byron [Fouty] was missing, traveled with

him, . . . and attended Byron[ Fouty]'s funeral with him[,]" Pls.' Mot. at 59 (citing Pls.' 2d

Additional Exs., Ex. 28 (Gordon Dibler Tr.) at 85:4–20), there is "no question about it" that

Mickey Fouty was grieving the loss of his son, Pls.' 2d Additional Exs., Ex. 28 (Gordon Dibler

Tr.) at 86:17–18.  Ronald Fouty testified that Mickey Fouty was not on a path of self-destruction

before Byron Fouty was captured.  See id., Ex. 30 (Ronald Fouty Tr.) at 15:9–11.  However,

following his son's abduction, torture, and murder, Mickey Fouty

> was just extremely distraught and very, very depressed and overwhelmed with
> grief.  And [the loss of Byron Fouty] hurt him completely and totally. . . .  He
> started doing drugs that were extremely powerful.  And then he died from those
> drugs.  He basically committed suicide slowly.  He stopped communicating.  He
> stopped trying.  He stopped working and he gave up.  It totally destroyed him[.]

Id., Ex. 30 (Ronald Fouty Tr.) at 12:9–12, 12:16–20.  Mickey Fouty died on January 31, 2011,

see id., Ex. 30 (Ronald Fouty Tr.) at 6:8–9, "only two and one-half years after [his son's]

remains were recovered[,]" Pls.' Mot. at 58.

## B.     The Jiménez Family

Alex Jiménez is survived by his biological mother, Maria Duran, and his biological

father, Ramon D. Jiménez.  See Compl. ¶¶ 2–3.  Alex Jiménez is also survived by his widow,

Yaderlin Jiménez, see id. ¶ 4; his two biological full blood brothers, Andy Domingo Jiménez and

Bryant Jiménez, see id. ¶¶ 5–6; and his three biological half-blood brothers, Andy Javier Jiménez

Vargas, Irving Lazaro Jiménez Vargas, and Alexander Jiménez Vargas, see id. ¶¶ 7–9.  The

Court makes the following damages related findings of fact with respect to the eight Jiménez

family member plaintiffs.

### 1.    Yaderlin Jiménez

Yaderlin Jiménez is Alex Jiménez's widow.  See Pls.' 2d Additional Exs., Ex. 34

(Transcript of Yade[r]lin Jiménez ("Yaderlin Jiménez Tr.")) at 10:3–5, ECF No. 27-17.  Yaderlin

Jiménez and Alex Jiménez were teenage sweethearts, see id., Ex. 34 (Yaderlin Jiménez Tr.))

at 7:9–16, and they were married on June 14, 2004, in Watertown, New York, see Pls.' 4th

Additional Exs., Ex. 105 (New York State Department of Health Certified Transcript of

Marriage) at 1, ECF No. 29-3, while Alex Jiménez was back in the United States following his first deployment as an Army soldier to South Korea, see Pls.' 2d Additional Exs., Ex. 34 (Yaderlin Jiménez Tr.) at 7:21–8:7.  Alex Jiménez then deployed to Iraq for one year, see id., Ex. 34 (Yaderlin Jiménez Tr.) at 14:7–8, only "three days after [he and Yaderlin Jiménez] got married[,]" id., Ex. 34 (Yaderlin Jiménez Tr.) at 10:6–8.  When Alex Jiménez returned from his first deployment to Iraq, the couple lived together for one year in Watertown, New York.  See id., Ex. 34 (Yaderlin Jiménez Tr.) at 14:13–20.  They "tried to have children[,]" id., Ex. 34 (Yaderlin Jiménez Tr.) at 15:2, but Yaderlin Jiménez had a miscarriage, see id., Ex. 34 (Yaderlin Jiménez Tr.) at 15:8–10, which was a "very painful" ordeal that they managed together alone and in secret, id., Ex. 34 (Yaderlin Jiménez Tr.) at 15:5–7.  While Alex Jiménez was serving his second deployment in Iraq, he and Yaderlin Jiménez were able to speak by telephone "every three or four days," id., Ex. 34 (Yaderlin Jiménez Tr.) at 17:12–13, and he wrote many letters to her, in which he "t[old] [her] how much he missed [her,]" id., Ex. 34 (Yaderlin Jiménez Tr.) at 18:2–3, and mentioned trying to have children again and other future plans, see id., Ex. 34 (Yaderlin Jiménez Tr.) at 18:6–12.

Yaderlin Jiménez testified that she first learned of the May 12, 2007 attack when she "heard on the news that there was a bomb explo[sion] in Iraq, and there were five dead, and among the dead a Dominican."  Id., Ex. 34 (Yaderlin Jiménez Tr.) at 19:19–21.  The next day, she learned from Army soldiers that "Alex [Jiménez] had suffered an accident[,]" id., Ex. 34 (Yaderlin Jiménez Tr.) at 20:10–11, but the Army "did[ not] know if he was dead or [had] just disappeared," id., Ex. 34 (Yaderlin Jiménez Tr.) at 20:12–13.  She subsequently learned from the Army that they "only found [Alex Jiménez's] belongings," id., Ex. 34 (Yaderlin Jiménez Tr.) at 22:12, and later that "they had found some of his bones[,]" id., Ex. 34 (Yaderlin Jiménez Tr.) at

22:14.  She testified to the emotional pain she suffered during the fourteen months she waited to

learn of her husband's fate.  See id., Ex. 34 (Yaderlin Jiménez Tr.) at 20:17–20 ("It was very

hard for the family not knowing what had happened, what[ was] being done to him.  It was

[fourteen] months.  It was a very desperate [fourteen] months for everybody.").

        Yaderlin Jiménez described Alex Jiménez as "a very loving person[,] . . . very

affectionate[,] . . . [and] very, very close with his family."  Id., Ex. 34 (Yaderlin Jiménez Tr.) at

10:11–13.  She testified that she "almost ha[s] no words to describe all the beautiful things that

he was."  Id., Ex. 34 (Yaderlin Jiménez Tr.) at 10:17–18.  Her husband's murder affected her

daily life as she "could[ not] sleep or anything like that[,]" id., Ex. 34 (Yaderlin Jiménez Tr.) at

22:21, and had to seek medical attention from doctors, see id., Ex. 34 (Yaderlin Jiménez Tr.) at

22:22.  She still suffers and mourns over Alex Jiménez's handwritten letters, which she kept

along with his uniforms, identification, and other personal effects.  See id., Ex. 34 (Yaderlin

Jiménez Tr.) at 18:15–18.  However, the items impacted her so much that she "had to see a

doctor[,]" id., Ex. 34 (Yaderlin Jiménez Tr.) at 19:2, and ultimately "had to make the decision [ ]

[to] send [the items] over to the Dominican Republic to [her] mother's house," id., Ex. 34

(Yaderlin Jiménez Tr.) at 18:22–19:1.  She has seen the video published by the Zarqawi Terrorist

Organization, see id., Ex. 34 (Yaderlin Jiménez Tr.) at 21:5–9, she testified that the video made

her feel "[v]ery frustrat[ed,]" id., Ex. 34 (Yaderlin Jiménez Tr.) at 21:14, and she described the

actions of the Zarqawi Terrorist Organization as "[s]uch a cruel attack[,]" id., Ex. 34 (Yaderlin

Jiménez Tr.) at 21:15–16, that she "[does not] even want to remember[,]" id., Ex. 34 (Yaderlin

Jiménez Tr.) at 21:17.  As illustrated by the following deposition testimony, Yaderlin Jiménez is

unable to forget her husband's violent murder:

        [E]ven as time went by, I could[ not] get that out of my mind.  Only thinking that
        he was killed and how much he could have suffered by that.  What he could be

thinking at that time, his mother and us, how we were at that moment, and the way that all of us felt at that moment.  That affects me in a way that [I] can[not] tell you[.]  I do[ not] think I will ever forget that, because he lives with me at – almost, at least in my heart for all my life.

Id., Ex. 34 (Yaderlin Jiménez Tr.) at 23:1–10.

### 2. **Maria Duran**

Maria Duran is the biological mother of Alex Jiménez.  See Pls.' 2d Additional Exs., Ex. 33 (Transcript of Maria Duran ("Maria Duran Tr.")) at 8:16–17, ECF No. 27-16.  Alex Jiménez lived with Ms. Duran from birth until he was eighteen years old.  See id., Ex. 33 (Maria Duran Tr.) at 8:4–15.  She testified that she and her son had "a beautiful relationship[,]" id., Ex. 33 (Maria Duran Tr.) at 10:12–13, and that they "were really close[,]" id., Ex. 33 (Maria Duran Tr.) at 10:14.  Ms. Duran further testified that she "protected [Alex Jiménez] so much that [she] personally took him to school" when they lived in Massachusetts, id., Ex. 33 (Maria Duran Tr.) at 12:12–13, and Alex Jiménez "always protected [her]" as well, id., Ex. 33 (Maria Duran Tr.) at 13:8–9.  As he grew older, the two "were in constant communication[,]" id., Ex. 33 (Maria Duran Tr.) at 12:1–2, and her son "always called [her] from wherever he was[,]" id., Ex. 33 (Maria Duran Tr.) at 12:4–5.

Ms. Duran testified about the horrifying way in which she learned that Alex Jiménez had been abducted: she received a voicemail message where she heard his voice screaming "'Mom[,]'" id., Ex. 33 (Maria Duran Tr.) at 30:17, and "[a] mysterious voice that seemed to be talking in the desert[,]" id., Ex. 33 (Maria Duran Tr.) at 30:17–18.  Ms. Duran has no doubt that the voice she heard screaming was her son's voice.  See id., Ex. 33 (Maria Duran Tr.) at 31:7–10.  After listening to the voicemail, she immediately thought that "[s]omething [terrible] happened to Alex[ Jiménez]," and she felt "a very deep hurt."  Id., Ex. 33 (Maria Duran Tr.) at 11:6.  Ms. Duran was later notified by the Army that "[her] son ha[d] been captured[,]" id., Ex. 33 (Maria

Duran Tr.) at 31:15–16, and then, fourteen months later, "that [her] son had died[] and [the Army] had found his remains[,]" id., Ex. 33 (Maria Duran Tr.) at 31:19–20.  She also saw the video published by the Zarqawi Terrorist Organization claiming responsibility for her son's abduction and death, which she described as "a very difficult moment[,]" id., Ex. 33 (Maria Duran Tr.) at 34:3, that made her feel "[h]orrible[,]" id., Ex. 33 (Maria Duran Tr.) at 33:22.

Ms. Duran's "life changed completely" when she lost Alex Jiménez.  Id., Ex. 33 (Maria Duran Tr.) at 16:8.  After her son's murder, she "almost could[ not] eat[,]" id., Ex. 33 (Maria Duran Tr.) at 34:9–10, "[she] could[ not] work," id., Ex. 33 (Maria Duran Tr.) at 34:10, and she "lost sleep thinking about the terrible things" that happened to him, id., Ex. 33 (Maria Duran Tr.) at 34:11.  Another of her sons, Andy Domingo Jiménez, testified that the loss of Alex Jiménez "hurt her a lot[,]" id., Ex. 35 (Transcript of Andy Jiménez ("Andy Domingo Jiménez Tr.") at 42:5, ECF No. 27-18, and that "she[ is] [now] very quiet and you can see it in her face that she[ is] thinking about him[,]" id., Ex. 35 (Andy Domingo Jiménez Tr.) at 42:8–9.  Likewise, Ramon D. Jiménez, Alex Jiménez's father and Ms. Duran's former husband, testified that the loss of their son caused Ms. Duran to "suffer[] a lot, a lot, a lot."  Id., Ex. 32 (Transcript of Ramon Domingo Jiménez Peralta ("Ramon D. Jiménez Tr.")) at 49:6–7, ECF No. 27-15. "[Alex Jiménez's] loss has been immensely painful for [her,]" id., Ex. 33 (Maria Duran Tr.) at 16:8–9, and she "ha[s] no [ ] words to express the pain [she] ha[s] for losing him[,]" id., Ex. 33 (Maria Duran Tr.) at 16:9–10.  Ms. Duran testified: "I feel [the pain] like the first day.  And I will never forget it.  You never forget a son and even more, a son like that."  Id., Ex. 33 (Maria Duran Tr.) at 16:18–20.

### 3.  Ramon D. Jiménez

Ramon D. Jiménez is the biological father of Alex Jiménez.  See id., Ex. 32 (Ramon D. Jiménez Tr.) at 8:18–19.  Alex Jiménez lived with Mr. Jiménez and Ms. Duran in their household

from birth until he was fourteen years old, see id., Ex. 32 (Ramon D. Jiménez Tr.) at 12:21–13:8,

when "he moved with [Ms. Duran] [ ] who separated from his father and went to live in the

Dominican Republic," Pls.' Mot. at 67 (citing Pls.' 2d Additional Exs., Ex. 32 (Ramon D.

Jiménez Tr.) at 14:5–12, 13:5–8).  Mr. Jiménez still saw him "every year for holidays[,]" Pls.' 2d

Additional Exs., Ex. 32 (Ramon D. Jiménez Tr.) at 13:10, and spent "[t]hree[ to] four months

with [Alex Jiménez]" yearly in the Dominican Republic, id., Ex. 32 (Ramon D. Jiménez Tr.) at

13:15.  Immediately prior to joining the Army and deploying to South Korea, see id., Ex. 32

(Ramon D. Jiménez Tr.) at 13:20–14:4, Alex Jiménez returned to Mr. Jiménez's house in

Massachusetts "and lived with [him] for one year," id., Ex. 32 (Ramon D. Jiménez Tr.) at 13:18.

Ms. Duran testified that Mr. Jiménez and Alex Jiménez had a "really close" relationship,

id., Ex. 33 (Maria Duran Tr.) at 17:2, and that Mr. Jiménez "was always looking after [Alex

Jiménez,]" id., Ex. 33 (Maria Duran Tr.) at 17:3.  Mr. Jiménez "spent time with Alex [Jiménez]

on camping trips, at the beach, [and] at a sloping grassy area near his house in Lawrence,

Massachusetts."  Pls.' Mot. at 67 (citing Pls.' 2d Additional Exs., Ex. 32 (Ramon D. Jiménez Tr.)

at 35:12–17).  "[Mr. Jiménez] recalls surprising [his son] at his graduation from high school in

the Dominican Republic[,]" id. (citing Pls.' 2d Additional Exs., Ex. 32 (Ramon D. Jiménez Tr.)

at 36:4–13), as well as "renting a minibus and driving [fifteen] of [his] family [members] down

to the Carolinas to attend Alex[ Jiménez]'s graduation from Army boot camp[,]" id. (citing Pls.'

2d Additional Exs., Ex. 32 (Ramon D. Jiménez Tr.) at 38:2–39:3).  Mr. Jiménez was "[v]ery

proud" of his son.  Pls.' 2d Additional Exs., Ex. 32 (Ramon D. Jiménez Tr.) at 38:17.

Mr. Jiménez first learned that Alex Jiménez had been kidnapped when two Army soldiers

came to his house the day his son was captured, see id., Ex. 32 (Ramon D. Jiménez Tr.)

at 40:22–41:6, and informed him "that there had been an ambush and that Alex [Jiménez] had

been taken away[,]" id., Ex. 32 (Ramon D. Jiménez Tr.) at 41:12–13, by "the terrorists[,]" id., Ex. 32 (Ramon D. Jiménez Tr.) at 41:15.  Mr. Jiménez testified that but for his religious faith, the news of his son's kidnapping would have killed him.  See id., Ex. 32 (Ramon D. Jiménez Tr.) at 41:17 (stating that when he heard the news of the kidnapping, "[he] did not die because [he] believe[s] in God[]").  During the fourteen months that Alex Jiménez was missing and his fate remained unknown, Mr. Jiménez experienced deep suffering.  See id., Ex. 32 (Ramon D. Jiménez Tr.) at 42:17–20 ("[Fourteen] months [not] knowing whether your son is alive—your kidnapped son is alive or dead, that[ is], like—even if one explains it, if someone does[ not] live through that, I do[ not] desire it [on] anyone.").  "There was a time that [he] could[ not] even sleep[,]" id., Ex. 32 (Ramon D. Jiménez Tr.) at 44:21, and "[he] would not eat[,]" id., Ex. 32 (Ramon D. Jiménez Tr.) at 44:21.  Additionally, Mr. Jiménez's suffering prevented him from working.  See id., Ex. 32 (Ramon D. Jiménez Tr.) at 43:19–20 ("There was a time when I was stuck.  I did not work or anything."); id., Ex. 32 (Ramon D. Jiménez Tr.) at 44:13–16 ("At the beginning, at work itself, I would cry.  I couldn't stop crying.").  Another of his sons, Irving Jiménez Vargas, confirms that the capture, torture, and murder of Alex Jiménez "affected [their father] a lot[,]" id., Ex. 38 (Transcript of Irving Lazaro Jiménez Vargas ("Irving Jiménez Vargas Tr.")) at 27:7, ECF No. 27-21, and caused him to "suffer from insomnia, . . . stop working[,] . . . and los[e] a lot of weight," id., Ex. 38 (Irving Jiménez Vargas Tr.) at 27:13–19.

Mr. Jiménez still suffers from the loss of his son and describes the loss as "something you adapt to, but [ ] will never, never overcome [ ] or forget[.]"  Id., Ex. 32 (Ramon D. Jiménez Tr.) at 43:18–19.  "[Mr. Jiménez's] family corroborates that the tragedy has permanently damaged [him]."  Pls.' Mot. at 69.  For example, another of his sons, Andy Javier Jiménez Vargas, testified that his father is "not the same anymore[,]" Pls.' 2d Additional Exs., Ex. 37 (Transcript

of Andy Javier Jiménez Vargas ("Andy Javier Jiménez Vargas Tr.")) at 26:1–2, ECF No. 27-20,

and that "he just starts crying and loses it[,]" id., Ex. 37 (Andy Javier Jiménez Vargas Tr.) at

26:4–5, any time something "comes up that [ ] brings [up] a memory of Alex[ Jiménez], [like] [ ]

a picture[] or a song," id., Ex. 37 (Andy Javier Jiménez Vargas Tr.) at 26:2–4.  Similarly, Ms.

Duran testified that "[Mr. Jiménez] still cries like the first day he learned of [Alex Jiménez's]

passing[,]" id., Ex. 33 (Maria Duran Tr.) at 17:10 –11, and that "[h]e looks very sad and

depressed[,]" id., Ex. 33 (Maria Duran Tr.) at 17:15.

### 4. Andy Domingo Jiménez

"Andy Domingo [Jiménez] and Alex [Jiménez] are full blood, biological brothers who

share the same biological father and mother."  Pls.' Mot. at 72 (citing Pls.' 2d Additional Exs.,

Ex. 35 (Andy Domingo Jiménez Tr.) at 6:18–7:19).  Andy Domingo Jiménez was Alex

Jiménez's "[y]ounger brother[,]" Pls.' 2d Additional Exs., Ex. 35 (Andy Domingo Jiménez Tr.)

at 7:22, and there was a five-year age difference between them, see id., Ex. 35 (Andy Domingo

Jiménez Tr.) at 8:1–5.  Andy Domingo Jiménez "gr[e]w up in the same house with

Alex[ Jiménez,]" id., Ex. 35 (Andy Domingo Jiménez Tr.) at 9:12–13, and they "shared a

room . . . until [Alex Jiménez] . . . [joined] the [A]rmy[,]" id., Ex. 35 (Andy Domingo Jiménez

Tr.) at 9:17–18.  Andy Domingo Jiménez testified that he had a "[v]ery close" relationship with

his older brother, id., Ex. 35 (Andy Domingo Jiménez Tr.) at 13:1, and that Alex Jiménez "was

[his] closest brother out of all of [his brothers,]" id., Ex. 35 (Andy Domingo Jiménez Tr.) at 13:3.

He described Alex Jiménez as "[a] mentor[ and] a father figure [ ] [who] always gave [him]

advice in life."  Id., Ex. 35 (Andy Domingo Jiménez Tr.) at 12:8–9.

Andy Domingo Jiménez knew that Alex Jiménez had been captured by the terrorists in

the so-called "Triangle of Death[,]" id., Ex. 35 (Andy Domingo Jiménez Tr.) at 24:1–3, and he

saw the video the Zarqawi Terrorist Organization released with Alex Jiménez's "personal

belongings[,] . . . [identification], [and] [ ] calling cards that he used to call [his family,]" id.,
Ex. 35 (Andy Domingo Jiménez Tr.) at 23:18–20.  His older brother's capture made Andy
Domingo Jiménez feel "very angry . . . [and] very hopeless."  Id., Ex. 35 (Andy Domingo
Jiménez Tr.) at 25:16–17.  He testified that he suffered profoundly during the "[fourteen] long
months" that Alex Jiménez was missing.  Id., Ex. 35 (Andy Domingo Jiménez Tr.) at 31:18.  For
example, he "could[ not] sleep," id., Ex. 35 (Andy Domingo Jiménez Tr.) at 23:9, he "could[
not] eat[,]" id., Ex. 35 (Andy Domingo Jiménez Tr.) at 30:4, and he worked excessively, see id.,
Ex. 35 (Andy Domingo Jiménez Tr.) at 29:5–8 ("I basically became a workaholic.  I just worked
to try to get my mind occupied[.]").  He testified that at the time his brother was abducted, he
weighed approximately 190 pounds, dropping to roughly 130 pounds at one point after the
abduction.  See id., Ex. 35 (Andy Domingo Jiménez Tr.) at 30:4–8 ("I lost a lot of weight
because all I was thinking [about] was him[.]")  Andy Domingo Jiménez "also abused drugs for
the first time in his life," Pls.' Mot. at 73 (citing Pls.' 2d Additional Exs. Ex. 35 (Andy Domingo
Jiménez Tr.) at 29:4–5, 30:15–19), and dropped out of school for a couple of years, see Pls.' 2d
Additional Exs., Ex. 35 (Andy Domingo Jiménez Tr.) at 48:9–21.

When Andy Domingo Jiménez learned the news of his brother's death, his suffering "got
worse."  Id., Ex. 35 (Andy Domingo Jiménez Tr.) at 32:6.  He intensified his drug abuse, see id.,
Ex. 35 (Andy Domingo Jiménez Tr.) at 35:7–10, lost his religious faith, see id., Ex. 35 (Andy
Domingo Jiménez Tr.) at 39:3–5, and even thought about ending his life, see id., Ex. 35 (Andy
Domingo Jiménez Tr.) at 35:19–36:3 ("The only thing that kept me strong from not doing it was
my mother and my little brother.  I didn't want them to go through . . . what they went through
with Alex[ Jiménez again.]").

Andy Domingo Jiménez "credits meeting his wife for his turnaround after [seven] years of hopeless suffering[.]"  Pls.' Mot. at 74.  He testified that his wife "showed [him] . . . how to basically live again[.]"  Pls.' 2d Additional Exs., Ex. 35 (Andy Domingo Jiménez Tr.) at 39:10– 11.  However, he testified that his pain is "never going to go" away, id., Ex. 35 (Andy Domingo Jiménez Tr.) at 39:22, and that he "still miss[es] [Alex Jiménez], [ ] still think[s] about him, [and] [ ] still ha[s] objects of hi[s,]" id., Ex. 35 (Andy Domingo Jiménez Tr.) at 39:22–40:1.  Andy Domingo Jiménez testified that he will "never forget [Alex Jiménez], [who is] always in [his] heart[.]"  Id., Ex. 35 (Andy Domingo Jiménez Tr.) at 41:2–3.

### 5. Bryant Jiménez

"Bryant [Jiménez] and Alex [Jiménez] are full blood, biological brothers who share the same biological father and mother."  Pls.' Mot. at 75; see Pls.' 2d Additional Exs., Ex. 39 (Transcript of Br[yant] [d]e[ ]Jesus Jiménez ("Bryant de Jesus Jiménez Tr.")) at 6:7–20, ECF No. 27-22.  Bryant Jiménez was Alex Jiménez's younger brother and there was approximately an eight-year age difference between them.  See Pls.' 2d Additional Exs., Ex. 39 (Bryant de Jesus Jiménez Tr.) at 8:4–9.  Bryant Jiménez lived with Alex Jiménez "[his] whole life . . . until [Alex Jiménez] finished high school and joined the [A]rmy."  Id., Ex. 39 (Bryant de Jesus Jiménez Tr.) at 8:13–14.  They had a "great relationship[,]" id., Ex. 39 (Bryant de Jesus Jiménez Tr.) at 11:1, and Alex Jiménez taught Bryant Jiménez "how to swim, how to ride the bike, and many more things[,]" id., Ex. 39 (Bryant de Jesus Jiménez Tr.) at 8:19–20.

Bryant Jiménez understood that Alex Jiménez had been captured by the terrorists, see id., Ex. 39 (Bryant de Jesus Jiménez Tr.) at 12:17–21, and recalls seeing the video published by the Zarqawi Terrorist Organization, which made him feel "horrible[,]" id., Ex. 39 (Bryant de Jesus Jiménez Tr.) at 13:14.  As a result of his brother's abduction, Bryant Jiménez effectively dropped out of high school, see id., Ex. 39 (Bryant de Jesus Jiménez Tr.) at 9:18–10:6, and he withdrew

from his family, see id. (Bryant de Jesus Jiménez Tr.) at 12:8–10 ("I used to lock myself in the bedroom and did[ not] want to talk to no one.  I used to cry a lot.").  He testified that he tried to cope with his feelings by "drinking a lot of alcohol[.]"  Id., Ex. 39 (Bryant de Jesus Jiménez Tr.) at 14:22.  Ms. Duran testified that he "did[ not] want to accept that he had lost his brother[,]" id., Ex. 33 (Maria Duran Tr.) at 19:13–14, and that "[h]e would lock himself in . . . and did[ not] want to talk to anyone[,]" id., Ex. 33 (Maria Duran Tr.) at 19:16–17.  Additionally, his brother, Andy Domingo Jiménez, testified that while Bryant Jiménez "is not that expressive with his emotions," id., Ex. 35 (Andy Domingo Jiménez Tr.) at 47:8–9, Alex Jiménez's abduction and killing "one hundred percent affected him a lot[,]" id., Ex. 35 (Andy Domingo Jiménez Tr.) at 47:16–17.  Andy Domingo Jiménez further testified that Bryant Jiménez has kept his brother's clothes and wears his Army dog tags, see id., Ex. 35 (Andy Domingo Jiménez Tr.) at 47:21–48:7.

"Bryant [Jiménez] still suffers intensely, and his deposition is the first time he has spoken outside the family about it."  Pls.' Mot. at 77 (citing Pls.' 2d Additional Exs., Ex. 39 (Bryant de Jesus Jiménez Tr.) at 8:21–9:8).  He no longer drinks excessively like he used to, see Pls.' 2d Additional Exs., Ex. 39 (Bryant de Jesus Jiménez Tr.) at 17:10–12, but he testified that "it was a long process for [him] to accept that [Alex Jiménez] was gone," id., Ex. 39 (Bryant de Jesus Jiménez Tr.) at 19:4–5, and that he has "no words to describe how . . . bad it felt[] [and] how bad it feels[,]" id., Ex. 39 (Bryant de Jesus Jiménez Tr.) at 19:6–8.  Bryant Jiménez married approximately five years ago and named his only child, a daughter, Nashla Alexandra, after his deceased brother.  Id., Ex. 39 (Bryant de Jesus Jiménez Tr.) at 7:5–8:1.

**6. Andy Javier Jiménez Vargas**

"Andy Javier [Jiménez Vargas] and Alex [Jiménez] are half-blood biological brothers who have the same biological father, Ramon Jiménez."  Pls.' Mot. at 77; see Pls.' 2d Additional

Exs., Ex. 37 (Andy Javier Jiménez Vargas Tr.) at 7:19–8:7.  Andy Javier Jiménez Vargas was

Alex Jiménez's older brother, and there was a six-year age difference between them.  See Pls.'

2d Additional Exs., Ex. 37 (Andy Javier Jiménez Vargas Tr.) at 8:20–9:1.  "Andy Javier

[Jiménez Vargas] was born and grew up in Puerto Rico and New York and lived primarily with

his mother Gladys[ Vargas]."  Pls.' Mot. at 77 (citing Pls.' 2d Additional Exs., Ex. 37 (Andy

Javier Jiménez Vargas Tr.) at 8:8–10; 9:5–19).  However, Andy Javier Jiménez Vargas and Alex

Jiménez both later lived in Queens, New York, and they saw each other frequently, including

"[a]n average of probably two weekends out of the month, holidays, birthdays[,] and

summers[,]" Pls.' 2d Additional Exs., Ex. 37 (Andy Javier Jiménez Vargas Tr.) at 10:11–12.

Additionally, Andy Javier Jiménez Vargas lived with his father Ramon Jiménez and Alex

Jiménez for a year in Lawrence, Massachusetts, and for another year in the Dominican Republic.

See id., Ex. 37 (Andy Javier Jiménez Vargas Tr.) at 10:21–11:2.  Andy Javier Jiménez Vargas

testified that he and Alex Jiménez "were just so close that [they] knew everything about each

other," id., Ex. 37 (Andy Javier Jiménez Vargas Tr.) at 14:2–3, and that "[Alex Jiménez] looked

up to [him]" as the oldest brother, id., Ex. 37 (Andy Javier Jiménez Vargas Tr.) at 13:3.

Andy Javier Jiménez Vargas testified that he saw the video the Zarqawi Terrorist

Organization released with Alex Jiménez's belongings and that it made him feel "deteriorated"

and "very angry[ and] sad."  Id., Ex. 37 (Andy Javier Jiménez Vargas Tr.) at 20:16.  In the

fourteen months before Andy Javier Jiménez Vargas learned of his brother's death, he "worked

three jobs . . . just to try to keep [himself] occupied[.]"  Id., Ex. 37 (Andy Javier Jiménez Vargas

Tr.) at 23:18–20.  When he received confirmation of Alex Jiménez's death, "[i]t made [him] feel

sad and broken."  Id., Ex. 37 (Andy Javier Jiménez Vargas Tr.) at 24:5.  Although by his own

admission, he does not share his feelings frequently, see id., Ex. 37 (Andy Javier Jiménez Vargas

Tr.) at 30:2–7, Andy Javier Jiménez Vargas grieved in his own way.  "[He] testified that as a coping mechanism he created a shrine to Alex [Jiménez] in his home, with a mural, shadow boxes, [his] beret, uniform, and medals."  Pls.' Mot. at 80 (citing Pls.' 2d Additional Exs., Ex. 37 (Andy Javier Jiménez Vargas Tr.) at 27:14–28:3); see also id. (citing Pls.' 2d Additional Exs., Ex. 37 (Andy Javier Jiménez Vargas Tr.) at 28:5–13) (noting that "[e]ventually seeing those things began to hurt [him], and he had to wrap them up and put them away").  "Andy Javier [Jiménez Vargas] still suffers intensely from the loss of his brother[.]"  Id.; see also Pls.' 2d Additional Exs., Ex. 33 (Maria Duran Tr.) at 26:12–13 (testimony of Maria Duran that Andy Javier Jiménez Vargas "was really affected by" the loss of his brother and that "[e]ven today, he still feels the pain").  He described the pain as

> the type of pain that . . . when you have a cut or a scab on your skin, and with time it heals, but the line [ ] or the sign of something happening is still there. It[ is] never going to go away.  It[ is] a feeling that [he] can[not] even describe, that [he] do[es not] want anybody to ever feel.

Pls.' 2d Additional Exs., Ex. 37 (Andy Javier Jiménez Vargas Tr.) at 28:18–29:1.

### 7. Irving Lazaro Jiménez Vargas

"Irving [Jiménez Vargas] and Alex [Jiménez] are half-blood biological brothers who have the same biological father, Ramon Jiménez."  Pls.' Mot. at 80; see Pls.' 2d Additional Exs., Ex. 38 (Irving Jiménez Vargas Tr.) at 7:11–13, 8:21–9:7.  "Irving [Jiménez Vargas] was Alex[ Jiménez]'s older brother, and there was a [two]-year age difference between them."  Id. (citing Pls.' 2d Additional Exs., Ex. 38 (Irving Jiménez Vargas Tr.) at 9:8–9).  Irving Jiménez Vargas was born in Puerto Rico and lived primarily with his mother Gladys Vargas.  See Pls.' 2d Additional Exs., Ex. 38 (Irving Jiménez Vargas Tr.) at 9:12–16.  However, Irving Jiménez Vargas and Alex Jiménez lived together under the same roof for "three to four months" each year, id., Ex. 38 (Irving Jiménez Vargas Tr.) at 10:3, during holidays, vacations, and summers,

see id., Ex. 38 (Irving Jiménez Vargas Tr.) at 10:3–11:4.  Additionally, before Alex Jiménez

joined the Army, he and Irving Jiménez Vargas lived only "about [thirty] minutes away from

each other" in Queens, New York, id., Ex. 38 (Irving Jiménez Vargas Tr.) at 14:1, and they

"would meet up . . . to walk around the block[] and [ ] chit chat," id., Ex. 38 (Irving Jiménez

Vargas Tr.) at 14:1–3.  Irving Jiménez Vargas testified that on a scale of one to ten, he would

describe the closeness of his relationship with Alex Jiménez as a ten.  See id., Ex. 38 (Irving

Jiménez Vargas Tr.) at 19:7–10.

 When Irving Jiménez Vargas learned that Alex Jiménez had been captured by the

terrorists while serving in the Army in Iraq, he "experienced days of insomnia and loss of

appetite, and he drank excessively in order to try to forget."  Pls.' Mot. at 82 (citing Pls.' 2d

Additional Exs., Ex. 38 (Irving Jiménez Vargas Tr.) at 24:10–15); see also Pls.' 2d Additional

Exs., Ex. 38 (Irving Jiménez Vargas Tr.) at 22:17–22 (describing the "self torture" of "not

knowing exactly what[ was] going on" with his brother's abduction and the resulting fixation on

"what might be happening[ or] what they can do to torture him[]").  Andy Domingo Jiménez

testified that he, Andy Javier Jiménez Vargas, and Irving Jiménez Vargas all responded to their

grief by becoming "workaholics."  Pls.' 2d Additional Exs., Ex. 35 (Andy Domingo Jiménez Tr.)

at 52:20.  Moreover, Ramon Jiménez testified that Irving Jiménez Vargas suffered a lot upon

learning of his brother's death.  See id., Ex. 32 (Ramon D. Jiménez Tr.) at 48:19–20.  And, Maria

Duran similarly testified that she observed Irving Jiménez Vargas experiencing "a lot of

sadness[ and] deep pain[.]"  Id., Ex. 33 (Maria Duran Tr.) at 23:20.  Irving Jiménez Vargas has

seen the video that the Zarqawi Terrorist Organization released with Alex Jiménez's belongings,

see id., Ex. 38 (Irving Jiménez Vargas Tr.) at 28:1–9, and he testified that it made him feel

"[h]urt, just knowing that it[, i.e., Alex Jiménez's capture and death,] was all . . . true[,]" id., Ex.

38 (Irving Jiménez Vargas Tr.) at 28:11–12.  Irving Jiménez Vargas testified that, without Alex

Jiménez, "it[ is] like [his] family . . . is incomplete," id., Ex. 38 (Irving Jiménez Vargas Tr.)

at 32:15–16, and he described the loss of his brother as "a space that can never be filled[,]" id.,

Ex. 38 (Irving Jiménez Vargas Tr.) at 32:17.

**8. Alexander Jiménez Vargas**

"Alexander [Jiménez Vargas] and Alex [Jiménez] are half-blood biological brothers who

have the same biological father, Ramon Jiménez."  Pls.' Mot. at 83; see Pls.' 2d Additional Exs.,

Ex. 40 (Transcript of Alexander Jiménez ("Alexander Jiménez Vargas Tr.")) at 6:21–7:8, ECF

No. 27-23.  Alexander Jiménez Vargas is Alex Jiménez's youngest brother, and there was a

nineteen-year age difference between them.  See Pls.' 2d Additional Exs., Ex. 40 (Alexander

Jiménez Vargas Tr.) at 9:21–10:3.  "Alexander [Jiménez Vargas] is named after Alex [Jiménez]

and looked up to and relied on him for encouragement, and as a role model."  Pls.' Mot. at 83

(citing Pls.' 2d Additional Exs., Ex. 40 (Alexander Jiménez Vargas Tr.) at 15:6–16:3).

Alexander Jiménez Vargas testified that he and Alex Jiménez "loved each other a lot."  Pls.' 2d

Additional Exs., Ex. 40 (Alexander Jiménez Vargas Tr.) at 11:22.  And, "the fact [that] [he is]

named after [Alex Jiménez] really makes [him] feel proud."  Id., Ex. 40 (Alexander Jiménez

Vargas Tr.) at 16:1–2.  Andy Domingo Jiménez corroborates the closeness of the relationship

between Alex Jiménez and Alexander Jiménez Vargas.  See id., Ex. 35 (Andy Domingo Jiménez

Tr.) at 56:9–19 ("Alex [Jiménez] loved Alexander [Jiménez Vargas].  . . . [E]ven though he had

another mother and he lived in another house, he was [his] brother[,] period.").  "Alexander

[Jiménez Vargas] and Alex [Jiménez] built and sustained their relationship through a

combination of phone calls, video-conferencing, and in-person contact."  Pls.' Mot. at 84 (citing

Pls.' 2d Additional Exs., Ex. 40 (Alexander Jiménez Vargas Tr.) at 10:4–12:9).  For example,

Maria Duran recalls that Alex Jiménez would "call [Alexander Jiménez Vargas] frequently by

phone and stay in touch[,]" Pls.' 2d Additional Exs., Ex. 33 (Maria Duran Tr.) at 28:20–21, and

Ramon Jiménez testified that Alex Jiménez traveled to the Dominican Republic to spend time

with Alexander Jiménez Vargas, see id., Ex. 32 (Ramon D. Jiménez Tr.) at 31:18–20.  Likewise,

Andy Domingo Jiménez testified that "[t]here was not a time that [Alex Jiménez] would go to

[the] Dominican Republic and not go see Alexander [Jiménez Vargas.]"  Id., Ex. 35 (Andy

Domingo Jiménez Tr.) at 56:14–16.

Alexander Jiménez Vargas was six years old and living in the Dominican Republic at the

time of Alex Jiménez's abduction, see id., Ex. 40 (Alexander Jiménez Vargas Tr.) at 9:19–20,

8:14–18.  Alexander Jiménez Vargas "vividly" recalls the moment he learned that his brother

had been killed.  Id., Ex. 40 (Alexander Jiménez Vargas Tr.) at 12:13.  Maria Duran "told

[Alexander Jiménez Vargas] about what happened[.]"  Id., Ex. 40 (Alexander Jiménez Vargas

Tr.) at 12:17.  "Maria [Duran] recalls this excruciating moment in detail."  Pls.' Mot. at 85; see

Pls.' 2d Additional Exs., Ex. 33 (Maria Duran Tr.) at 29:13–16 ("I told him, 'It's true.  He passed

away.'  And I showed him pictures.  And right there, he started to cry.  He got really sad with

very deep pain.").  Alexander Jiménez Vargas testified that when he learned that Alex Jiménez

had been killed, he "felt really angry[,] [b]ut at the same time, [he] just had a really bad feeling in

[ ] [his] stomach about [ ] not being able to see him anymore and hear his voice or be able to hear

his encouragement."  Pls.' 2d Additional Exs., Ex. 40 (Alexander Jiménez Vargas Tr.) at 13:9–

13.  He further testified that the loss of his brother still "hurts just like it did ten years ago when

[he] heard that [Alex Jiménez] was[ not] here anymore."  Id., Ex. 40 (Alexander Jiménez Vargas

Tr.) at 16:11–12.  Describing the loss of his brother, Alexander Jiménez Vargas testified that "it

feels like part of [him] will never be the same.  And it never will, because it does[ not] get easier

with time."  Id., Ex. 40 (Alexander Jiménez Vargas Tr.) at 16:15–16.

## IV.    CONCLUSIONS OF LAW

The Court previously concluded (1) that it has subject-matter jurisdiction over the plaintiffs' claims in this case, see Fouty I, 2024 WL 3443591, at *20, (2) that it has personal jurisdiction over the defendants, see id. at *21, and (3) that the plaintiffs have "establishe[d] [their] claim[s] or right to relief by evidence satisfactory to the [C]ourt[,]" 28 U.S.C. § 1608(e); see Fouty I, 2024 WL 3443591, at *21–30.  Accordingly, the Court granted the plaintiffs' motion for a default judgment as to liability.  See Fouty I, 2024 WL 3443591, at *30.  Having concluded that the defendants are liable to the plaintiffs, the Court now addresses the damages to which the plaintiffs are entitled.

In general, "the [C]ourt must make an independent evaluation of the damages to be awarded and it has 'considerable latitude in determining the amount of damages.'"  Ventura, 134 F. Supp. 3d at 103 (quoting Boland, 763 F. Supp. 2d at 67).  However, the Court "must ensure[] that there [i]s a basis for the damages specified in the default judgment."  Id. (quoting Transatlantic Marine Claims Agency, Inc., 109 F.3d at 111) (second alteration in original).  Accordingly, "'the plaintiff[s] must prove [ ] entitlement to the amount of monetary damages requested' using 'detailed affidavits or documentary evidence' on which the [C]ourt may rely."  Boland, 304 F.R.D. at 36 (quoting Fanning, 257 F.R.D. at 7).

Under the Act, a foreign state is liable to victims of state-sponsored terrorism for money damages including "economic damages, solatium, pain and suffering, and punitive damages."  28 U.S.C. § 1605A(c)(4).  To be awarded damages under § 1605A(c), a plaintiff "must prove that the consequences of the foreign state's conduct were reasonably certain (i.e., more likely than not) to occur, and must prove the amount of damages by a reasonable estimate consistent with this [Circuit]'s application of the American rule on damages."  Thuneibat v. Syrian Arab

Republic, 167 F. Supp. 3d 22, 47–48 (D.D.C. 2016) (alteration in original) (quoting Roth v.

Islamic Republic of Iran, 78 F. Supp. 3d 379, 402 (D.D.C. 2015)).  "In determining the

'reasonable estimate,' courts may look to expert testimony and prior awards for comparable

injury."  Braun v. Islamic Republic of Iran, 228 F. Supp. 3d 64, 82 (D.D.C. 2017).  Furthermore,

"[a] plaintiff may establish the necessary proof for damages through affidavits or live

testimony[,]" but the Court need not hold an evidentiary hearing.  Kim v. Democratic People's

Republic of Korea, 87 F. Supp. 3d 286, 289 n.1 (D.D.C. 2015).  And, as with determining

liability under the Act, "[u]pon evaluation, the Court may accept any uncontroverted evidence

presented by plaintiffs as true."  Fouty I, 2024 WL 3443591, at *3 (quoting Belkin, 667 F. Supp.

2d at 20).  However, "in a default case, the Court may not exceed the amount demanded by the

plaintiff."  Winternitz v. Syrian Arab Republic, No. 17-cv-2104 (TJK), 2022 WL 971328, at *9

(D.D.C. Mar. 31, 2022) (citing Fed. R. Civ. P. 54(c)).

 Here, the plaintiffs have satisfactorily demonstrated that the defendants' conduct was

reasonably certain to—and indeed intended to—cause the injuries suffered by the plaintiffs.  As

discussed at length in Fouty I, the defendants knowingly provided material support and resources

to the Zarqawi Terrorist Organization.  See Fouty I, 2024 WL 3443591, at *4–7.  Moreover, this

material support was provided for the purpose of allowing this terrorist group to commit

precisely the types of attacks and harm at issue in this case.  See id. at *19.  Thus, the

defendants' conduct in supporting the Zarqawi Terrorist Organization was "more likely than

not[,]" Thuneibat, 167 F. Supp. 3d at 48, to result in the deaths of Byron Fouty and Alex Jiménez

and to devastate the families of these victims in the manner described by the plaintiffs, see

Fouty I, 2024 WL 3443591, at *19 (finding that "the plaintiffs have demonstrated that the

material support provided to the Zarqawi Terrorist Organization by the defendants was a

'substantial factor in the sequence of events[,]' leading to the injuries and deaths of Byron Fouty and Alex Jiménez, as well as the resulting injuries experienced by the family members of both servicemen") (internal citation omitted).

Because the plaintiffs have proven that "the consequences of the foreign state's conduct were reasonably certain . . . to occur," Thuneibat, 167 F. Supp. 3d at 47–48, the Court will now determine the reasonable estimate of the plaintiffs' damages.  The plaintiffs seek (1) economic damages for the estates of Byron Fouty and Alex Jiménez, see Pls.' Mot. at 35–37; (2) pain and suffering damages for the estates of Byron Fouty and Alex Jiménez, see id. at 37–41; (3) solatium damages for the twelve immediate family member plaintiffs, see id. at 41–88; (4) past and future medical care costs for plaintiff Hilary North, see id. at 88–89; (5) prejudgment interest, see id. at 89–92; and (6) punitive damages, see id. at 92–93.  The Court will address each of the plaintiffs' requests in turn.  In determining the appropriate damages award, the Court recognizes that assessing damages "is an imperfect science[,]" Goldstein v. Islamic Republic of Iran, 383 F. Supp. 3d 15, 19 (D.D.C. 2019), and that "[n]o amount of money can [adequately] compensate [the] victim[s] and [their] famil[ies] for suffering after a terrorist attack[,]" Mark v. Islamic Republic of Iran, 626 F. Supp. 3d 16, 35 (D.D.C. 2022).

1. **Economic Damages Awarded to the Estates of Byron W. Fouty and Alex R. Jiménez**

First, the plaintiffs seek economic damages "to compensate the estate[s] of the decedent[s] for the [decedents'] lost earning capacity."  Pls.' Mot. at 35.  "Section 1605A explicitly provides that foreign state-sponsors of terrorism are liable to victims for economic losses stemming from injuries or death sustained as a result of the foreign state's conduct."  Thuneibat, 167 F. Supp. 3d at 48 (citing 28 U.S.C. § 1605A(c)).  Although "economic loss can never be predicted with exact certainty, such damages may be proven by the submission of a forensic economist's expert report."  Fuld v. Islamic Republic of Iran, Nos. 20-cv-2444

(RCL), 20-cv-3492 (RCL), 2024 WL 1328790, at *17 (D.D.C. Mar. 28, 2024).  "In considering

an award for lost future earnings, the Court shall take account of the reasonableness and

foundation of the assumptions relied upon by the expert."  Roth, 78 F. Supp. 3d at 402.

Here, the plaintiffs have submitted economic loss reports for Byron Fouty and Alex

Jiménez, both of which were prepared by Chad L. Staller and Stephen M. Dripps—the President

and Senior Economist/Manager, respectively, at the Center for Forensic Economic Studies

("CFES").[7]  See Pls.' 2d Additional Exs., Ex. 25 (Fouty CFES Report) at 1, ECF No. 27-8; id.,

Ex. 26 (Jiménez CFES Report) at 1, ECF No. 27-9.  "The CFES is an organization whose

forensic economics expertise has been acknowledged by courts in this jurisdiction on several

occasions[,]" Fuld, 2024 WL 1328790, at *17, and whose reports have been "previously

accepted . . . to establish damages in cases under the state sponsor[ of] terrorism exception to the

. . . Act[,]" Fritz v. Islamic Republic of Iran, No. 15-cv-456 (RDM), 2018 WL 5046229, at *16

(D.D.C. Aug. 13, 2018), adopted as modified by Fritz v. Islamic Republic of Iran, 324 F. Supp.

3d 54 (D.D.C. 2018); see also Neiberger v. Islamic Republic of Iran, No. 16-cv-2193-EGS-ZMF,

2022 WL 17370239, at *14 (D.D.C. Sept. 8, 2022), adopted by Neiberger v. Islamic Republic of

Iran, No. 16-cv-2193 (EGS), 2022 WL 17370160 (D.D.C. Sept. 30, 2022) ("This Court has

---

[7] Both Mr. Staller and Mr. Dripps are "Certified Valuation Analyst[s]."  See Pls.' 2d Additional Exs., Ex. 25 (Fouty CFES Report) at 13, 18, ECF No. 27-8.  Mr. Staller has a master's degree in Business Administration and a Juris Doctor from Temple University.  See id., Ex. 25 (Fouty CFES Report) at 13.  He also "serves on the faculty of Temple University's Beasley School of Law . . . Trial Advocacy program and lectures regularly at Villanova University School of Law and Drexel University's Thomas R. Kline School of Law."  Id., Ex. 25 (Fouty CFES Report) at 13.  Additionally, "Mr. Staller is a certified instructor through the National Institute of Trial Advocacy where he lectures to practicing lawyers in the area of forensic economics."  Id., Ex. 25 (Fouty CFES Report) at 13. Mr. Dripps has a bachelor's degree in Statistics and a master's degree in Finance from Pennsylvania State University.  See id., Ex. 25 (Fouty CFES Report) at 18.  As a senior economist at the CFES, Mr. Dripps "concentrat[es] on the analysis of personal injury wrongful death, employment discrimination, commercial damages, and business valuation[.]"  Id., Ex 25 (Fouty CFES Report) at 18.  Mr. Staller and Mr. Dripps have both performed valuation analyses and calculated economic loss in multiple commercial disputes and personal injury and wrongful death matters.  See id., Ex. 25 (Fouty CFES Report) at 14–15, 19.  Based on their credentials and experience, see id., Ex. 25 (Fouty CFES Report) at 13–28, the Court concludes that both Mr. Staller and Mr. Dripps are qualified as experts in the area of economic loss computations.

previously found similar [economic loss] calculations prepared by CFES in FSIA cases to be 'reasonable,' 'consistent with generally accepted practices,' and calculated using 'appropriate assumptions based on reasonable and well-documented sources.'" (quoting Fritz, 324 F. Supp. 3d at 59–60)); Roth, 78 F. Supp. 3d at 404–05 (relying on a CFES report in awarding economic damages).

 In calculating economic loss resulting from the deaths of Byron Fouty and Alex Jiménez, the CFES used reasonable assumptions and reliable calculations based on economic models, government data, and affidavits from their surviving family members.  For example, the lost earning capacity computations are based on the military pay status of both victims as of the date of their deaths and application of the reasonable assumption that each would have continued in the military until their military pensions vested, see Pls.' 2d Additional Exs., Ex. 25 (Fouty CFES Report) at 2; id., Ex. 26 (Jiménez CFES Report) at 2, followed then by both obtaining civilian employment, see id., Ex. 25 (Fouty CFES Report) at 4; id., Ex. 26 (Jiménez CFES Report) at 4–5.  "This assumption is generally consistent with economic loss analysis involving members of the military and with the experience of members of the military in general."  Fritz, 2018 WL 5046229, at *17 (approving of CFES calculations doing the same).  Additionally, because "[Byron Fouty] completed the General Educational Development ('GED') tests prior to enlisting in the United States Army[,]" Pls.' 2d Additional Exs., Ex. 25 (Fouty CFES Report) at 2, the CFES projected his civilian earnings based on United States Census Bureau "earnings data for high school and GED holders and assume[d] [he] would secure earning consistent with his statistical age and educational cohorts[,]" id., Ex. 25 (Fouty CFES Report) at 4.  Similarly, the CFES projected Alex Jiménez's civilian earnings based on the career plan he expressed to his brother, Andy Domingo Jiménez, which was "to join the Federal Bureau of Investigation ('FBI')

after leaving the Army, and to work specifically in its anti-terrorism operations." Id., Ex. 26

(Jiménez CFES Report) at 4; see Gates, 580 F. Supp. 2d at 70–71 (awarding economic damages

based in part on the testimony of family members regarding the decedents' personal and

professional intentions); Thuneibat, 167 F. Supp. 3d at 49 (concluding that it was reasonable to

assume a nine-year old decedent would have achieved a master's degree due to her background

and her family members' indications that she had ambitions to do so).  The CFES then added

reasonable earnings growth and fringe benefits to the lost earning capacity for both Byron Fouty

and Alex Jiménez, see id., Ex. 25 (Fouty CFES Report) at 5–6; id., Ex. 26 (Jiménez CFES

Report) at 5–8, and applied appropriate deductions to account for personal maintenance and

taxes, see id., Ex. 25 (Fouty CFES Report) at 5–6; id., Ex. 8 (Jiménez CFES Report) at 6.

Moreover, the CFES discounted the future values to their present value.  See id., Ex. 25 (Fouty

CFES Report) at 7; id., Ex. 8 (Jiménez CFES Report) at 9–10; see also Fritz, 2018 WL 5046229,

at *17 (adopting the economic loss calculations provided by CFES, which discounted the future

values to present value).

The CFES calculated two alternate values for Byron Fouty's economic loss: one based on

his age at the end of his statistical worklife expectancy of 58.6 years ($1,555,875), see id., Ex. 25

(Fouty CFES Report) at 9, and one based on his Social Security retirement age of 67 years

($1,686,788), see id., Ex. 25 (Fouty CFES Report) at 10.  Likewise, for Alex Jiménez, the CFES

calculated his economic loss based on his age at the end of his statistical worklife expectancy

of 58.9 years ($2,275,588), see id., Ex. 26 (Jiménez CFES Report) at 11, as well as one based on

the mandatory federal retirement age of 65 for FBI agents ($2,498,869), see id., Ex. 26 (Jiménez

CFES Report) at 12.  Because "[c]urrent trends indicate that individuals are more likely to work

beyond the average [statistical] work life[,]"  Fritz, 2018 WL 5046229, at *16, "courts in this

District have previously opted for the social security retirement age because it yields a later retirement age," Neiberger, 2022 WL 17370239, at *14.  Therefore, the Court will award economic damages to Byron Fouty and Alex Jiménez's estates in accordance with the CFES's retirement age calculations, i.e., $1,686,788 to the Estate of Byron Fouty and $2,498,869 to the Estate of Alex Jiménez.  See Gates, 580 F. Supp. 2d at 70 (concluding that it is "reasonable to forecast that [the decedent] would work until he was 65, as Americans are increasingly working past that age").

Additionally, the CFES estimates the value of the lost household services Alex Jiménez—whose wife, Yaderlin Jiménez, became a widow as a result of his death—would have provided.  See Pls.' 2d Additional Exs., Ex. 34 (Yaderlin Jiménez Tr.) at 10:6–8 (stating that Jiménez "left [for deployment] three days after [he and Yaderlin] got married").  The CFES calculates the value of Alex Jiménez's household services using data from the United States Department of Labor's 2017 American Time Use Survey.  See id., Ex. 26 (Jiménez CFES Report) at 9.  The calculations yield two alternate values: one value which assumes Alex Jiménez would have worked until the age of 58.9, see id., Ex. 26 (Jiménez CFES Report) at 13 ($481,261), and one value which assumes he would have worked until the age of 65, see id., Ex. 26 (Jiménez CFES Report) at 14 ($451,144).  The plaintiffs "propose that the Court use an average of these two alternate household value awards[.]"  Pls.' Mot. at 37.  However, because the Court—as with other courts in the District—assumes that Alex Jiménez would have worked at least until the age of 65 given the "[c]urrent trends indicate that individuals are more likely to work beyond the average [statistical] work life[,]" Fritz, 2018 WL 5046229, at *16, the Court will award household services to the Estate of Alex Jiménez consistent with this assumption, i.e.,

household services in the amount of $451,144.[8]  See Gates, 580 F. Supp. 2d at 70 (accepting a

calculation of lifetime lost earnings based on a worklife to age 65 over a separate calculation

assuming a worklife to age 62.7 because it was "reasonable to forecast that [the decedent] would

work until he was 65, as Americans are increasingly working past that age").

Having reviewed the reports prepared by the CFES, the Court concludes that the

calculations are "reasonable," "consistent with generally accepted practices," and calculated

using "appropriate assumptions based on reasonable and well-documented sources."  Fritz, 324

F. Supp. 3d at 59–60.  Therefore, the Court will award economic damages to the Estate of Byron

Fouty in the amount of $1,686,788 and to the Estate of Alex Jiménez in the amount of

$2,950,013.

### 2.  Pain and Suffering Damages Awarded to the Estates of Byron Fouty and Alex Jiménez

The plaintiffs also seek an award of "conscious pain and suffering damages" pursuant to

28 U.S.C. § 1605A(c) to the estates of Byron Fouty and Alex Jiménez.  Pls.' Mot. at 37.  "In

suits involving acts of terrorism, the federal courts have routinely awarded survival damages to

the deceased's estate for the physical and emotional pain and suffering endured by the victim in

the moments before death."  Stern v. Islamic Republic of Iran, 271 F. Supp. 2d 286, 300 (D.D.C.

2003); see also Haim v. Islamic Republic of Iran, 425 F. Supp. 2d 56, 71 (D.D.C. 2006) (stating

that courts "have awarded damages for the victim's pain and suffering that occurred between the

attack and the victim's death").  In determining the amount of pain and suffering damages to

award, courts "ha[ve] broad discretion[,]" Gates, 580 F. Supp. 2d at 72 (citing Taylor v. Wash.

---

[8] The CFES did not include loss of household services in its loss analysis for the Estate of Byron Fouty, presumably because Byron Fouty was not married at the time of his death and there is no evidence in the record that he was helping to provide for his parents' needs.  See Fritz, 2018 WL 5046229, at *17 (adopting CFES's analysis of loss of household services "[b]ecause the victim was helping with his parents' needs").  Therefore, the Court will not consider any loss of household services in its damages award to the Estate of Byron Fouty.

Terminal Co., 409 F.2d 145, 149 (D.C. Cir. 1969)), and are guided by "damage awards for pain and suffering in other cases brought under the [Act,]" Weinstein v. Islamic Republic of Iran, 184 F. Supp. 2d 13, 23 (D.D.C. 2002).

In essentially similar cases involving the Zarqawi Terrorist Organization, courts in this District have awarded a wide range of pain and suffering damages.  See Gates, 580 F. Supp. 2d at 74 (awarding "damages for pain and suffering in the amount of $50,000,000.00 to the estate[s] of" two United States civilian contractors where video evidence "graphically portray[ed]" their decapitation "after days of captivity in unknown circumstances" and showed the men "alive throughout a significant portion of the beheading . . . , with pain and blood and indescribable suffering"); Foley v. Syrian Arab Republic, 281 F. Supp. 3d 153, 157 (D.D.C. 2017) (declining to match the precise award in Gates, but instead awarding $30,000,000 for pain and suffering to the estate of a Staff Sergeant who endured "various blunt force injuries, strangulation, and the removal of his eyes and tongue before his death"); id. (awarding $10,000,000 to a Private First Class soldier where "[t]he facts surrounding [his] death [we]re less certain, but the [c]ourt ha[d] determined that he was subjected to mental and physical torture before being murdered by means involving the application of significant force to his jaw" (internal quotation marks omitted)).  As the plaintiffs note, in these cases, courts have looked to the period of captivity, evidence of torture, and evidence of decapitation in determining a reasonable award.  See Pls.' Mot. at 40; see also Foley, 281 F. Supp. 3d at 157–58 (distinguishing awards between the decedents based on "the particular facts of [the] case[,]" including evidence of torture and beheading); Gates, 580 F. Supp. 2d at 73–74 (detailing evidence of prolonged captivity, torture, and decapitation in granting the award of $50,000,000).

Here, as discussed in depth in the Court's Findings of Fact in <u>Fouty I</u>, the plaintiffs have presented compelling expert reports and documentary evidence that Byron Fouty and Alex Jiménez were detained while still alive and conscious for a substantial time, that they were brutally tortured, and that they were beheaded by the Zarqawi Terrorist Organization.  <u>See</u> <u>Fouty I</u>, 2024 WL 3443591, at *9–11.  Because the plaintiffs have established that Byron Fouty and Alex Jiménez were held captive for a long period of time, brutally tortured, and ultimately beheaded, and because the plaintiffs' requested award is well within the range of awards in relatively similar cases, the Court will award compensatory damages in the requested amount of $20,000,000 to each of their estates for pain and suffering.

### 3.  Solatium Damages Awarded to the Immediate Family Member Plaintiffs

The plaintiffs also seek to recover solatium damages for "the immediate family members of Byron [ ] Fouty and Alex [ ] Jiménez [who] have suffered severe emotional distress[.]"  Pls.' Mot. at 41 (capitalization omitted).  "Solatium [damages] [are] awarded to compensate 'the mental anguish, bereavement[,] and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent['s] society and comfort.'"  <u>Valore v. Islamic Republic of Iran</u>, 700 F. Supp. 2d 52, 85 (D.D.C. 2010) (third and fourth alterations in original) (quoting <u>Belkin</u>, 667 F. Supp. 2d at 22).  The Act "expressly contemplates the award of solatium damages to the close relatives of terrorism victims."  <u>Fritz</u>, 324 F. Supp. 3d at 61–62 (citing 28 U.S.C. § 1605A(c)).  "The 'legal representatives' of those close relatives—[including . . . ] their estates—also may bring solatium claims on their behalf."  <u>Doe v. Democratic People's Republic of Korea Ministry of Foreign Affs. Jungsong-Dong</u>, 414 F. Supp. 3d 109, 128 (D.D.C. 2019) (quoting 28 U.S.C. § 1605A(c)(4)).  "Likewise, [District of Columbia] law allows spouses and next of kin to recover solatium damages."  <u>Mwila v. Islamic Republic of Iran</u>, 33 F. Supp. 3d 36, 41 (D.D.C. 2014)

(citing D.C. Code § 16-2701); see also Abedini v. Gov't of Islamic Republic of Iran, 422 F.

Supp. 3d 118, 139 (D.D.C. 2019) ("Non-U.S. family members of [Foreign Sovereign Immunities

Act] terrorism victims may recover [solatium] damages.").

"In determining the appropriate award of damages for solatium, the Court may look to

prior decisions awarding damages for pain and suffering, and to those awarding damages for

solatium." Acosta v. Islamic Republic of Iran, 574 F. Supp. 2d 15, 29 (D.D.C. 2008).  Because

solatium damages "are by their very nature unquantifiable[,]" Moradi v. Islamic Republic of

Iran, 77 F. Supp. 3d 57, 72 (D.D.C. 2015), courts in this District have developed a framework,

known as the Heiser framework, for assessing these damages under the Act.  See Roth, 78 F.

Supp. 3d at 403 (noting that the Heiser "framework has been adopted by other courts as an

appropriate measure of solatium damages for the family members of victims of state-sponsored

terror" (citing Valore, 700 F. Supp. 2d at 85)).  Although this framework is not binding, see

Fraenkel v. Islamic Republic of Iran, 892 F.3d 348, 361 (D.C. Cir. 2018) (declining to "impose

Heiser's framework as a mandatory scheme under the [Act]" and stating that "[d]istrict [c]ourt

judges invariably must exercise discretion in determining damages awards"), it "provides

baseline figures and a basic methodology by which to ascertain the 'appropriate measure of

damages' . . . for 'the family members of victims who died' . . . in a terrorist attack[,]" Taitt v.

Islamic Republic of Iran, 664 F. Supp. 3d 63, 91 (D.D.C. 2023) (quoting Lelchook v. Syrian

Arab Republic, No. 16-cv-1550 (RC), 2019 WL 4673849, at *4 (D.D.C. Sept. 25, 2019)).

Under the Heiser framework, "[s]pouses typically receive greater damage awards than

parents, who, in turn, typically receive greater awards than siblings."  Estate of Heiser, 466 F.

Supp. 2d at 269.  More specifically, "courts typically award between $8 million and $12 million

for pain and suffering resulting from the death of a spouse[,] approximately $5 million to a

parent whose child was killed[,] and approximately $2.5 million to a plaintiff whose sibling was killed." Id.  However, upward departures from this framework may be appropriate when, for example, "evidence establish[es] an especially close relationship between the plaintiff and [the] decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief[,] or suffering on behalf of the claimant [is presented]; [or] circumstances surrounding the terrorist attack [that rendered] the suffering particularly more acute or agonizing." Oveissi v. Islamic Republic of Iran, 768 F. Supp. 2d 16, 26–27 (D.D.C. 2011).  Moreover, in cases involving torture or kidnapping, "greater awards are justified because the afflicted party not only had to cope with the grief that follows the loss of a loved one, but—at the time of the event—was also forced to endure unending anxiety and an extended period of extreme distress over the health and safety of their captive family member." Id. at 27; see also Greenbaum v. Islamic Republic of Iran, 451 F. Supp. 2d 90, 108 (D.D.C. 2006) (noting that "larger awards are typically reserved for cases with aggravating circumstances that appreciably worsen the [claimant's] pain and suffering, such as cases involving torture or kidnapping of a [relative]").  "Decisions to deviate from the starting points provided by the Heiser framework are committed to the discretion of the particular court in each case[.]" Oveissi, 768 F. Supp. 2d at 26.

With this framework as its guide, the Court will assess the appropriate amounts of solatium damages each member of the Fouty and Jiménez families are entitled to be awarded, beginning with Alex Jiménez's spouse, Yaderlin Jiménez, and then the parents of the decedents, and finally their siblings.  Nonetheless, the Court appreciates that the amounts awarded below cannot "perfectly reflect the measure of individual suffering" endured by these family members. Barry v. Islamic Republic of Iran, 410 F. Supp. 3d 161, 180 (D.D.C. 2019).

### a.  Solatium Damages for Alex R. Jiménez's Spouse

The Court begins with Yaderlin Jiménez, the widow of Alex Jiménez, for whom the plaintiffs "propose a solatium award of $14,000,000[.]"  Pls.' Mot. at 87.  As noted above, the Heiser framework provides a baseline of $8 million to $12 million for a plaintiff whose spouse was killed in a terrorist attack.  See Estate of Heiser, 466 F. Supp. 2d at 269.  However, in this case, there are several "aggravating circumstances that appreciably worsen the surviving spouse's pain and suffering," Greenbaum, 451 F. Supp. 2d at 108, and, thus, weigh in favor of an upward departure from the Heiser baseline.  First, despite their relatively short marriage, the evidence suggests that Alex Jiménez and Yaderlin Jiménez enjoyed "an especially close relationship[.]"  Oveissi, 768 F. Supp. 2d at 26; see supra Section III.B.3 (detailing their relationship history from their beginning as "teenage sweethearts").  Furthermore, the aggravated "circumstances surrounding the terrorist attack [rendered Yaderlin Jiménez's] suffering particularly more acute or agonizing[,]" Oveissi, 768 F. Supp. 2d at 27, given the abrupt extinguishing of her marriage shortly after the marriage, the inhumane manner in which her husband was murdered by the Zarqawi Terrorist Organization, see Fouty I, 2024 WL 3443591, at *9–11, and the "extended period of extreme distress over [his] health and safety[,]" Oveissi, 768 F. Supp. 2d at 27, that Yaderlin Jiménez was forced to endure, see Pls.' 2d Additional Exs., Ex. 34 (Yaderlin Jiménez Tr.) at 20:17–20 ("It was very hard for the family not knowing what had happened, what[ was] being done to him.  It was [fourteen] months.  It was a very desperate [fourteen] months for everybody.").  At least one court has awarded damages almost equivalent to the amount awarded under similar circumstances.  See Report of Special Master Re: Private First Class Kristian Menchaca at 30, 45, Foley v. Syrian Arab Republic, Civil Action No. 11-699 (CKK), ECF No. 83 (awarding $17,000,000 to the widow of a Private First Class Army solider

where, "notwithstanding their brief marriage, [the couple] enjoyed an especially close relationship; . . . the [widow] was diagnosed with permanent post-traumatic stress disorder as a result of her husband's torture and murder [by the Zarqawi Terrorist Organization]; . . . [and the widow's] suffering was particularly acute and agonizing given [a] propaganda video depicting her husband's mutilated body and the severed head of a fellow soldier" (internal quotation marks omitted)), adopted in relevant part by Foley, 281 F. Supp. 3d at 159. Therefore, the Court will accept the plaintiffs' requested amount of damages and award Yaderlin Jiménez $14,000,000 in solatium damages.

### b. Solatium Damages Awarded to the Parents of Byron Fouty and Alex Jiménez

The Court next turns to the determination of the solatium awards the parents of Byron Fouty and Alex Jiménez are entitled to receive. The plaintiffs have proposed "an adjusted solatium award of [ ] $6,500,000 to three of the five parents in this case, [i.e.,] Ramon [ ] Jiménez, Maria Duran, and Gordon Dibler," Pls.' Mot. at 86, as well as adjusted solatium awards of $9,000,000 to the remaining two parents, i.e., Hilary North and the Estate of Mickey W. Fouty, see id. at 86–87. The plaintiffs argue that these proposed awards "take into account the core aggravating factors triggered by the circumstances in their cases." Id. at 86.

The Court agrees for several reasons that the proposed upward adjustments from the Heiser baseline of $5,000,000 are warranted for each of the parents in this case. First, the plaintiffs presented highly credible testimony that demonstrates the "especially close relationship[s,]" Oveissi, 768 F. Supp. 2d at 26, that Byron Fouty and Alex Jiménez enjoyed with each of their parents. See Section III.A.3 (finding that Byron "was the most important person in [his mother, Hilary North's] whole world[,]" (quoting Pls.' 2d Additional Exs., Ex. 27 (Sarah Haverlock Tr.) at 43:8–9); Section III.A.1 (describing Mr. Dibler as the "functional equivalent"

of a father to Byron Fouty and noting their "very close" relationship); Pls.' 2d Additional Exs.,

Ex. 30 (Ronald Fouty Tr.) at 11:1–4 (describing Mickey Fouty's love for Byron Fouty as a "ten"

on a scale of one to ten); Sections III.B.1, III.B.2 (detailing the "really close" relationships

between Alex and his parents).  Additionally, as indicated above with respect to Yaderlin

Jiménez, the "circumstances surrounding the terrorist attack [rendered] the suffering particularly

more acute or agonizing[,]" Oveissi, 768 F. Supp. 2d at 27, for Byron Fouty and Alex Jiménez's

parents, given the inhumane manner in which these servicemen were murdered by the Zarqawi

Terrorist Organization, see Fouty I, 2024 WL 3443591, at *9–11; see supra Sections III.A.1, A.3,

A.4, B.1, B.2 (finding that the abduction and subsequent execution of their children has caused

them profound suffering, including serious medical and health issues).  Moreover, like Yaderlin

Jiménez, all five parents "not only had to cope with the grief that follows the loss of a loved one,

but—at the time of the event—[were] also forced to endure unending anxiety and an extended

period of extreme distress over the health and safety of their captive family member[,]" Oveissi,

768 F. Supp. 2d at 27, as they endured this suffering for fourteen months with knowledge that

their sons had been captured by terrorists before learning their ultimate fate, see supra Sections

III.A.1, A.3, A.4, B.1, B.2 (detailing the parents' experiences attempting to cope with their sons'

abduction).  Based on the circumstances surrounding the terrorist attack in this case, the Court

concludes that an upward enhancement of $1,500,000 from the Heiser baseline award of

$5,000,000 is warranted for plaintiffs Ramon Jiménez, Maria Duran, and Gordon Dibler.

Therefore, the Court awards the requested amount of $6,500,000 in solatium damages to each of

these plaintiffs.  See Greenbaum, 451 F. Supp. 2d at 108 (noting that "larger awards are typically

reserved for cases with aggravating circumstances that appreciably worsen the [claimant's] pain

and suffering, such as cases involving torture or kidnapping of a [relative]").

For plaintiffs Hilary North and the Estate of Mickey W. Fouty, the Court concludes that further aggravating circumstances warrant a greater upward enhancement from the Heiser baseline award of $5,000,000.  In addition to the aggravating circumstances applicable to Ramon Jiménez, Maria Duran, and Gordon Dibler, these plaintiffs presented evidence of "medical proof of severe pain, grief[,] or suffering[,]" Oveissi, 768 F. Supp. 2d at 27, experienced by Hilary North, see supra Section III.A.3.  Specifically, these plaintiffs presented proof of how Byron's death "shattered [Ms. North] emotionally and psychologically, and she has never recovered[,]" Pls.' Mot. at 52, as demonstrated by the fact that she is now her daughter Sarah Haverlock's ward, pursuant to a guardianship order issued in the State of Texas, see supra Section III.A.3. Similarly, the plaintiffs presented testimony regarding how Byron Fouty's abduction, torture, and murder caused his father Mickey Fouty to lose the will to live and "commit[] suicide slowly[,]" Pls.' 2d Additional Exs., Ex. 30 (Ronald Fouty Tr.) at 12:18, by self-destructively "doing drugs that were extremely powerful[,]" id., Ex. 30 (Ronald Fouty Tr.) at 12:16.  And, Mickey Fouty's death occurred "only two and one-half years after Byron[ Fouty]'s remains were recovered[.]" Pls.' Mot. at 58.  Therefore, based on the additional aggravating circumstances presented regarding these two parents, the Court will adopt the plaintiffs' requested award of $9,000,000 in solatium damages to both plaintiffs Hilary North and the Estate of Mickey Fouty.

### c.  Solatium Damages Awarded to the Siblings of Byron Fouty and Alex Jiménez

#### i.   Solatium Damages for Bryant Jiménez, Andy Javier Jiménez Vargas, Irving Jiménez Vargas, and Alexander Jiménez Vargas

The plaintiffs have proposed "an adjusted solatium award of $3,250,000 to four of the six siblings in this case—Bryant Jiménez, Andy Javier[ Jiménez Vargas], Irving[ Jiménez Vargas,] and Alexander[ Jiménez Vargas]."  Pls.' Mot. at 87.  The plaintiffs contend that "[t]hese

proposed awards track the reasoning, adopted by the court in full, of the special master assigned

to calculate solatium damages for Matt Maupin's siblings in Maupin v. Syrian Arab Republic,

405 F. Supp. 3d 75, 79 (D.D.C. 2019)."  Id.  In that case, the special master recommended that

the siblings of Matt Maupin receive $3,500,000 each in compensatory damages for loss of

solatium because:

> (1) the cause of Matt's death "interfer[ed] with the prospects for [the] family's anguish to diminish over time," Elahi[ v. Islamic Republic of Iran], 124 F. Supp. 2d [97,] 111 [(D.D.C. 2000)]; (2) the circumstances surrounding Matt's kidnapping murder "appreciably worsen[ed] [his siblings'] pain and suffering," Greenbaum, 451 F. Supp. 2d at 108; (3) the videos aired by the Z[arqawi ]T[errorist ]O[rganization] rendered "the[ir] suffering particularly more acute or agonizing," Oveissi, 768 F. Supp. 2d at 26–27; and (4) the years spent not knowing what befell their brother exacerbated their "mental anguish in excess of that which would have been experienced following the decedent's natural death." Dammarell[ v. Islamic Republic of Iran], 281 F. Supp. 2d [105,] 197 [(D.D.C. 2003)].

> Report of Special Master Re: Family of Staff Sergeant Keith Matthew Maupin at 16,

Maupin v. Syrian Arab Republic, Civil Action No. 17-1213 (CKK), ECF No. 32.

As previously noted, the Heiser framework provides for a baseline award of

"approximately $2.5 million to a plaintiff whose sibling was killed."  Estate of Heiser, 466 F.

Supp. 2d at 269.  However, the Court may enhance damages if it concludes there are aggravating

circumstances.  See Oveissi, 768 F. Supp. 2d at 26–27 ("Factors pertinent to the determination of

damage enhancements . . . generally fall into one of three categories: evidence establishing an

especially close relationship between the plaintiff and decedent . . . ; medical proof of severe

pain, grief or suffering on behalf of the claimant; and circumstances surrounding the terrorist

attack which made the suffering particularly more acute or agonizing."); id. at 27 (stating that, in

cases involving torture or kidnapping, "greater awards are justified because the afflicted

party . . . was [ ] forced to endure unending anxiety and an extended period of extreme distress over the health and safety of their captive family member").

Here, there are several aggravating circumstances which weigh in favor of enhancement. First, Alex Jiménez had "especially close relationship[s]" with these siblings.  Oveissi, 768 F. Supp. 2d at 26; see Section III.B.5 (noting Alex Jiménez's role as an older brother and role model for Bryant Jiménez, and Bryant Jiménez's tribute to Alex Jiménez in the naming of his daughter); Pls.' 2d Additional Exs., Ex. 37 (Andy Javier Jiménez Vargas Tr.) at 14:2–3 (testifying that he and Alex Jiménez "were just so close that [they] knew everything about each other"); id., Ex. 38 (Irving Jiménez Vargas Tr.) at 19:7–10 (testifying that on a scale of one to ten, Irving Jiménez Vargas would describe the closeness of his relationship with Alex Jiménez as a ten); Pls.' Mot. at 83 ("Alexander [Jiménez Vargas] is named after Alex [Jiménez] and looked up to and relied on him for encouragement, and as a role model.").  Second, these siblings were intimately aware of the inhumane manner in which Alex Jiménez was murdered, which "made the[ir] suffering more acute and agonizing."  Oveissi, 768 F. Supp. 2d at 27; see Sections III.B.5, III.B.6, III.B.7, III.B.8 (describing these siblings' ordeal throughout their brother's abduction and subsequent murder).  Finally, throughout the fourteen months between Alex Jiménez's abduction by the Zawahiri Terrorist Organization and the recovery of his remains, these siblings were "forced to endure unending anxiety and an extended period of extreme distress over the health and safety of their captive family member."  Oveissi, 768 F. Supp. 2d at 27; see Sections III.B.5, III.B.6, III.B.7, III.B.8 (reviewing these siblings' testimony regarding the depths of their distress over this fourteen month period).  Based on these circumstances, the Court agrees with the plaintiffs that an upward enhancement from the baseline award of $2.5 million to a plaintiff whose sibling was killed, see Estate of Heiser, 466 F. Supp. 2d at 269, is warranted.  Therefore,

the Court will award the plaintiffs' requested amount of $3,250,000 to plaintiffs Bryant Jiménez, Andy Javier Jiménez Vargas, Irving Jiménez Vargas, and Alexander Jiménez Vargas.

### ii. Solatium Damages for Sarah Haverlock and Andy Domingo Jiménez

The plaintiffs have also proposed "solatium awards of $5,000,000 for Byron[ Fouty]'s sister Sarah Haverlock, and $5,000,000 for Alex[ Jiménez]'s brother Andy Domingo[ Jiménez]." Pls.' Mot. at 88.  The plaintiffs assert that "[t]he proposed award to Sarah [Haverlock] is intended to account for [her] especially close relationship with Byron[ Fouty], [her] loss of her relationship with her mother Hilary North who has been rendered legally incapacitated by Byron[ Fouty]'s murder, and [her] permanent post-traumatic stress." Id.  Furthermore, the plaintiffs assert that "[t]he proposed award to Andy [Domingo Jiménez] is intended to account for his especially close relationship with his older brother Alex[ Jiménez], who was also a father figure to [him], and his protracted self-destructive behavior over a period of [seven] years evincing the depth of his suffering." Id.

As with the other siblings, the Court agrees that Sarah Haverlock and Andy Domingo Jiménez had "especially close relationship[s]" with their deceased siblings, Oveissi, 768 F. Supp. 2d at 26; see Pls.' 2d Additional Exs., Ex. 28 (Gordon Dibler Tr.) at 55:8–13 ("They were very close. That was her big brother, her protector I guess you could say. . . . They loved each other very much."); id., Ex. 35 (Andy Domingo Jiménez Tr.) at 13:1–3 (testifying that he had a "[v]ery close" relationship with Alex Jiménez, who "was [his] closest brother out of all of [his] brothers]").  The Court further agrees that Sarah Haverlock and Andy Domingo Jiménez were intimately aware of the inhumane manner in which their servicemen brothers were murdered, which "made the[ir] suffering more acute and agonizing[,]" Oveissi, 768 F. Supp. 2d at 27; see Sections III.A.2, III.B.4 (describing Sarah Haverlock and Andy Domingo Jiménez's awareness

of the Zawahiri Terrorist Organization's involvement in and conduct relating to their brothers' abduction and execution).  And finally, as with the other siblings, the Court agrees that throughout the fourteen months between Byron Fouty and Alex Jiménez's abduction by the Zawahiri Terrorist Organization and the recovery of their remains, Sarah Haverlock and Andy Domingo Jiménez were "forced to endure unending anxiety and an extended period of extreme distress over the health and safety of their captive family member[,]" Oveissi, 768 F. Supp. 2d at 27; see Sections III.A.2, III.B.4 (collecting testimony relating to Sarah Haverlock and Andy Domingo Jiménez's prolonged anguish and severe mental health issues arising out of their brothers' abduction).

Also in regards to plaintiffs Sarah Haverlock and Andy Domingo Jiménez, the Court also agrees that a more significant departure from the Heiser baseline award is warranted.  As detailed in the Court's Findings of Fact, Byron Fouty and Alex Jiménez were very close with all of their siblings.  See supra Section III.  However, Sarah Haverlock and Andy Domingo Jiménez shared a particularly strong bond with their deceased siblings.  See Pls.' 2d Additional Exs., Ex. 27 (Sarah Haverlock Tr.) at 21:11–14, (testimony of Ms. Haverlock describing Byron Fouty as "[her] brother and [her] best friend" and stating that "[she] trusted him more than [she] trusted anybody"); id., Ex. 35 (Andy Domingo Jiménez Tr.) at 12:8, 13:13 (testimony of Andy Domingo Jiménez describing Alex Jiménez as "[a] mentor[ and] a father figure" and stating that he "was [his] closest brother out of all of [his brothers]").  Moreover, as Ms. Haverlock's therapist Lisa Lewis Page confirms, "[she] suffered and continues to suffer from [d]epression and [p]ost-[t]raumatic [s]tress [d]isorder as a result of [Byron Fouty's] murder."  Pls.' 5th Additional Exs., Ex. 120 (Page Decl.) ¶ 6.  Likewise, Andy Domingo Jiménez's testimony demonstrates the self-destructive behavior he engaged in following Alex Jiménez's murder, including dropping

out of high school, abusing drugs, and even contemplating suicide.  See supra Section B.4.

Based on the combination of aggravating circumstances applicable to both Sarah Haverlock and

Andy Domingo Jiménez, the Court concludes that a significant upward departure from the

baseline $2.5 million is warranted for these two siblings.  Accordingly, the Court will award

plaintiffs Sarah Haverlock and Andy Domingo Jiménez the requested amount of $5,000,000 each

in solatium damages.  Cf. Baker v. Socialist People's Libyan Arab Jamahirya, 775 F. Supp. 2d

48, 83 (D.D.C. 2011) (departing upward from the Heiser baseline by 25% where sibling's death

caused her brother to exhibit "self-destructive behavior" and her sister to "battle[] depression

ever since").

### 4.  Past and Future Recovery of Medical Care Costs for Hilary North

The plaintiffs next seek past and future recovery of medical care costs for Hilary North.

See Pls.' Mot. at 88.  In support of their requests, the plaintiffs argue that, "[a]s a direct result of

her son's abduction, torture and killing, [Ms.] North has incurred, and will continue to incur, for

the rest of her life, certain medical expenses."  Id.[9]

"Pursuant to the [Act], economic expenses of terrorist-caused personal injury are

compensable."  Campuzano v. Islamic Republic of Iran, 281 F. Supp. 2d 258, 273 (D.D.C. 2003)

(citing 28 U.S.C. § 1605 note).  Such economic expenses include medical expenses.  See id.

("[M]edical expenses are compensable under the [Act's] 'economic damages' provision.")

---

[9] As support for an award of the requested past and future medical care costs for Ms. North, the plaintiffs have
submitted an expert report prepared by the CFES.  See Pls.' 5th Additional Exs., Ex. 119 (Hilary North CFES
Report ("North CFES Report")) at 1, ECF No. 30-6.  The CFES has identified $104,433 in past medical costs paid
by Medicare as of May 26, 2020.  See id., Ex. 119 (North CFES Report) at 2–3, which the plaintiffs claim "are the
basis of a future subrogation claim," and thus included in Ms. North's request for compensatory damages.  Pls.'
Mot. at 89 n.36.  However, because the plaintiffs offer no evidence that Ms. North has herself incurred past medical
care costs, the Court concludes that she is not entitled to payment for the expenses paid by Medicare.  See, e.g.,
Owens v. Republic of Sudan, 01-cv-2244 (JDB), 2014 U.S. Dist. LEXIS 108354, at *14–15 (D.D.C. Mar. 28, 2014)
(adopting a special master's recommendation regarding out-of-pocket medical expenses already incurred) (emphasis
added).

(citing Mousa v. Islamic Republic of Iran, 238 F. Supp. 2d 1, 11 (D.D.C. 2001)); cf. Price v. Socialist People's Libyan Arab Jamahiriya, 384 F. Supp. 2d 120, 136 (D.D.C. 2005) (awarding past medical expenses under the Act for treatment received by an American citizen following his torture in Libya).  As noted previously, see supra Section IV.1, although "economic loss can never be predicted with exact certainty, such damages may be proven by the submission of a forensic economist's expert report[,]" Fuld, 2024 WL 1328790, at *17.  "In considering an award for lost future earnings, the Court shall take account of the reasonableness and foundation of the assumptions relied upon by the expert."  Roth, 78 F. Supp. 3d at 402.  Moreover, in awarding medical expenses, courts in this District have relied on reports prepared by a life care planner who has evaluated a plaintiff's need for constant medical care and treatment because of injuries sustained as a result of a terrorist attack.  See, e.g., Owens v. Republic of Sudan, 01-cv-2244 (JDB), 2014 U.S. Dist. LEXIS 108354, at *14–15 (D.D.C. Mar. 28, 2014) (adopting a special master's recommendation regarding out-of-pocket medical expenses already incurred and as to future medical costs based on reports prepared by "a life care planner[] who determined that several plaintiffs will require constant medical care and treatment for the rest of their lives because of the injuries they sustained in the bombing").

As support for an award of the requested future medical care costs for Ms. North, the plaintiffs have submitted an expert report prepared by the CFES.  See Pls.' 5th Additional Exs., Ex. 119 (Hilary North CFES Report ("North CFES Report")) at 1, ECF No. 30-6.  In order to value Ms. North's future medical expenses, the CFES "utilize[d] the information contained in [a] June 30, 2020 report" submitted by BalaCare Solutions, the plaintiffs' expert life care planner.  See id., Ex. 119 (North CFES Report) at 3.  BalaCare Solutions, has determined the type, quantity, and duration of psychiatric care and supported living services that Ms. North will

require for the rest of her anticipated lifespan.  See id., Ex. 118 (Life Care Plan Hilary North) at

5–8, ECF No. 30-5.  Using the report prepared by BalaCare, the CFES calculated the present

value of Ms. North's required future medical care.  See id., Ex. 119 (North CFES Report) at 4.

The costs calculated by the CFES "have been valued from August 1, 2020 through [Ms. North's]

statistical life expectancy, age 84.2."  Id., Ex. 119 (North CFES Report) at 3.  Furthermore,

"[a]fter 2020, the costs of future physician services, other medical professional services, facility

care, and prescription drugs are assumed to grow at annual rate of 2.45%, 2.07%, 3.80%, and

3.33%, respectively[,]" and "[e]ach rate is equal to the average annual change in the specific

component of the Consumer Price Index . . . between 1999 and 2019."  Id., Ex. 119 (North CFES

Report) at 3.  Finally, "[f]uture values are discounted to their present value" in the CFES report.

Id., Ex. 119 (North CFES Report) at 4.

Having reviewed the report prepared by the CFES, the Court concludes that the

calculations are "reasonable," "consistent with generally accepted practices," and calculated

using "appropriate assumptions based on reasonable and well-documented sources."  Fritz, 324

F. Supp. 3d at 59–60.  Therefore, the Court will award plaintiff Hilary North future medical

expenses in the requested amount of $5,353,106.

### 5. Prejudgment Interest

The plaintiffs also seek prejudgment interest on the economic damages and pain and

suffering damages awarded to the Estate of Byron Fouty and the Estate of Alex Jiménez, as well

as on the solatium damages awarded to the twelve family member plaintiffs.[10]  See Pls.' Mot. at

89–92.  The plaintiffs argue that an award of prejudgment interest "is necessary in order to

---

[10] The plaintiffs do not seek prejudgment interest on the compensatory damages award of past and future medical care costs for plaintiff Hilary North.  See Pls.' Mot. at 91 n.38 (noting that the aggregate proposed compensatory award used to calculate the proposed prejudgment interest award for Hilary North "excludes past and future medical expenses").

compensate . . . [them] for the lost time value of the compensatory damages award[s]."  Id. at 89–90.

"Whether to award prejudgment interest is a matter committed to the discretion of the court, subject to equitable considerations."  Roth, 78 F. Supp. 3d at 404 (citing Oldham v. Korean Air Lines Co., 127 F.3d 43, 54 (D.C. Cir. 1997)).  Although "[p]rejudgment interest may be awarded on compensatory damages[,] . . . prejudgment interest should not be added to economic loss damages when such awards are already discounted to present value because this would result in double counting of the interest multiplier."  Id.  Additionally, "nonpecuniary damages, such as solatium damages, do not typically require prejudgment interest because they are 'designed to be fully compensatory.'"  Thuneibat, 167 F. Supp. 3d at 54 (quoting Wyatt v. Syrian Arab Republic, 908 F. Supp. 2d 216, 232 (D.D.C. 2012)).  Indeed, "the majority of Judges on this Court [who have] consider[ed] the issue of prejudgment interest for [Foreign Sovereign Immunities Act] damages awards have held 'the values set by the Heiser framework represent the appropriate level of compensation, regardless of the timing of the attack,' and that 'pain and suffering and solatium damages are both designed to be fully compensatory,'" Blank v. Islamic Republic of Iran, No. 19-cv-3645 (BAH), 2021 WL 3021450, at *14 (D.D.C. July 17, 2021) (internal citations and internal quotation marks omitted) (quoting Barry v. Islamic Republic of Iran, 437 F. Supp. 3d 15, 60 (D.D.C. 2020)); see also Bathiard v. Islamic Republic of Iran, Nos. 16-cv-1549 (CRC), 17-cv-2006 (CRC), 2020 WL 1975672, at *23 (D.D.C. Apr. 24, 2020) (concluding that "prejudgment interest is not appropriate for nonpecuniary damages already designed to provide complete compensation"); Wyatt, 908 F. Supp. 2d at 232 (denying prejudgment interest after concluding that "pain and suffering and solatium damages are both designed to be fully compensatory"); Cohen v. Islamic Republic of Iran, No. 17-1214 (JEB),

2019 WL 3037868, at *9 (D.D.C. Jul. 11, 2019) (same). But see Fritz, 324 F. Supp. 3d at 63–64 (awarding prejudgment interest after concluding that "[a]wards for pain and suffering and solatium are calculated without reference to the time elapsed since the attacks," and are "best viewed as fixed at the time of the loss" and thus prejudgment interest is appropriate "to account for the time that they have not had access to that full amount").

Here, the total economic damages awarded to plaintiffs Estate of Byron Fouty and Estate of Alex Jiménez have already been discounted to present value, see supra Section IV.1, and, thus, "a separate award of prejudgment interest would be duplicative[,]" Thuneibat, 167 F. Supp. 3d at 54. Additionally, the "pain and suffering and solatium damages [awarded in this case] are both designed to be fully compensatory." Wyatt, 908 F. Supp. 2d at 232. Indeed, the plaintiffs "clearly account[] for the passage of time and the persistence of the plaintiffs' injuries in determining the appropriate compensatory damages." Bathiard, 2020 WL 1975672, at *8; see, e.g., Pls.' Mot. at 56 (noting that Ms. North "'continues to deteriorate'") (quoting Pls.' 4th Additional Exs., Ex. 113 (Sarah Haverlock Decl.) ¶ 21); id. at 49 ("Sarah [Haverlock] reports she still suffers severely and in many ways."); id. at 63 ("Gordon [Dibler] still suffers from insomnia because of thoughts of Byron[ Fouty]'s murder."); id. at 66 ("Maria [Duran] testified that she still suffers even now[.]"). And, the plaintiffs "have not provided any reason why [the] awards under [the Heiser] framework are insufficient to provide 'complete compensation[.]'" Akins v. Islamic Republic of Iran, 332 F. Supp. 3d 1, 46 (D.D.C. 2018) (quoting West Virginia v. United States, 479 U.S. 305, 310 (1987)). Therefore, consistent with the majority practice in this District, the Court concludes that the plaintiffs are not entitled to prejudgment interest on the compensatory damages awarded in this case.

### 6.   Punitive Damages

Finally, the plaintiffs request that they be awarded punitive damages.  See Pls.' Mot.

at 92.  In 2008, Congress amended the Act to, inter alia, "create[] an express federal cause of

action for acts of terror . . . , [which is] codified at 28 U.S.C. § 1605A(c)," Opati v. Republic of

Sudan, 590 U.S. 418, 422 (2020), and "expressly authorizes punitive damages[,]" id. at 423.

"Although the [District of Columbia] Circuit had previously concluded that plaintiffs could not

recover punitive damages before the 2008 enactment of § 1605A," Cabrera v. Islamic Republic

of Iran, Nos. 19-cv-3835 (JDB), 18-cv-2065 (JDB), 2022 WL 2817730, at *56 n.47 (D.D.C. July

19, 2022) (citing Owens v. Republic of Sudan, 864 F.3d 751, 818 (D.C. Cir. 2017)), "the

Supreme Court later concluded 'that punitive damages are permissible for federal claims' based

on past conduct under § 1605A," id. (quoting Opati, 590 U.S. at 430); see Opati, 590 U.S. at 427

(holding that "Congress was as clear as it could have been when it authorized plaintiffs to seek

and win punitive damages for past conduct using § 1605A(c)'s new federal cause of action").

Moreover, a number of courts in this District "have concluded that retroactive punitive damages

may be awarded on state-law claims."  Maxwell v. Islamic Republic of Iran, No. 22-173 (RC)

2024 WL 1342775, at *24 (D.D.C. Mar. 29, 2024).

"Punitive damages are not meant to compensate the victim, but [are] instead meant to

award the victim an amount of money that will punish outrageous behavior and deter such

outrageous conduct in the future."  Oveissi v. Islamic Republic of Iran, 879 F. Supp. 2d 44, 56

(D.D.C. 2012).  In determining whether punitive damages are warranted, courts consider four

factors: "(1) the character of the defendants' act, (2) the nature and extent of harm to the

plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the

wealth of the defendants."  Kim v. Democratic People's Republic of Korea, 87 F. Supp. 3d 286,

291 (D.D.C. 2015) (quoting Acosta, 574 F. Supp. 2d at 30).  Moreover, "[c]ourts routinely

award punitive damages in cases brought under the [state sponsor of] terrorism exception to the [Act]."  Frost v. Islamic Republic of Iran, 419 F. Supp. 3d 112, 116 (D.D.C. 2020).  And, "[w]hen assessing punitive damages, courts do not differentiate between [Foreign Sovereign Immunities Act] causes of action and foreign family members' claims brought under state law." Abedini, 422 F. Supp. 3d at 141.

Here, all four factors support an award of punitive damages.  First, Byron Fouty and Alex Jiménez's murders were horrific, egregious, and designed to have maximum public impact by instilling fear.  See Fouty I, 2024 WL 3443591, at *9–11; see also Thuneibat, 167 F. Supp. 3d at 53 ("The defendants' conduct in sheltering and sponsoring [the Zarqawi Terrorist Organization], known terrorists whose stated mission is to devastate those who support Americans, certainly justifies the imposition of punitive damages here.").  Second, both Byron Fouty and Alex Jiménez were abducted, held in captivity, tortured, and killed in a cruel manner calculated to inflict maximum, prolonged pain and suffering on the soldiers, see id., and on their family members, who indeed were devastated by the conduct, see supra Part III; see also Gates, 580 F. Supp. 2d at 74 ("The evidence shows that Syria supported, protected, harbored, and subsidized [the Zarqawi Terrorist Organization] whose modus operandi was the targeting, brutalization, and murder of American and Iraqi civilians.").  Third, "as courts of this district have repeatedly held, the need for deterrence for terrorist acts is high."  Colvin v. Syrian Arab Republic, 363 F. Supp. 3d 141, 163 (D.D.C. 2019).  And, "only a large amount of punitive damages can serve as an effective deterrent against future terrorist acts."  Bodoff v. Islamic Republic of Iran, 424 F. Supp. 2d 74, 89 (D.D.C. 2006).  Finally, "Syria is a sovereign that has substantial wealth."  Colvin, 363 F. Supp. 3d at 163.  Therefore, the Court concludes that the plaintiffs are entitled to punitive damages.

"Once punitive damages are found to be warranted, the next task is to figure out the amount to be awarded." Blank, 2021 WL 3021450, at *10. As the plaintiffs note, "[c]ourts in this [D]istrict have used different methodologies to calculate the appropriate amount of punitive damages" to be awarded in state-sponsor of terrorism cases. Pls.' Mot. at 93. The first approach, "used more commonly in mass-casualty events, involves multiplying the foreign state's 'annual expenditures on terrorism' by a factor between three and five." Ben-Yishai v. Syrian Arab Republic, 642 F. Supp. 3d 110, 134 (D.D.C. 2022) (citing Valore, 700 F. Supp. 2d at 88). "The second approach awards a fixed amount of $150 million per affected family." Id. Under the third approach, courts "multipl[y] the total compensatory damages award by a factor of between one and five." Id. Finally, some courts have adopted a fourth approach and "have awarded punitive damages equal to the amount of compensatory damages." Alinejad v. Islamic Republic of Iran, No. 19-cv-3599 (GMH), 2023 WL 4684929, at *26 (D.D.C. July 6, 2023).

"The multiplier approach is especially appropriate when the defendants 'did not directly carry out the attack, but funded [a proxy actor], [and] it is doubtful whether a large amount . . . would have the deterrent effect that it might have had in times past.'" Ben-Yishai, 642 F. Supp. 3d at 134 (second and third alterations in original) (omission in original) (quoting Cohen v. Islamic Republic of Iran, 268 F. Supp. 3d 19, 28 (D.D.C. 2017)); see Gill v. Islamic Republic of Iran, 249 F. Supp. 3d 88, 105–06 (D.D.C. 2017) (applying a multiplier of three to compensatory damages); Fritz, 324 F. Supp. 3d at 65 (concluding that "a multiplier of two [wa]s appropriate" for the punitive damages calculation in a case involving a hostage-taking and killing by a terrorist organization that the defendant provided with "significant support—in the form of training, supplies, intelligence, and funding—as part of its larger strategy to destabilize Iraq and

[to] drive the United States from the Middle East") (alteration in original) (internal quotation omitted).

Here, the "[p]laintiffs submit that in the circumstances of this case, the Court should award total punitive damages against the [d]efendants at least in the amount of twice the total aggregate compensatory damages, to be split and allocated equally among the surviving family members and estates of each family." Pls.' Mot. at 93. The Court agrees that this third approach to calculating punitive damages is the appropriate method to apply in this case because "the defendants 'did not directly carry out the attack, but funded [a proxy actor],'" Ben-Yishai, 642 F. Supp. 3d at 134 (alteration in original) (quoting Cohen, 268 F. Supp. 3d at 28), and because, given the now lengthy history of cases brought against Syria for its material support of the Zarqawi Terrorist Organization, "'it is doubtful whether a large amount . . . would have the deterrent effect that it might have had in times past[,]'" id. Although other courts in similar cases have applied the flat-award method of punitive damages, see, e.g., Gates, 580 F. Supp. 2d at 75 (awarding $150,000,000 per decedent), the Court declines to follow that approach because, as other courts in this District have concluded, it is insufficiently flexible and "trades discretion for predictability," see Christie v. Islamic Republic of Iran, No. 19-1289 (BAH), 2020 WL 3606273, at *22 (D.D.C. 2020), and because the plaintiffs have not requested that the Court adopt the flat-award method in awarding damages. Conversely, given the heinous nature of the defendants' conduct and the deaths of both decedents, the Court declines to merely match the compensatory damages in awarding punitive damages. See Alinejad, 2023 WL 4684929, at *27 (awarding punitive damages mirroring compensatory damages in a case where the victim

survived).[11]  Therefore, the Court must decide what multiplier to apply in awarding punitive

damages.

Prior courts have generally applied a multiplier of three, absent extraordinary

circumstances.  See Gunn v. Islamic Republic of Iran, No. 21-1187 (RC), 2024 WL 3566173,

at *36 (D.D.C. July 29, 2024) (noting that "a 'multiplier of three' is the 'usual practice in state

sponsored terrorism cases[]'" (quoting Roth v. Syrian Arab Republic, No. 14-cv-1946, 2018 WL

4680270, at *17 (D.D.C. Sept. 28, 2018)).  But see Cohen, 268 F. Supp. 3d at 28 (awarding a

punitive damages award that was "[d]oubl[e] the amount of compensatory damages" and

apportioning the award to the individual plaintiffs "relative to their individual compensatory

awards"); Fritz, 324 F. Supp. 3d at 65 (applying a multiplier of two in a case where the victims

were kidnapped and executed, though not beheaded).  Here, the Court sees no reason to apply a

downward departure from the usual multiplier of three given the severity of the conduct at issue.

Application of a multiplier of three also ensures that the award of punitive damages in this case

is not disproportionate to the amounts awarded pursuant to the lump sum award approach in

other cases involving the Zarqawi Terrorist Organization.  See Gates, 580 F. Supp. 2d at 75

(awarding $150,000,000 per decedent); see also Alinejad, 2023 WL 4684929, at *27 (noting "the

strong interest in promoting consistency by awarding similar awards in similar cases").

Therefore, the Court will adhere to the "usual practice in state sponsored terrorism cases," Roth,

2018 WL 4680270, at *17, and apply a multiplier of three and allocate the resulting awards to

the individual plaintiffs in proportion to their individual compensatory damages awards.

Accordingly, the family members comprising the Jiménez family member plaintiffs are awarded

punitive damages in the amount of $135,000,00 to be allocated in proportion to each family

---

[11] The Court also declines to follow the first method because the plaintiffs have provided no evidence indicating
Syria's expenditures on terrorism.  See Alinejad, 2023 WL 4684929, at *26 (concluding the same).

member plaintiff's compensatory damages award, and the three surviving family members and one estate comprising the Fouty family member plaintiffs are awarded punitive damages in the amount of $104,559,318 to be allocated in proportion to each family member plaintiff's compensatory damages award.

# V.    CONCLUSION

For the foregoing reasons, the Court grants the plaintiffs' motion for a default judgment as to damages and enters a default judgment against the defendant Syria in the total amount of $364,049,225.  The award will be distributed as follows:

| | Economic | Pain and Suffering | Solatium | Future Recovery of Medical Care | Punitive Damages | Total Damages |
|---|---|---|---|---|---|---|
| Estate of Byron Fouty | $1,686,788 | $20,000,000 | - | - | - | **$21,686,788** |
| Estate of Alex R. Jiménez | $2,950,013 | $20,000,000 | - | - | - | **$22,950,013** |
| Gordon Dibler | - | - | $6,500,000 | - | $19,500,000 | **$26,000,000** |
| Hilary North | - | - | $9,000,000 | $5,353,106 | $43,059,318 | **$57,412,424** |
| Estate of Mickey W. Fouty | - | - | $9,000,000 | - | $27,000,000 | **$36,000,000** |
| Sara Haverlock | - | - | $5,000,000 | - | $15,000,000 | **$20,000,000** |
| Maria Duran | - | - | $6,500,000 | - | $19,500,000 | **$26,000,000** |
| Ramon D. Jiménez | - | - | $6,500,000 | - | $19,500,000 | **$26,000,000** |
| Yaderlin Jiménez | - | - | $14,000,000 | - | $42,000,000 | **$56,000,000** |
| Andy Domingo Jiménez | - | - | $5,000,000 | - | $15,000,000 | **$20,000,000** |
| Bryant Jiménez | - | - | $3,250,000 | - | $9,750,000 | **$13,000,000** |
| Andy Javier Jiménez Vargas | - | - | $3,250,000 | - | $9,750,000 | **$13,000,000** |
| Irving Lazaro Jiménez Vargas | - | - | $3,250,000 | - | $9,750,000 | **$13,000,000** |
| Alexander Jiménez Vargas | - | - | $3,250,000 | - | $9,750,000 | **$13,000,000** |
| **TOTAL** | **$4,636,801** | **$40,000,000** | **$74,500,000** | **$5,353,106** | **$239,559,318** | **$364,049,225** |

**SO ORDERED** this 30th day of August, 2024.[12]

REGGIE B. WALTON
United States District Judge

---

[12] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.